IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| **BOARD OF TRUSTEES SHEET METAL WORKERS' NATIONAL PENSION FUND,** *et al.* | |
| **Plaintiffs,** | **Case No.** 1:22-cv-1294-PTG-WEF |
| **v.** | |
| **NEW YORK CHUTES, LLC,** | |
| **Defendant.** | |

## DECLARATION OF ROBERT GEISLER

1.       I am the Collections Manager for the Sheet Metal Workers' National Pension Fund ("NPF"). I make this declaration in support of Plaintiffs' request for delinquent contributions, accrued interest, liquidated damages, audit fees, and attorneys' fees and costs owed pursuant to the audit conducted by the Funds for the period of July 2016 through December 2020.

2.       As Collections Manager, I supervise a variety of tasks. Specifically, I oversee the performance of audits of payroll records of contributing employers and determine whether participating employers have satisfied their obligations to provide reports and contributions to the Sheet Metal Workers Benefit Funds, which is comprised of a number of funds, including Plaintiffs NPF, International Training Institute of the Sheet Metal and Air Conditioning Industry ("ITI"), the National Stabilization Agreement of the Sheet Metal Industry Trust Fund ("SASMI"), Sheet Metal Workers' Occupational Health Institute Trust ("SMOHIT"), and the National Energy Management Institute Committee ("NEMIC") (collectively, the "Funds"). I also determine whether participating employers cooperate with the audit process and assist in efforts to obtain reports and contributions from participating employers who have failed to meet their obligations to the Funds.

3.       The Funds are employee benefit plans/trust funds within the meaning of the

Employee Retirement Income Security Act ("ERISA"), or joint labor-management organizations, that provide benefits to certain collectively-bargained sheet metal workers. The Funds' offices are located in Fairfax, Virginia.

4.     The Sheet Metal & Air Conditioning Contractors Association of New York City, Inc. and SMACNA of Long Island, Inc. ("SMACNA") entered into a Collective Bargaining Agreement with the International Association of Sheet Metal, Air, Rail and Transportation Workers f/k/a the Sheet Metal Workers' International Association, Local Union No. 28 (the "Union" or "Local 28") effective for the period of August 1, 2014 through July 31, 2017 ("2014 CBA"). Exhibit 1 is a true and accurate copy of the 2014 CBA. On October 6, 2015, Defendant New York Chutes, LLC ("NY Chutes") executed a Memorandum of Understanding ("MOU") obligating Defendant to abide by the terms of the CBA between SMACNA and Local 28. Exhibit 2 is a true and accurate copy of the MOU.

5.     SMACNA and Local 28 then entered into a Memorandum of Agreement modifying and extending the terms of the 2014 CBA through July 31, 2020 ("2017 CBA"). Exhibit 3 attached hereto is a true and accurate copy of the 2017 MOA which incorporates the 2014 CBA. SMACNA and Local 28 then agreed to extend the 2017 CBA through October 31, 2020. Exhibit 4 is a true and accurate copy of the extension agreement.

6.     Pursuant to Article XII(B), Sections 21-23 of the 2014 and 2017 CBAs, NY Chutes is obligated to submit monthly remittance reports and fringe benefit contributions to NPF, ITI, SASMI, SMOHIT, and NEMIC (the "Funds") for all hours worked or paid on behalf of its covered employees within the jurisdiction of Local 28. Ex. 1, Art. XII(B), Secs. 21-23. Further, Article III, Section 2 of the 2014 and 2017 CBA expressly prohibits Defendant from subcontracting covered work to non-bargaining unit employees. Ex. 1, Art. III, Sec. 2.

7.     Pursuant to the CBA, and extensions, and by submitting reports and contributions, NY Chutes is obligated to abide by the terms and conditions of the Trust Agreements establishing the Funds, including any amendments thereto and policies and procedures adopted by the Boards of Trustees. Ex. 1, Art. XII(B), Secs. 21 & 24. Attached hereto as Exhibit 5 is a true and accurate copy of the Sheet Metal Workers' National Pension Fund Trust Document ("Trust Document"). The delinquency/collection rules in the Pension Fund Trust Document have been adopted by the other National Funds pursuant to internal management agreements. A true and correct copy of the Collection Policy is attached hereto as Exhibit 6.

8.     Payments due to the Funds are calculated and paid to the Funds at rates specified in the CBAs. Ex. 1, at pgs. 58-59. The calculations are recorded on monthly remittance reports. On these reports, Defendants are required to list all employees for whom contributions are due, all hours worked by these employees, all hours for which the employees were paid, and the wages and fringe benefits due to or on behalf of the covered employees. The completed remittance reports and accompanying contribution payments must be submitted to the Funds no later than the twentieth (20th) day after the end of each month during which covered work was performed and are delinquent if received thereafter. Ex. 1, Art. XII(B), Sec. 25.

9.     In the Funds' normal course of operations, participating employers' monthly contribution obligations to the Funds are entirely self-reported by the employers in their remittance reports. Employers may submit correct contributions based on the number of hours reflected in accompanying remittance reports, but the Funds have no way of verifying, absent an audit, whether the hours reported in the employer's reports and, as a result, owed contributions, accurately reflect the number of hours of covered work that was actually performed.

10.     To address this issue, Article V, Section 3 of the governing Trust Agreement and Section B of the Introduction to the Collection Policy both provide that the Funds may audit a contributing employer for the purposes of assuring the accuracy of reports and ensuring that such employer has remitted the appropriate amount of contributions to the Funds. Ex. 5, Art. V & Ex. 6, Intro. The CBA also states that the Funds have the authority to audit a participating employer. Ex. 1, Art. XII(B), Sec. 21(A) & 25.

11.     When selected for an audit, participating employers are directed to make available certain documents to the auditor, including original time cards/sheets, payroll registers, individual earnings records, 941's, state U/C's, W-2's, W-3's and 1099's, cash disbursement journals, National Benefit Funds remittance reports/records, remittance reports for any other fringe benefit fund to which the Employer contributes, personnel records, and such other records as are necessary to complete the audit. Ex. 6, Sec. 5(c).

12.     Article V, Section 2 of the Trust Document requires a delinquent employer, such as Defendant, to pay the following in addition to the delinquent contributions:

      a.     Interest on the delinquent contributions at a rate of 0.0233% per day, compounded daily;

      b.     Liquidated damages equal to the greater of: fifty dollars ($50.00) or ten percent (10%) of the contributions due for each month of contributions that the Company fails to pay within 30 days after the due date, but pays before any lawsuit is filed;

      c.     Liquidated damages equal to the greater of: interest on the delinquent contributions at the above rate or twenty percent (20%) of the delinquent contributions owed upon the commencement of litigation; and

      d.     The attorneys' fees and costs incurred by the Funds in pursuing the

delinquent amounts, including the attorneys' fees and costs in this action.

*See* Ex. 5.

## Amounts Owed Pursuant to Audit

19.     The Funds conducted an audit of NY Chutes' payroll records for the period of July 2016 through December 2020. The Funds contacted NY Chutes via mail and email informing it of the results of the audit. A true and accurate copy of the original audit is attached hereto as Exhibit 7.

20.     In response to additional information provided by NY Chutes in February 2023, the Funds revised the audit. A true and accurate copy of the revised audit is attached hereto as Exhibit 8.

21.     The revised audit determined that NY Chutes used subcontractors to perform covered work in violation of Article III, Section 2 of the CBAs. Specifically, based on invoices provided by NY Chutes in response to the audit, the Fund's auditors determined that subcontractors performed covered work. Ex. 8 at 5. These invoices were then used to determine contributions due for the subcontracting violation and interest and liquidated damages were assessed in accordance with the Funds' governing documents.

22.     The revised audit also determined that NY Chutes failed to remit reports and contributions for covered work on what was known as the Wilkinson Hi-Rise Job in 2019. Ex. 8 at 3-4.

23.     As a result of the audit for the period of July 2016 through December 2020, NY Chutes owes $12,577.76 in contributions, $4,628.87 in interest (calculated through March 6, 2023), and $4,628.87 in liquidated damages. Ex. 8. Because amounts were found due and owing, Defendant is also responsible for the payment of $2,955.50 in audit testing fees pursuant to Section

1 of the Collections Policy. Ex. 7; Ex. 6, Sec. 1(c). In total, Defendant owes $24,791.00 to the Funds pursuant to the audit.

I have read this declaration in its entirety.  Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on __March 30, 2023__ .

Robert Geisler

# EXHIBIT 1

# AGREEMENT
# SHEET METAL CONTRACTING DIVISION
# OF THE
# CONSTRUCTION INDUSTRY
# BETWEEN INTERNATIONAL ASSOCIATION
# SHEET METAL, AIR, RAIL AND
# TRANSPORTATION WORKERS
# LOCAL UNION NO. 28







# AND
# SHEET METAL & AIR CONDITIONING
# CONTRACTORS ASSOCIATION
# OF NEW YORK CITY, INC.
# AND
# SMACNA OF LONG ISLAND, INC.
# AND THOSE EMPLOYERS
# WHO SUBSCRIBE THERETO

### EFFECTIVE AUGUST 1, 2014
### TERMINATES JULY 31, 2017

# TABLE OF CONTENTS

| Article | | Page |
|---|---|---|
| I. | Jurisdiction | 2 |
| II. | Fan Maintenance | 7 |
| III. | Work Preservation & No-Subcontracting | 9 |
| | Work Performed City of New York | 10 |
| | Work Performed Nassau/Suffolk Counties | 16 |
| IV. | Union Security | 20 |
| V. | Manpower | 22 |
| VI. | Apprentices | 24 |
| VII. | Wages | 26 |
| VIII. | Hours & Holidays | 29 |
| IX. | Shift Work | 30 |
| X. | Shop Steward | 31 |
| XI. | Travel | 32 |
| XII. | Fringe Benefit Funds | 34 |
| XIII. | Promotion Funds | 41 |
| XIV. | Owners and Owner-Members | 43 |
| XV. | Work Rules | 43 |
| XVI. | Market Recovery Addendum | 49 |
| XVII. | Miscellaneous | 50 |
| XVIII. | Grievance Procedure | 52 |
| XIX. | Term | 54 |
| | Sketch A | 55 |
| | Sketch B | 56 |
| | Sketch C | 57 |
| | Joint Negotiating Committee | 64 |

# AGREEMENT
## SHEET METAL CONTRACTING DIVISION
## OF THE
## CONSTRUCTION INDUSTRY

THIS AGREEMENT, effective as of the first day of August, 2014, by and between SHEET METAL & AIR CONDITIONING CONTRACTORS ASSOCIATION OF NEW YORK CITY, INC., and SMACNA OF LONG ISLAND, INC., hereinafter referred to as the "Employer" and INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS, LOCAL UNION NO. 28 hereinafter referred to as the "Union."

# ARTICLE I
# JURISDICTION

**SECTION 1.**

    **A.** This Agreement covers the rate of pay rules and working conditions of all employees of the Employer including owner/members as defined in the International Association of Sheet Metal, Air, Rail and Transportation Workers Constitution and Ritual, engaged in the manufacture, fabrication, assembly, erection, installation, dismantling, reconditioning, adjustment, alteration, repairing and servicing of all sheet metal work (including ferrous or nonferrous sheet metal) and any and all other work included in the jurisdiction of the Sheet Metal Division of the Sheet Metal, Air, Rail, and Transportation Workers' Union, including, but not limited to, any and all substitute materials and/or new technologies or technological advances within the Union's covered industry that may replace, alter, eliminate, or antiquate the current and future here-to-for agreed upon jurisdiction of the Union. (any questions of jurisdiction of substitute material on job sites within the City of New York to be settled in accordance with the Joint Arbitration Plan between the Building Trades Employers' Association and the Unions of the Building Trades of the City of New York), including all shop and field sketches used in the fabrication and erection (including those taken from original architectural and engineering drawings or sketches) and all other work included in the jurisdiction of International Association of Sheet Metal, Air, Rail and Transportation Workers.

**2**

**B.** Within the limits of Nassau/Suffolk Counties, New York, disputes which arise concerning the substitution of material to be settled and adjusted according to the present plan established by the Building and Construction Trades Department (Plan for National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry) or any other plan or method or procedure that may be adopted as a replacement thereof.

**C.** Testing and balancing of all air-handling equipment ductwork and water-balancing shall be performed only by journeyperson sheet metal workers in the bargaining unit covered by this Agreement. Testing and Balancing Employers must bid a job to do the complete testing and balancing work, which includes using computer communication. The Testing and Balancing Employer, using journeyperson sheet metal workers, shall balance a system by testing and adjusting parameters for the proper C.F.M. square foot area, velocity pressure, and K factor.

**D.** All internal linings for casings, plenums and ducts are and shall remain the work of sheet metal workers, exclusively, which shall be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement. Internal linings for casings, plenums and ducts must be lined prior to erection.

**E.** Supply casings shall be the work of and performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement in accordance with Sketch "A" on page 55.

**F.** Supply air shafts shall be sheet metal and the work of and be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement.

**G.** Walls, floors and ceilings (excluding concrete and masonry and excluding penthouses) that are part of the HVAC system shall be sheet metal and the work of and be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement, unless they serve a dual purpose.

**H.** O.B.D.'s and Santrols shall be utilized as per Sketches B and C on pages 56 and 57.

**I.** The handling and installation of electric motors for fans. VAV boxes, dampers, etc. in work contracted for the renovation and/or rehabilitation of the HVAC System shall be done by Local Union No.

**3**

**J.** The fabrication, handling and installing of all types of solar panels shall be done by Local Union No. 28 members under the terms of this Agreement.

**K.** The work connected with the following items shall be performed only by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement:

    (i) Under Floor Air Distribution Systems.
    (ii) Indoor Air Quality.
    (iii) Energy Management.
    (iv) Photovoltaic Cells and Support Frames and Modules.
    (v) Solar-to-Air Systems.
    (vi) Sub-Slab Depressurization Systems.
    (vii) Sock Systems.
    (viii) FRP Duct.
    (ix) Toilet Partitions regardless of material.

**SECTION 2.** As used in Section 1.A, the term "dismantling" shall consist of all of the following work:

**A.** When duct work or other sheet metal work is the only work to be dismantled; and

**B.** When duct work or other sheet metal work is dismantled mechanically; and

**C.** When other trades dismantle the work of their respective trades.

**SECTION 3.** It is hereby understood and agreed that none but journeyperson sheet metal workers and registered apprentices shall be employed by the Employer within the bargaining unit on work specified in this Article of the Agreement quoted below, which work may not be specifically covered in the jurisdictional claims of the International Association of Sheet Metal, Air, Rail and Transportation Workers as provided for in this Article of the current Standard Form of Union Agreement. Work covered by this Agreement, the manufacturing and erection of all sheet metal in connection with buildings and structures, follows:

Hollow metal sash, frames, partitions, skylights, cornices, crestings, awnings, circular moldings, spandrels, (except stamping of same), sheet iron

**4**

sheeting or roofing, package chutes, linen chutes, rubbish chutes, hoods, sheet metal fireproofing, ventilators, heating and ventilating pipes, air washers, conveyors, breeching and smoke pipes for hot water heaters, furnaces and boilers, laundry dryers and all connections to and from same, metal jackets and lagging for pumps and boilers, blow pipe work in mills, sheet metal connections to machines in planing mills, saw mills, and other factories (whether it be used for ventilating, heating or other purposes), sheet metal connections to and from fans, separators, sheet metal cyclones for shavings or other refuse in connection with various factories, sheet metal work in connection with or fastened to storefronts or windows, sheet metal work in connection with concrete construction and sheet metal columns and casings, covering all drain boards, lining of coil boxes, iceboxes, and other sheet metal work in connection with bar furniture and soda fountains. Spot welding, electric arc welding, oxyacetylene cutting, and welding in connection with sheet metal work covered by this Agreement; also sheet metal work in connection with plain and corrugated fire doors; also the erection of floor domes, the setting of registers and register faces, the cutting and bending of metal necessary for the application and erection of metal ceilings and side walls (except stamping), the applying of metal ceiling and side walls and the furring and sheathing of same. The assembling and erection of fans and blowers; also the erection of metal furniture, factory bins, shelving and lockers, corrugated iron on roofs and sidings, all metal shingles and metal slate and tile, plain or covered with a foreign substance, the manufacture and erection of corrugated wire glass and accessories; also the glazing of metal skylights. The installation of unit vents where there is sheet metal work in connection with the supply and discharge of air, the setting of radiator enclosures of sheet metal where it does not support the cleaning of ductwork in new and existing buildings. In the manufacture of drawn metal work the work of the journeyperson sheet metal workers shall be the cutting and forming of the metal before the same is applied to the wood, and all clipping and soldering that may be necessary in the finishing of the assembled parts and the covering of wood and composition doors, frames and sash with sheet metal. Also such other sheet metal work, not herein specified, that has been decided by the Executive Committee of the Building Trades Employers Association to be, or is now, in the possession of the Sheet Metal Workers' Union, shall be regarded as sheet metal workers' work.

In the Kitchen Equipment industry, it is understood that the term "sheet metal work" shall mean all work made of sheet metal including the making, mounting, erecting, cleaning and repairing of all steel and gas

**5**

ranges, grid irons and oven racks, hoods, tables and stands, warming closets, plate warmers and plate shelves, bands, doors and slides for same, drip pans, urns and percolators, kettles, revolving covers, meat dishes and covers, steam and carving tables and drainers for same, bain marie boxes and potato mashers and any other items or types of work that are included in Article I, Section 5 of the current Constitution and Ritual of the International Association of Sheet Metal, Air, Rail and Transportation Workers.

In the Testing and Balancing segment of the sheet metal industry, it is understood that the term "Testing and Balancing" shall mean all work in the Testing, Adjusting, and Balancing of BOTH AIR AND WATER systems. This work includes the set up and operations of any and all instruments, tools, equipment, and computers and any computer like device used in communicating to the equipment being tested, adjusted and balanced.

All such work as has been described in the foregoing paragraphs shall be performed by journeyperson sheet metal workers and apprentices who shall be furnished only to Employers regularly engaged in the sheet metal industry, except that authorization may be issued from time to time by united agreement of the Joint Adjustment Board, authorizing the employment of journeyperson sheet metal workers by an Employer on work that may be the subject of jurisdictional disputes in order to permit the claim or retention of such work by sheet metal workers.

**SECTION 4.** If a contractor purchases or rents a knockdown shanty of any material, the jurisdiction for the erection of such shanty shall be that of Local Union No. 28.

**SECTION 5.** The Employer agrees that all the work described in this Article shall be performed only by journeyperson or apprentice sheet metal workers in the bargaining unit covered by this Agreement.

**SECTION 6.**
   **A.** Within the limits of New York City, New York, disputes which arise between the Sheet Metal Trade and other trades and disputes relative to questions of jurisdiction of trade shall be adjusted in accordance with the method set forth in the Joint Arbitration Plan of the New York Building Trades as adopted on July 9, 1903 and amended on April 22, 1905, and all decisions rendered thereunder determining disputes arising out of the conflicting jurisdictional claims of the various trades shall be recognized by and be binding upon the parties hereto.

**6**

Jurisdictional controversies within the limits of New York City, New York shall be settled in accordance with the provisions and intent of agreements between the International Association of Sheet Metal, Air, Rail and Transportation Workers and other National or International Unions directly involved or by decisions rendered by regularly constituted authorities recognized by the International Association of Sheet Metal, Air, Rail and Transportation Workers, including any jurisdictional council voluntarily set up by the AFL-CIO Building Trades Unions and various contractors' associations (including Sheet Metal and Air Conditioning Contractors' National Association, Inc.), to which the International Association  of Sheet Metal, Air, Rail and Transportation Workers subscribes.

**B.** Within the limits of Nassau/Suffolk Counties, New York, disputes which arise concerning the jurisdictional controversies to be settled and adjusted according to the present plan established by the Building and Construction Trades Department (Plan for National Joint Board for the Settlement of Jurisdictional Disputes in the Building and Construction Industry) or any other plan or method or procedure that may be adopted as a replacement thereof.

# ARTICLE II
# FAN MAINTENANCE

**SECTION 1.** In the temporary operation of fans or blowers in a new building, or in an addition to an existing building for heating and/or ventilation, and/or air conditioning, prior to the completion of the duct work in connection therewith, journeyperson sheet metal workers shall have jurisdiction in the temporary operation and/or maintenance of such fans or blowers, and they shall work in full shifts of not less than seven (7) hours, nor more than eight (8) hours each, and shall be paid eighty percent (80%) of the then prevailing straight time hourly rate of pay for each shift of this work, including nights, Saturdays, Sundays, and holidays, on full shifts. No journeyperson engaged in fan maintenance shall work in excess of forty (40) hours in any work week. The eighty percent (80%) ratio to journeyperson wage rate is not to be applied to the fringe benefit contributions provided in this Collective Bargaining Agreement. The Employer will continue to pay fringe benefits at the full rate. The Employer shall receive a twenty percent (20%) reimbursement of all fan maintenance wages from the Joint Labor Management Committee and Trust.

**A.** The jurisdiction of Local Union No. 28 shall apply to the operation

and/or maintenance of fans or blowers only for new systems installed in an existing building or when an old system is in effect completely replaced by a more modern and complete system.

**B.** Journeyperson sheet metal workers shall not be employed for the sole purpose of operating and/or maintaining fans or blowers during any period when such fans or blowers are operating for the sole purpose of testing or adjusting a heating, ventilating or air-conditioning system.

**C.** The Employer is to provide a log for workers to sign in and sign out to verify hours worked as many owners or construction managers require copies of log or shop tickets to be attached with invoices for payment.

**D.** The Employer shall provide manpower for three (3) shifts per twenty-four hour period. Hours worked per shift will be limited to one (1) eight-hour shift every twenty-four hours and forty (40) hours per payroll period. The number of different sheet metal workers assigned to fan maintenance on a particular job site shall be limited.

**E.** Journeypersons working fan maintenance shall be expected to perform the following duties:
  (i). Check that all systems are running, as required.
  (ii). Check that all belts, pulleys, drive and belt guards are properly secured.
  (iii). Check that all access doors are secured.
  (iv). Check filters or replace filters, if required.
  (v). Check auto control dampers; confirm that they are operating properly.
  (vi). Check and lubricate fans and equipment, if required.

**F.** On fan powered boxes, there shall be no fan maintenance required on the first floor of their use, but fan maintenance shall be required when they are used on the second or any additional floor.

**SECTION 2.** All temporary operations and/or maintenance shall be paid at single time. Less than a full shift of work outside of regular hours shall be paid at one and one-half (1 1/2) time, except for Sundays and those recognized holidays listed in Article VIII, Section 3.

**SECTION 3.** In the temporary operation and/or maintenance of fans and blowers, the jurisdiction of Sheet Metal Workers' Local Union No. 28 shall continue:

**A.** Until a system and/or systems are accepted by the owner or his

**8**

representative after having been tested and balanced, and until the area is substantially completed.

**B.** Each area in a building shall be considered as substantially completed for the purpose of stopping fan maintenance when all core work, toilets, elevator machine rooms, perimeter systems and fan rooms are installed in the area, and the public corridor and perimeter of the building are plastered to the ceiling height, or a substitute for plaster is used on either the public corridor or periphery or perimeter of a building. The plastering requirements shall be waived where the plastering is not done because the area is not rented.

**SECTION 4.** The number of journeyperson sheet metal workers required for each shift of fan maintenance shall be based on the assignment of one employee to maintain a reasonable number of operating heating, ventilating, air conditioning or exhaust systems.

<div align="center">

## ARTICLE III
## WORK PRESERVATION AND NO SUBCONTRACTING

</div>

## SECTION 1. RULES GOVERNING USE OF CONDUIT AND FLEXIBLE HOSE FOR SUPPLY AND/OR RETURN SYSTEMS AND FABRICATED ITEMS.

<div align="center">

### INTRODUCTION

</div>

Historically, sheet metal workers are skilled journeypersons with four and one half (4 1/2) years apprenticeship training and have always been unique in that they have fabricated what they erected. While other crafts in the building trades erected materials fabricated by others, sheet metal workers historically fabricated the cornices they erected, they fabricated the skylights they erected; and since the development of modern systems for air-conditioning, they have fabricated the ducts and distributional devices which they have erected. Lately the introduction of machine-made products for the conveying and distribution of air in air-conditioning systems has posed a serious threat to the nature and extent of job opportunities of sheet metal workers. Convinced that the introduction of these items, which are intended to reduce labor costs with resultant loss of job opportunities and to give no benefit of automation to sheet metal workers, and to reduce their trade to an erection trade only and to obviate the need for the use of their skills as fabricating craftsperson, sheet metal workers and their Union have insisted that reasonable rules be adopted for the

<div align="center">**9**</div>

conservation and spreading of work opportunities and terms of employment. Sheet metal workers and their Union insisted that the failure to adopt these reasonable rules would result in the loss of not less than seventy-five percent (75%) of the work hours now available to sheet metal workers.

To meet these demands for the preservation and extension of work opportunities and job conditions after an eight-week strike in 1960, a five-week strike in 1969, and a nine-week strike in 1972, and in consideration of the Union dropping many demands similarly designed to conserve work opportunities and to protect working conditions, the Employer has consented to the following Rules Governing Use of Spiral Conduit and Flexible Hose for Supply and/or Return Systems, which the Union deems necessary.

## RULES AND REGULATIONS FOR JOBS/WORK PERFORMED IN THE CITY OF NEW YORK, NEW YORK.

### SECTION 1. (A) GENERAL

1.  The use of spiral conduit and flexible hose is divided into two (2) categories:
    **A.** Airtight (high-pressure)
    **B.** Conventional

2.  The classification of a system, for this purpose, will not be determined by static pressure of velocity but by the following requirements:

    **A.**    A high-pressure system will have airtight duct work of special construction. It will be made airtight by mechanical means such as welding, gasketing, and/or caulking.

    **B.**    In addition, for a system to be considered high pressure, it must have pressure reduction devices such as one of the following:

        (i).    Pressure reducing valve with lined duct.
        (ii).   Pressure reducing valve with sound trap.
        (iii).  Attenuation box with pressure reducing valve.
        (iv).   Double duct or mixing box with valves.
        (v).    Peripheral high velocity system.

For the purposes of this section, VAV Boxes, Control Volume Boxes, and Fan Volume Boxes shall not be considered pressure-reducing devices.

**10**

**3.** Any supply system that does not have both airtight construction and a pressure-reduction device will be considered a conventional system.

**4.** The requirements in Paragraph No. 2 above refer to both supply and return systems, except, in addition to the aforementioned, a high velocity return system must have metal flues or metal risers to be considered high pressure, and be of airtight construction to qualify.

**5.** There shall be no limitation in the use of spiral conduit and flexible hose in private one (1) and two (2) family homes and garden apartments up to three (3) stories.

**6.** There shall be no limitation in the use of spiral conduit on exhaust and return risers in apartment houses except for kitchen exhaust risers.

**7.** It shall be permissible to use spiral in airtight (high pressure) systems from the trunk to the box (variable air volume, control volume, fan volume) not to exceed ten feet (10').

**8.** On fume exhaust systems, dust collector systems, and carbon monoxide systems, each piece may be no longer than ten feet (10'). All fittings required shall be fabricated in the shop of the Employer.

## SECTION 1. (B) CONVENTIONAL SYSTEMS.

**1.** The use of spiral conduit and flexible hose is not permitted in a conventional system, with the exception of when spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

**2.** The use of flexible hose is permitted to connect to any air delivery device which is supported by the ceiling up to a maximum of ten feet (10').

## SECTION 1. (C) HIGH PRESSURE (AIRTIGHT) SYSTEMS

**1. Peripheral Systems (Single or Double Duct)**

**A.** The use of spiral conduit shall not be restricted in any manner except that the maximum diameter of conduit shall be twenty inches (20").

**B.** Flexible hose may be used to connect the riser or crossover mains to the window units. There shall be no limitations of length or size in this application.

**11**

**NOTE:** Where the connection to the window unit is from a header duct, the header duct shall be adjacent to the periphery of the building.

**2. Interior Single Duct Systems**

    **A.** Unlimited use of spiral conduit up to a maximum diameter of twenty inches (20") will be permitted from fan to connection at final pressure-reducing device.



**3. Rules Governing Use of Flexible Hose on All-Air Outlets and Troffers on Sealed and Unsealed Systems (drawing above).**

    **A.** Flexible hose may be used only to connect the inlet side of any box, valve or troffer.

    **B.** The maximum length of flexible hose which can be used is ten feet (10').

    **C.** Where flexible hose is permitted, there shall be no restriction as to its configuration.

**SECTION 2.  MEMORANDUM CONTAINING NO SUBCONTRACTING CLAUSE**

    **A.** For the preservation of the work opportunities of journeyperson sheet metal workers and apprentice sheet metal workers within the collective bargaining unit, each Employer within the collective bargaining unit shall not subcontract out any item or items of work described herein below except that each said Employer shall have the right to subcontract for the manufacture, fabrication or installation of such

**12**

work with any other Employer within the collective bargaining unit as set forth in paragraph B below:

1. Duct work.

2. Radiator enclosures except when manufactured and sold as a unit including heating element.

3. Functional louvers.

4. Attenuation boxes except for mechanical devices contained herein; soundtraps.

5. Dampers: All types of dampers, including automatic dampers and multizone dampers, manual control dampers and fire control dampers, except patented pressure-reducing devices, OBD's and Santrols as per Sketches B and C.

6. Skylights, sheet metal sleeves, pressure-reducing boxes, volume control boxes, troffers (plenums), high pressure fittings and gutters (excluding 112 round gutters).

7. Air-handling units in excess of 50,000 C.F.M.'s. Air-handling units up to a maximum of one hundred thousand (100,000) C.F.M.'s shall be permitted on Airside projects and for rooftop units distributing air in a building up to six (6) stories for all areas other than the borough of Manhattan. Rooftop units in excess of 100,000 C.F.M.'s must receive Union approval pending consideration of the work opportunities available on these units.

8. Testing and balancing both air and water systems.

9. All other work historically, traditionally and customarily performed by journeyperson sheet metal workers and apprentice sheet metal workers within the collective bargaining unit in accordance with the Collective Bargaining Agreement.

All the work described in this "no subcontracting clause" shall be performed by journeyperson and/or apprentice sheet metal workers in the bargaining unit covered by this Agreement.

**B.** The Employer shall be required to perform all sheet metal work in its contract with its own employees. The Employer shall have the right to subcontract work within the bargaining unit under the following

**13**

circumstances:

1. When it is an item the Employer does not normally fabricate.

2. When required, the Employer may purchase items from a manufacturing company whose employees are within the collective bargaining unit covered by this Agreement.

3. The Employer may sub-contract a portion of a larger job if said subcontract includes drafting, fabrication and installation.

4. When the Employer takes sheet metal work as part of an HVAC contract as a mechanical contractor.

Each item described in the "No-Subcontracting Clause" shall have both an international label and a label indicating that it was manufactured by employees within the collective bargaining unit covered by this Agreement.

**C.** The items listed below shall be governed as follows:

1. The Employer shall make its best effort to purchase these items from a Local Union No. 28 manufacturing contractor, and is required to purchase said items from a Local Union No. 28 manufacturing contractor when there are at least two (2) Local Union No. 28 manufacturing contractors fabricating said items. This would apply only to suppliers who are manufacturing only and do not have, or are affiliated with, a duct shop.

2. These items may be utilized on any and all jobs.

3. Items Covered: Flat Oval, Swivel Elbows, Snap Lock for Round Pipe, Roofing Curbs, HETOS, Conical Take-Offs, Straight Take-Offs, T-Fittings, Reducers, Stamped Elbows, End Caps and Couplings, and all the associated items such as miscellaneous single blade dampers and special hangers/connectors directly associated with flat oval.

4. All the above items except flat oval and roofing curbs shall be limited to a fourteen inch (14") diameter or less.

5. All items must have a SMWIA/SMART Label.

**SECTION 3.   SUBSTITUTE   MATERIALS   AND   SUBSTITUTE SYSTEMS**

**14**

The heating, ventilating and air conditioning industry is continuously introducing new methods for distributing air into the conditioned spaces. Two of these new systems known as the continuously slotted or linear type of distribution and the pressurized ceiling type of air distribution have seriously affected work opportunities for sheet metal workers and could cause a serious loss of employment opportunities.

### A. LINEAR SLOT DUCT AIR DISTRIBUTION

The continuously slotted type of duct distribution generally consists of an acoustically-lined tubular duct directly connected to a slotted or continuous linear type diffuser, and therefore, is within the jurisdiction of Local Union No. 28. The tubular duct work and the lining of this duct shall be fabricated and installed by journeyperson and apprentice sheet metal workers. The ductwork shall be fabricated of uncut, unformed or unbent steel, aluminum or other materials. The duct shall be lined with acoustical insulation from bulk rolls. The fabrication of the duct work and lining of the ducts as well as the installation shall be done by journeyperson and apprentice sheet metal workers.

In order to avoid jurisdictional disputes and "split" responsibility for the integrated performance of the systems, this portion of the system shall be included with the entire job under the HVAC section of the specifications and/or contract.

### B. PRESSURIZED CEILING DISTRIBUTION/ PRESSURED PLENUM DISTRIBUTION

This type of system consists of supply and return ducts delivering or returning conditioned air to or from the pressure chambers above a hung ceiling or under a raised floor of a room to which air is delivered. This air is distributed from the air chamber through various types of openings such as, but not limited to, perforated tile, slotted tile, slotted ceiling bars, floor tiles, etc. The installation of the ceiling or floor distributing panels and/or slotted diffusers and zone baffles, which replace the normal distribution and outlets, are substitutes for the ducts which normally and conventionally would carry the air.

Therefore, the distribution system when accompanied by a pressurized air chamber is within the jurisdiction of Local Union No. 28 and should be assigned to and installed by journeyperson and apprentice sheet metal workers in order to offset some of the opportunities for employment lost in the non-fabrication and non-erection of conventional systems because of the use of the aforesaid pressurized plenums. In order to avoid jurisdictional disputes and "split"

**15**

responsibility for this type of system for integrated performance, the Employers agree that this type of system should be included with the entire job under the HVAC section of the specifications and/or contract.

## RULES AND REGULATIONS FOR JOBS/WORK PERFORMED IN THE COUNTIES OF NASSAU/SUFFOLK, NEW YORK

### SECTION 1. (A) GENERAL

**1.** The use of spiral conduit and flexible hose is divided into two categories:
    **A.** Conventional

    **B.** Airtight (high velocity) i.e.: two thousand (2,000) F.P.M.

**2.** The classification of a system, for this purpose, will not be determined by the static pressure or velocity, but by the following requirements:

    **A.** A high pressure system will have airtight duct work of special construction. It will be made airtight by mechanical means such as welding, gasketing and/or caulking.

    **B.** In addition, for a system to be considered high velocity, it must have pressure reduction devices such as one of the following:

        (i). Pressure reducing valve with lined duct.

        (ii). Pressure reducing valve with sound trap.

        (iii). Attenuation box with pressure reducing valve.

        (iv). Double duct or mixing box with valves.

        (v). Peripheral high velocity system.

        (vi). It shall be permissible to use spiral in airtight (high pressure) systems from the trunk to the box (variable air volume, control volume, fan volume) not to exceed ten feet (10').

For the purposes of this Section VAV Boxes, Control Volume Boxes, and Fan Volume Boxes shall not be considered pressure-reducing devices.

### SECTION 1. (B) CONVENTIONAL SYSTEMS

**1.** The use of spiral pipe is not permitted in a conventional system, except as follows:

**16**

    **A.**    Spiral duct may be used in place of transite or sonair duct in underground installation.

    **B.**    Unlimited use of spiral pipe on branch lines and/or take off in private homes (one (1) and two (2) family) and garden type apartments.

    **C.**    Where the original design specifications and mechanical drawings clearly indicate the use of conduit or spiral pipe.

    **D.**    When spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

**2.** The use of flexible hose is permitted on a conventional system, as follows:

    **A.**    Up to ten feet (10') of flexible hose may be used without restrictions.

    **B.**    Unlimited use of flexible hose in branch line and/or take off (one (1) and two (2) family homes) and garden type apartments.

    **C.**    Ten feet (10') of flexible hose unless a greater length is otherwise specified may be used in the following special exhaust systems:

- Fume exhaust system,
- Dust collector system,
- Carbon monoxide system.

## SECTION 1. (C) HIGH PRESSURE (Airtight) SYSTEMS

**1.** Peripheral Systems (Single or Double Duct)

    **A.**    The use of spiral pipe shall not be restricted in any manner.

    **B.**    Flexible hose may be used to connect the riser or crossover mains to the window units. There shall be no limitations of length or size in these applications.



### LOW VELOCITY SYSTEMS

Volume damper if required
MAX 10' 0" FLEX

2. Interior Single Duct System

    **A.**    The unlimited use of spiral pipe will be permitted from fan to connection at final pressure reducing device.

    **B.**    The use of flexible hose is permitted to connect to any device which is supported by the ceiling up to a maximum of ten feet (10').

    **C.**    The use of flexible hose will be permitted in accordance with the following:

        (i).    Where the pressure reducing device is an "octopus" type box, a four-foot (4') maximum length of flexible hose may be used on the inlet side of the box, In addition, an eight-foot (8') maximum length of flexible hose may be used from the box to each outlet. At the option of the Employer, on an "octopus box," the flexible connection on the inlet side of the

**18**

box may be eliminated and the use of a maximum
length of ten feet (10') of flexible hose shall be
permitted from the box to each outlet.

(ii).   Where flexible hose is permitted, there shall be no
restrictions as to its configuration.

(iii).  Where the pressure reducing device is located at the
outlet, the Employer may use a maximum of ten feet
(10') of flexible hose from the high pressure duct to
each pressure reducing device at outlet.

(iv).   Where the pressure device is remote from the outlet,
a maximum length of seven feet (7') of flexible hose
may be used to connect the outlet to the conventional
duct.

## HIGH VELOCITY SYSTEMS



## 3. Double Duct Interior Systems

**19**

**A.** The use of spiral pipe from the fan to the pressure reducing or mixing box shall not be restricted in any manner.

**B.** There shall be no spiral pipe permitted on the conventional (low pressure) side of the pressure reducing device or mixing box, except when spiral conduit is used to a single outlet as a sub-branch off the main rectangular duct on low pressure systems.

**C.** The Employer shall have the option of using flexible hose at the mixing box in accordance with either of the following provisions:

   (i). A maximum of ten feet (10') of flexible hose may be used to each inlet of the mixing box, or,

   (ii). A maximum length of ten feet (10') of flexible hose may be used as a connection to each outlet on the low pressure reducing device or mixing box.

## ARTICLE IV
## UNION SECURITY

**SECTION 1.** The Employer agrees to require membership in the Union as a condition of continued employment of all employees performing any of the work specified in Article I of this Agreement within seven (7) days following the beginning of such employment or the effective date of this Agreement, whichever is the later, provided the Employer has reasonable grounds for believing that membership is available to such employees on the same terms and conditions generally applicable to other members and that membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and initiation fees uniformly required as a condition of acquiring or retaining membership.

**SECTION 2.** If during the term of this Agreement the Labor Management Relations Act of 1947, as amended, shall be amended by Congress in such manner as to reduce the time within which an employee may be required to acquire union membership, such reduced time limit shall become immediately effective instead of and without regard to the time limit specified in Section I of this Article.

**SECTION 3.** The geographic area and jurisdiction covered by this Agreement is composed of the five boroughs of New York City and Nassau and Suffolk

**20**

counties, to be referred to as "the seven (7) counties of New York."

**SECTION 4.** Employees hired outside of the territorial jurisdiction of the Union to perform work outside of said jurisdiction and within the jurisdiction of another local union of the International, Association of Sheet Metal, Air, Rail and Transportation Workers shall be deemed to have complied with the provisions of this Article by acquiring and retaining membership in the said local union in whose jurisdiction such employee performs said work under the same conditions set forth in Section 1 of this Article.

**SECTION 5.** The provisions of this Article shall be deemed to be of no force and effect in any state, to the extent to which the making or enforcement of such provisions is contrary to law. In any state where the making or enforcement of such provision is lawful only after compliance with certain conditions precedent, this Article shall be deemed to take effect as to involved employees immediately upon compliance with such conditions.

**SECTION 6.** The Examining Board of Local Union No. 28 shall be the sole determining board to examine the qualifications for journeyperson membership into Local Union No. 28.

**SECTION 7.**
- **A.** The Employer agrees to deduct from the wages of its employees, upon written authorization from the employees, two percent (2%) of the total wage and fringe benefit package plus organizing contribution of five cents (\$ .05) for each hour paid ("assessment"). Assessment deductions shall be remitted weekly to the Financial Secretary of Local Union No. 28 together with a list of names of employees to whom said monies are to be credited. The Union shall have the right to withdraw manpower from the Employer, in addition to all other rights and remedies it might have, for failure to remit said monies weekly. Interest at the rate of prime plus twelve percent (12%) with a minimum of fifteen percent (15%) per year shall apply to all late payments of dues/assessments to the General Fund. Interest shall begin after a grace period which shall be the same length of time as that afforded by the Trustees of the Local Funds.
- **B.** Dues and assessments are considered assets of the General Fund (Union) and title to all monies paid to and/or due and owing to the Union shall be vested in and remain exclusively in the Union. The Employer shall have no legal or equitable right, title or interest in or

**21**

# ARTICLE V
# MANPOWER

**SECTION 1.** The Union agrees to furnish the Employer, at all times, with duly qualified journeyperson sheet metal workers and registered apprentices in sufficient numbers as may be necessary to properly execute work contracted for by the Employer in the manner and under the conditions specified in this Agreement.

**SECTION 2.** Light Commercial Workers (LCW) may be utilized in the shop as follows:

A. Ratios for LCW to "A" Mechanics.

| | |
|---|---|
| 1st Employee | "A" Mechanics |
| 2nd Employee | LCW |
| 3 | "A" Mechanics |
| 1 additional | LCW |
| 6 | "A" Mechanics |
| 1 additional | LCW |
| 9 | "A" Mechanics |
| 1 additional | LCW |
| 12 | "A" Mechanics |
| 1 additional | LCW |
| 15 | "A" Mechanics |
| 1 additional | LCW |
| 25 | "A" Mechanics |
| 1 additional | LCW |

B. No employer shall be entitled to more than a total of seven (7) Light Commercial Workers in its shop.

C. The current Light Commercial Workers Wage Package is:

**22**

Hire               $26.88
      After one (1) year     $30.63
      After two (2) years    $41.14

These rates shall be adjusted when required in accordance with the terms of the Light Commercial Agreement.

**SECTION 3.** All Industry Promotion Funds shall share and pay one-half (1/2) of the total of administering the Four-Year Experience Board.

**SECTION 4.** Contributions to the Welfare Fund and S.U.B. Plan on the first hour of overtime in the shop for key personnel only shall be on the basis of hours worked and not hours paid.

**SECTION 5.** Whenever, in the opinion of the Union, unemployment has risen to the point where some collective action shall be taken, the Joint Labor Management Committee shall meet, within forty-eight (48) hours, to attempt to place unemployed sheet metal workers in jobs.

**SECTION 6.** A mandatory referral hall shall be established as follows:
   A. For every four (4) new hires, one (1) must be from the Referral Hall. An employer meets the requirements of this Section regardless of the amount of time said referred employee remains with the Employer.
   B. All members must put their name on the Referral Hall list within twenty-four (24) hours of either voluntary or layoff termination.

**SECTION 7.** The Employer shall notify the Union of each mechanic hired. A letter of termination will be provided with the employee's final paycheck. An Employer wishing to layoff an employee must notify the Union office no later than 12:00 noon of the day of layoff, and the Union will maintain a numbered registry for this purpose.

**SECTION 8.** The Employer shall be at liberty to employ and discharge whomsoever it shall see fit, and the members of the Union shall be at liberty to work for whomsoever they shall see fit.

**23**

# ARTICLE VI
## APPRENTICES

**SECTION 1.** All duly qualified apprentices shall be under the supervision and control of the Joint Apprenticeship Committee and Trust composed of ten (10) members, five (5) of whom shall be selected by the Employer, and five (5) by the Union. Said Joint Apprenticeship Committee shall formulate and make operative such rules and regulations as they may deem necessary and which do not conflict with specific terms of this Agreement, to govern eligibility registration, education, transfer, wages, hours and working conditions of duly qualified apprentices and the operation of an adequate apprentice system to meet the needs and requirements of the trade. Said rules and regulations when formulated and adopted by the parties hereto shall be recognized as a part of this Agreement.

**SECTION 2.** The Joint Apprenticeship Committee and Trust designated herein shall serve for the life of this Agreement, except that vacancies in said Joint Apprenticeship Committee caused by resignation or otherwise may be filled by either party hereto, and it is hereby mutually agreed by both parties hereto that they will individually and collectively cooperate to the extent that duly qualified and registered apprentices shall be given every opportunity to secure proper technical and practical education, and experience in the trade under the supervision of the Joint Apprenticeship Committee and Trust.

**SECTION 3.**
   **A.** Classes shall be instituted on a schedule established by the Joint Apprenticeship Committee and Trust. All appointments shall be made pursuant to and in accordance with the Agreement and Declaration of Trust, the Rules and Regulations adopted thereunder by the Trustees and as administered by the Joint Apprenticeship Committee and Trust.
   **B.** Apprentices shall be charged tuition at a rate to be established by the Joint Apprenticeship Committee and Trust.
   **C.** Apprentice ratio on layoff shall continue in accordance with past practices as determined by the Joint Apprenticeship Committee and Trust.

**SECTION 4.** Each registered apprentice after successfully completing a pre-apprenticeship of six (6) months shall serve an apprenticeship of four and one half (4 1/2) years. Such apprentices shall not be put in charge of work on any

**24**

job, and shall work under the supervision of a journeyperson until their apprenticeship has been completed and they have qualified as journeypersons.

**SECTION 5.** All apprentices entering the program shall receive a wage package as set forth in the schedule attached hereto.

**SECTION 6.**

- **A.** If the Union allocates any portion of wage increase for a journeyperson to fringes, then the apprentice fringes shall be increased by the amount of money allocated to the fringes times the percentage corresponding with the term.

- **B.** The Union shall allocate the total fringe amount among the various Funds and may allocate some wages to fringes.

- **C.** The wage rate for apprentices may be adjusted during the term of this Agreement so as to increase wages for entering apprentices and lower wages for upper-term apprentices with the total cost to the Employer remaining the same, upon the recommendation of the Joint Apprenticeship Committee and Trust and the approval of the Joint Adjustment Board.

- **D.** Changes in the apprentice wage package shall become effective at the same time as the journeyperson's increase.

- **E.** Each apprentice shall attend school for four (4) one-week sessions spread out over fifty (50) weeks. Each apprentice shall receive a stipend for attendance at school as set forth in the schedule attached hereto. This program shall be monitored and evaluated by the Joint Apprenticeship Committee, who shall have the authority to make any changes it deems appropriate.

- **F.** The number and size of each apprentice class shall be determined by the Joint Apprenticeship Committee based upon the number of journeypersons employed.

- **G.** The Joint Apprenticeship Committee shall set up a procedure so that each apprentice shall have a basic set of tools when he/she reports to the Employer for work.

- **H.** The ratio of Journeyperson to Apprentice shall be 1:1 starting and 3:1 thereafter.

**25**

# ARTICLE VII
## WAGES

**SECTION 1.** The hourly wage rate for journeyperson sheet metal workers covered by this Agreement when employed in a shop or on a job within the jurisdiction of the Union to perform any work specified in this Agreement is set forth in the schedule attached hereto.

A. Provide for a wage package increase of $6.75 as follows.

| | |
|---|---|
| 8/1/2014 | $2.00 |
| 8/1/2015 | $2.00 |
| 8/1/2016 | $2.75 |

B. The Union shall make the required allocations to the Pension Funds out of the aforementioned wage package increase.

C. Other than the required allocations for the Pension Funds increases the Union will determine the allocation of the remainder of increase among Wages, Benefit Fund Contributions and Dues check-offs subject to paragraph D below.

D. The Union shall have the right to redistribute contribution amounts between the Funds upon sixty (60) days prior notice to the Employer. Any proposed redistribution from the Funds to Wages, or from either Pension Fund to the other Funds or Wages, must receive prior approval by the Employer.

**SECTION 2.** Wages at the established rate specified herein shall be paid in cash or by check, in the shop or on the job, at or before one-half (1/2) hour prior to quitting time on Friday of each week for all monies earned during the payroll week ending the previous Wednesday.

However, employees when discharged or laid off may be paid in full by cash or check for all days worked. Checks must be bonded or insured, and there shall be a one hundred dollar and no cents ($100.00) payment for any bounced check for any reason. In addition to the foregoing, in the event an Employees check bounces for two (2) separate payroll periods, then the Employer must pay in cash for a period of six (6) months.

The Employer shall indicate on each check stub the amount for wages and the total assessments withheld from each member's weekly pay, the year-to-date total of wages, benefits, assessments, and the amount to be paid by the Union

from such assessment payment to the court's affirmative action Education, Training, Employment and Recruitment Fund (ETER Fund).

**SECTION 3.**
- **A.** When a holiday falls on a Thursday, the Employer may terminate the work week on Tuesday, and in such case, wages at the established rates specified herein shall be paid in cash or by check, in the shop or on the job, at or before quitting time on Friday of that week. In such instance, any work performed on the Wednesday preceding the Thursday holiday shall be paid on the Friday of the following week.

- **B.** When a holiday falls on Friday, the Employer may likewise terminate the week on Tuesday, but in such case, wages at the established rate specified herein shall be paid in cash or check, in the shop or on the job, at or before quitting time on Thursday of that week. In such instance, any work performed on the Wednesday and Thursday proceeding the Friday holiday shall be paid on the Friday of the following week.

- **C.** The wage rate for payroll weeks when wage increases occur shall be determined by whether the Monday of that payroll week is in the old month or the new month.

**SECTION 4.** Journeyperson and apprentice sheet metal workers who report to work at the direction of the Employer and are not placed to work or who are prevented from continuing to work for any reason, except for unforeseen conditions beyond the Employees control (excluding snow, rain, and other conditions), shall be paid in the following manner:
- **A.** Journeyperson and apprentice sheet metal workers not placed to work shall receive two (2) hours of wages at the rate (straight time at overtime rate) then and there prevailing. If employed by a decking, siding or roofing contractor, journeyperson and apprentice sheet metal workers who qualify under this subsection shall also receive an additional two (2) hours pay from the S.U.B. Plan.

- **B.** Journeyperson and apprentice sheet metal workers who are placed to work but are prevented from continuing work in any hours from 7:30 a.m. to 11:30 a.m. shall receive four (4) hours of wages at the straight time rate then and there prevailing. Further, if the same should occur during such time(s) when the overtime rate is in effect, then the journeyperson and apprentice sheet metal worker shall receive wages at the overtime rate for the actual number of hours worked, but in no

**27**

event shall said journeyperson or apprentice be paid for less than three and one-half (3 1/2) hours of work at the overtime rate.

**C.** Journeypersons and apprentices who are placed to work after lunch who are prevented from continuing work shall receive eight (8) hours of wages at the straight time wage then and there prevailing. If the same should occur during such time(s) when the overtime rate is in effect, then the journeypersons and apprentices shall receive wages for the actual number of hours worked at the overtime rate then and there prevailing.

**SECTION 5.** When a journeyperson sheet metal worker or registered apprentice contracts for or engages for a lump sum to do any of the work covered by this Agreement, his/her membership card if a member of the Union shall be forfeited and surrender demanded by the Union subject to the provisions of the Constitution and Ritual of the International Association of Sheet Metal, Air, Rail and Transportation Workers.

**SECTION 6.**

**A.** An Employer having been charged with violating this Article of the Agreement for paying to a journeyperson sheet metal worker less than the prescribed rate of wage shall, on notice, appear before a meeting of the Joint Adjustment Board called to consider the complaint and charges. If upon the submission of conclusive proof of said charges of violation, the Joint Adjustment Board shall find the Employer guilty an order shall be issued, without undue delay, that the Employer shall pay in cash to the journeyperson sheet metal worker involved the difference between the prescribed wage rate and that tendered by the Employer and accepted by the journeyperson sheet metal worker.

**B.** A journeyperson sheet metal worker violating this Agreement by accepting less than the rate of wages prescribed in this Article of this Agreement shall without undue delay pay as liquidated damages into the Sick Dues Relief Fund of Local Union No. 28 the cash difference between the Agreement wage prescribed and that accepted by the journeyperson sheet metal worker from the guilty Employer, and be subject to such discipline as provided in the Constitution and Ritual of the International Association of Sheet Metal, Air, Rail and Transportation Workers.

**SECTION 7.** On new all-air systems, the manufacturing of boxes shall be

**28**

performed by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement at an eighty percent (80%) wage rate.

**SECTION 8.** Upon layoff the employee is to be paid in full for hours worked and shall receive that pay no later than one-half (1/2) hour before the end of the same day, provided that the employee is on the job site or in the shop. In the event of non-compliance, the Employer has the option to either pay the employee four (4) hours additional pay or retain the employee for the following work day. Employees when discharged or laid off may be paid in full by check for all days worked. In the event an employee is entitled to more than one week's pay, the Employer shall pay same with two (2) checks.

## ARTICLE VIII
## HOURS & HOLIDAYS

**SECTION 1.** The regular work day shall consist of eight (8) hours labor in the shop, Field, and drafting. The starting time shall be between 6:30 A.M. and 8:00 A.M. at each Employer's discretion. The regular work week shall consist of five (5) consecutive eight (8) hour days of labor in the shop, field, and drafting beginning with Monday and ending with Friday of each week. All full time or part time labor performed during the hours specified herein shall be recognized as regular time and paid for at the regular hourly rates specified in this Agreement. On job sites where more than one (1) sheet metal Employer is working, there shall be a uniform starting time, except as set forth below. The regular workday for journeypersons attending coordination meetings shall begin at the time the meeting starts.

**SECTION 2.** Lunch time shall be one-half (1/2) hour between 11:30 a.m. and 12:30 p.m., except if hoisting is to be done between 11:30 a.m. and 12:30 p.m., then the lunch period may begin at 11:00 a.m.

**SECTION 3.** The following legal holidays shall be recognized and observed within the territory covered by this Agreement: New Year's Day, Martin Luther King, Jr., Day Presidents Day, Memorial Day, July 4th, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, the day after Thanksgiving Day and Christmas Day. Still further, the Union shall have the right/option to reschedule any of its designated eleven (11) holidays, prior to commencement of the calendar year, with input from the Employer.

**SECTION 4.** For all work permitted or required outside of the regular working hours specified in Section 1 of this Article one and one-half (1 1/2) times the regular rate shall be paid. On Sundays and the holidays specified in Section 3 of this Article, double the regular rate shall be paid.

**SECTION 5.** No overtime work shall be performed during the term of this Agreement except in proven emergency situations. The Shop Steward shall report to the office of the Union all requests of the Employer for overtime work and the names of the journeypersons and apprentices working overtime.

**SECTION 6.** Should a journeyperson sheet metal worker or a registered apprentice leave his work before it is completed without the consent of his Employer, it shall be on his own time and at his own expense.

**SECTION 7.** High pressure fire dampers required pursuant to Local Law 5 may be installed outside of the regular work hours at a straight time rate with the proviso that a minimum of eight (8) hours work be performed during any one (1) regular work day.

**SECTION 8.** The Employer shall have the right to institute a time-management system in the shop. Such system may include Punch Card, Biometric, and Job Clock Keytab, etc.

**SECTION 9.** There may be a Saturday make-up day at straight time at the Employer's discretion with Union approval, which shall not be unreasonably withheld. This shall only apply to a situation where a work day is lost during the week due to reasons beyond the Employees control; i.e. weather and job shutdown. There can only be one (1) Saturday make-up day per week regardless of how many days are lost during the week.

# ARTICLE IX
## SHIFT WORK

**SECTION 1.** Shift work is defined as work that can only be performed outside the regular working hours as set forth in Article VIII, Section 1 of this Agreement. The Employer when confronted with this condition shall receive the approval of the Union, which approval shall not be unreasonably withheld.

**SECTION 2.** Should it be necessary to start a shift at the close of the regular work day, such shift, comprised only of journeypersons and apprentices who have not worked during regular working hours, shall start work between 3:30

**30**

p.m. and 11:30 p.m. with the customary lunch period, and shall be paid at ten percent (10%) above the established hourly rate. This shall be known as the first shift. The second shift shall be between 11:30 p.m. and 7:30 a.m., under the same conditions, with the exception of wages, which shall be paid at fifteen percent (15%) above the established hourly rate. On the above shifts, when job conditions require, the hours of work may be varied by mutual agreement of the parties. Shift work shall be for a minimum of five (5) consecutive work days in the shop or field.

**SECTION 3.** Employees working on shift on Saturdays shall be paid at one and one-half (1 1/2) time. Sundays and holidays shall be paid at double time shift differential i.e. first shift twenty percent (20%), second shift thirty percent (30%). Shift wage rate shall be the basis for all contributions to the Funds.

**SECTION 4.** There shall be a lunch period during each shift conforming to the standard work day.

**SECTION 5.** Shifts shall start at 3:30 p.m. and 11:30 p.m. except if there is one (1) shift, which may start any time outside the regular working hours, provided the starting time remains the same for each day of the shift period.

**SECTION 6.** No shop shall be set up on the job site for shift work, and drafting shall not be done on shift work.

# ARTICLE X
# SHOP STEWARD

**SECTION 1.** The Shop Steward shall be appointed by the Business Manager and/or Business Agent.

**SECTION 2.** The Shop Steward shall be a working steward and shall perform the duties of a journeyperson sheet metal worker, and shall report any violations of this Agreement to the Business Agent or to the office of the Union.

**SECTION 3.** The Shop Steward shall not be discriminated against in any manner by the Employer because of his/her activities on behalf of the Union, or discharged for Union activity. Neither shall the Shop Steward be discharged or laid off for any reason prior to the Employer notifying the Business Agent seventy-two (72) hours prior to said proposed layoff or discharge. If the Business Agent disagrees with the discharge, then the Union may, within forty-eight (48) hours, refer the matter to the Joint Adjustment Board, and if not settled there, then the Union may

**31**

continue its grievance according to the procedures set forth in Article XVI of this Agreement.

**SECTION 4.** Where four (4) or more journeyperson sheet metal workers, excluding superintendent or foreman, are employed on a job site, the Shop Steward may not be transferred without prior notification to the Business Agent.

**SECTION 5.** When the Employer of a Shop Steward has six (6) or more journeyperson sheet metal workers working overtime on a job site, the Shop Steward shall be one of the journeypersons working overtime.

**SECTION 6.**
   **A.** On Multi-Employer job sites (all working on parts of the same contract), one (1) Shop Steward shall be selected by the Union from among Journeypersons on said job. The Shop Steward's time with each Employer shall be a function of that Employer's portion of the work awarded on the job. All other provisions regarding Shop Stewards in this Agreement shall apply.

   **B.** The aforementioned provisions may be modified by agreement of the Employer and the Business Agent with the consent of the Union and the Associations.

**SECTION 7.** Every Employer must have a Steward in its shop to be selected by the Union from among the employees in the shop.

# ARTICLE XI
## TRAVEL

**SECTION 1.** When employed outside the limits of the seven (7) counties of New York, employees shall provide transportation for themselves which will assure their arrival at the job site at the regular starting time, and they shall remain at the job site until the conclusion of the regular time. The Employer shall reimburse the employee for all tolls, carfare or any other travel expenses incurred in going to or returning from the job site.

**SECTION 2.** There shall be no travel or board in the seven (7) counties of New York, and there shall be no travel or board within a fifty (50) mile radius of Columbus Circle, Manhattan.

**32**

**SECTION 3.** Fifty (50) miles or over from Columbus Circle, Manhattan, shall be a board zone and shall be paid for at forty-five dollars and no cents ($45.00) per day, seven (7) days per week. One trip is to be paid for at the start of the job and one trip is to be paid for at the completion of the job at a rate of forty cents ($ .40) per mile plus straight time traveling wage. When working outside the seven (7) counties of New York, the Employer shall reimburse its employees for tolls and car expenses incurred.

**SECTION 4.** On all work specified in Article I of this Agreement fabricated and/or assembled by employees within the jurisdiction of the Union or elsewhere for erection and/or installation within the jurisdiction of any other local Union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers, whose established wage scale is higher than the hourly wage rates specified in this Agreement, the higher wage scale of the local Union in whose jurisdiction the work is to be erected and/or installed shall prevail and shall be paid by the Employer.

**SECTION 5.** Except as otherwise provided herein, the Employer agrees that journeyperson sheet metal workers hired outside of the territorial jurisdiction of the Union to perform or supervise work outside of said jurisdiction and within the jurisdiction of another local Union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers shall receive the wage scale and working conditions of the local Union in whose jurisdiction such work is performed or supervised.

**SECTION 6.** When sent by the Employer to supervise or perform work specified in Article I of this Agreement outside of the jurisdiction of the Union and within the jurisdiction of another local Union affiliated with International Association of Sheet Metal, Air, Rail and Transportation Workers, journeyperson sheet metal workers covered by this Agreement shall be paid at least the established minimum wage scaled specified in this Agreement, but in no case less than the established wage scale of the local Union in whose jurisdiction they are employed plus all necessary transportation traveling time, board and expenses while employed in the jurisdiction of any other affiliated local Union, and said employees shall be governed by the established working rules of said Local Union. The provisions of this section shall also apply to all jobs located where no local Union of the International Association of Sheet Metal, Air, Rail and Transportation Workers has jurisdiction.

**SECTION 7.** Journeyperson sheet metal workers working for Employers in other jurisdictions shall work the regular working hours prevailing in that

**33**

jurisdiction at the regular hourly rate as prescribed by this Agreement.

**SECTION 8.** The term "jurisdiction of the Union" as used in Article XI shall mean the five (5) boroughs of New York City, and Nassau/Suffolk Counties, Long Island, New York (referred to as the seven (7) counties of New York).

# ARTICLE XII
# FRINGE BENEFIT FUNDS

## A. LOCAL UNION NO. 28 BENEFIT FUNDS

### SECTION 1. WELFARE FUND
  **A.** The Employer shall pay to the Sheet Metal Workers' Local Union No, 28 Welfare Fund ("Welfare Fund") contributions as set forth in the schedule attached hereto. The contributions of the Employer shall be used to provide group insurance such as life, hospitalization, accident, including prepaid legal services, health and sick benefits and such other forms of group insurance as the said Welfare Fund may wish to provide in addition to administrative costs. The said Welfare Fund shall be administered pursuant to the Agreement and Declaration of Trust, as amended. The Welfare Fund shall provide/pay for an annual physical examination for all eligible participants.

  **B.** In addition, the Employer shall pay the amount set forth in the schedule attached hereto which shall be used exclusively to provide vacation pay for eligible employees.

  **C.** In addition, the Employer shall pay the amount set forth in the schedule attached hereto for each hour paid for all employees covered by this Agreement:

   (i). To provide weekly benefits as determined by the Trustees to unemployed journeyperson and apprentice sheet metal workers covered by this Agreement.

   (ii). To reimburse employees for time lost from work and/or expenses in obtaining an annual physical examination.

   (iii). To pay two (2) hours' wages to those employees who qualify under Article VII, Section 4 of this Agreement.

   (iv). To provide scholarships under a Competitive System and under the regulations established by the Trustees of this Fund.

**34**

**SECTION 2. EDUCATION FUND**

 **A.** The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Education Trust Fund ("Education Fund") for each hour paid for all employees covered by this Agreement to provide for the establishment of standards and subsidies for the improvement of the proficiency, skill and ability of apprentice and journeyperson sheet metal workers, and further to provide for the education of such apprentices and journeyperson sheet metal workers now or hereafter members of the collective bargaining unit, and to provide such appropriate educational criteria and mechanical and scholastic attainments, greater skill and perfection in other and expanded fields to which such skills may be adapted and utilized all to the benefit of such apprentices and journeyperson sheet metal workers.

 **B.** If the Associations and the Union agree that additional funding is required for the Education Fund the parties shall contribute additional equal sums up to a total of three cents (\$ .03) from the Union and three cents (\$ .03) from the Employer.

**SECTION 3. ANNUITY FUND**

The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Annuity Fund ("Annuity Fund") for each hour paid for all employees covered by this Agreement which shall be for the purpose of paying members of the Union termination benefits in the event of disability severance of employment or on any other basis prescribed by the Trustees and which will be on a vested basis under regulations established by the Trustees of said Fund.

**SECTION 4. SCHOLARSHIP FUND**

The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Joint Scholarship Fund ("Scholarship Fund") for each hour paid for all employees covered by this Agreement. Scholarships are to be awarded under a competitive system, and under the regulations established by the Trustees of said Fund. This Fund shall be merged into the Welfare Fund and cease to exist effective January 1, 2015.

**SECTION 5. LABOR MANAGEMENT COMMITTEE**

The Employer shall pay the amount set forth in the schedule attached hereto to the Joint Labor Management Committee and Trust ("JLM") for each hour paid for all employees covered by this Agreement. The contributions shall be for the

purpose of protection and preservation of the work and jurisdiction covered in this Agreement.

## SECTION 6. LOCAL PENSION FUND

Commencing with the first payroll following the date hereof the Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' (Local Union No. 28) Pension Fund for each hour paid for all employees covered by this Agreement.

The Agreement and Declaration of Trust establishing the Sheet Metal Workers' (Local Union No. 28) Pension Fund as amended and the Restatement of the Local Union No. 28 Pension Plan as amended from time to time are incorporated herein by reference and adopted by the Employer.

## SECTION 7.

**A.** Each Employer shall furnish a surety bond to the Trustees of the several Local Union No. 28 fringe benefit funds and of any Local Union No. 28 jointly administered funds which may hereafter be established in order to secure the payments of contributions to said benefit funds provided for in this Agreement. Each Employer is required to furnish a bond in the amount of seven thousand five hundred dollars ($7,500.00) per employee. In the event an Employer's manpower increases then said Employer shall be required to furnish a greater bond or cash deposit in accordance with the foregoing. The amount of manpower is to be determined by taking the highest number of sheet metal journeypersons and apprentices employed by the Employer for any three (3) prior consecutive months during the past twelve (12) months. For new employers the bond amount shall be determined by the number of journeypersons and apprentices employed at the time the employer becomes subject to the terms and conditions of the Local 28 Collective Bargaining Agreement.

**B.** A ventilation shop must furnish a minimum bond of thirty thousand dollars ($30,000.00); in the event an Employer becomes delinquent in its payment of contributions to the several Local Union No. 28 fringe benefit funds its minimum bond shall immediately be increased to sixty thousand dollars ($60,000.00).

**C.** An Employer having a shop and/or address outside of the seven (7) counties of New York shall furnish a surety bond with the Trustees as to all contributions for hours paid on job sites within the seven (7) counties of New York in such amounts as set forth above or their cash equivalency. Coverage under said surety bond shall be limited to Local

**36**

Union No. 28 Trust Funds.

**SECTION 8.** The Union must withdraw members from the Employer in addition to all rights and remedies of the Union and Trustees if said Employer does not meet the bond and/or cash requirements of the Collective Bargaining Agreement.  The Union shall be required to implement the provisions of this section no later than December 31, 2014.

**SECTION 9.** The Employer shall be required to make payment at one and one-half (1 1/2) the regular hourly rate to all the respective Local Union No. 28 Funds and Plans on all overtime hours worked Monday through Saturday, and double the regular hourly rate for Sunday and holiday hours worked.

**SECTION 10.** An Employer may make payment of all fringe benefit contributions with a single check.

**SECTION 11.** All contributions to the Sheet Metal Workers Local Union No. 28 Funds and Plans shall be made weekly and received by the Funds' office no later than twenty-eight (28) days from the close of the week for which payment is made.  Interest shall revert back to seven (7) days after the close of the payroll week if payment is not received by the twenty-eight (28th) day.

**SECTION 12.** All contributions on apprentices shall be subject to further allocation and adjustment by the Union.

**SECTION 13.** All contribution hourly rates shall be rounded off to the nearest cent.

**SECTION 14.** All reasonable costs, fees and disbursements incurred in the collection of delinquencies shall be paid by the delinquent Employer.

**SECTION 15.** All delinquent contributions shall bear interest of the prime rate plus twelve percent (12%) with a minimum of fifteen percent (15%) per year. There shall be a five (5) day grace period before the interest shall commence to accrue. The Employer shall receive written notice of delinquency. Interest shall run from the end of the grace period. In addition to the foregoing, all delinquent Employers may be charged with liquidated damages of twenty percent (20%) on the unpaid contributions.

**SECTION 16.**   Each Employer shall submit a weekly report electronically (in accordance with the requirements of Federal Court Orders) on Friday to the

Funds' Office for the previous payroll week. Failure to file such report shall constitute a violation of the Employer's obligation under this Agreement and, among other available remedies, shall be subject to Section 15 above.

**SECTION 17.** The Union shall have the right to withdraw members from the Employer, in addition to all other rights and remedies of the Union and Trustees, after a thirty (30) day delinquency in the payment of weekly contributions, which can be non-consecutive, or the submission of monthly reconciliation reports, and the Union may exercise this right upon seventy-two (72) hours notice by mailgram, telegram, certified mail or facsimile transmission. The Union must withdraw members from the Employer after a six (6) week delinquency. The Union and the Funds shall have the right to bring an action in federal court pursuant to ERISA and/or to take other additional steps with regard to delinquent Employers as recommended by a joint management and labor committee.

**SECTION 18.** The books and records of the Employer shall be made available at reasonable times for inspection and audit by, but not limited to, the accountant, outside independent auditors or other representatives of the Trustees of any of Fringe Benefit Funds. The Employer shall be required to disclose upon such audits all payrolls and payroll ledgers, W-2 forms, quarterly federal payroll tax returns (Form 941), quarterly state payroll tax returns (Forms WRS2 and WRS-30), annual federal and state tax returns, cash disbursement journals, purchase journals, New York State employment records, insurance company reports, Employer remittance reports, payroll and supporting checks, ledgers, vouchers, 1099 forms, and any other documentation concerning payment of fringe benefit contributions for hours worked by Employees remitted to multiemployer fringe benefit funds other than Fringe Benefit Funds described herein, and any other items concerning payrolls. In addition, the aforementioned books and records of any affiliate, subsidiary, alter ego, joint venture or other related company of the Employer doing bargaining unit work within the Union jurisdiction, shall also be made available at all reasonable times for inspection and audits by, but not limited to, the accountants, outside independent auditors or other representatives of the Trustees of the Fringe Benefit Funds. The Employer agrees to pay the cost of the audit if the audit shows a discrepancy of ten percent (10%) or more when compared to the total contributions made during the audit period.

**SECTION 19.**
   A. The Employer agrees to be bound by the provisions of the Collection Policy, By-Laws, and the Agreement and Declaration of Trust governing the various Trust Funds of Local Union No. 28 Benefit

**38**

Funds, and the interpretations thereof by the respective Board of Trustees of the Funds as same may be amended from time to time, and hereby acknowledge that such trust documents are incorporated herein by reference and are adopted by the Employer.

**B.** Employer contributions are considered assets of the respective Funds and title to all monies paid into and/or due and owing said Funds shall be vested in and remain exclusively in the Trustees of the respective funds. The Employer shall have no legal or equitable right, title or interest in or to any sum paid by or due from the Employer.

**SECTION 20.** The Union shall have the option to create an additional Taft-Hartley fund that is permissible under federal law.

## B. NATIONAL BENEFIT FUNDS

### SECTION 21.

**A.** The Employer shall pay the amount set forth in the schedule attached hereto to the Sheet Metal Workers' National Pension Fund ("Pension Fund"), for each hour paid or part of an hour for which an employee is covered by the Collective Bargaining Agreement between the Employer and the Union. Contributions are required for vacation time, sickness absences, and other hours for which payment is made to the employee.

**B.** Contributions shall be paid on behalf of an employee starting with the employee's first day of employment in a job classification covered by the Collective Bargaining Agreement.

**C.** The Agreement and Declaration of Trust establishing the Pension Fund is incorporated herein by reference, and thereby the Employer adopts the provisions of the Trust Agreement.

**D.** It is agreed that all contributions shall be made at such time and in such manner as the Trustees require. The Trustees shall have the authority to have their auditor or an independent Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions made to the Pension Fund. If the audit reveals that inaccurate contributions or insufficient contributions have been made, the Employer agrees to pay all accountants' fees incurred in making the audit not to exceed the extent of its delinquency, and also all legal fees and costs incurred collecting the delinquency.

**E.** If an Employer's workforce did not perform any covered employment within a particular month, a remittance report shall be filed on the twentieth day (20) of the following month indicating that no covered employment was performed. Failure to do so shall subject the Employer to liability for all fees and costs resulting from its failure to file such a report or one hundred dollars ($100.00), whichever is greater.

**SECTION 22.** The Employer shall pay the amount set forth in the schedule attached hereto to the National Stabilization Agreement for the Sheet Metal Industry ("SASMI Fund") for each hour paid for all employees covered by this Agreement. The contributions of the Employer shall be used to provide unemployment benefits in periods of reduced work opportunities which cause periods of unemployment.

**SECTION 23.** The Employer shall pay the amount set forth in the schedule attached hereto for each hour paid for all employees covered by this Agreement to the International Training Institute ("ITI"), a fund which now encompasses the National Energy Management Institute ("NEMI") and the Sheet Metal Workers Occupational Health Institute and Trust ("SMOHIT").

**SECTION 24.**
- **A.** The Employer agrees to be bound by the provisions of the Agreement and Declaration of Trust governing the various National Benefit Funds, and the interpretations thereof by the respective Board of Trustees of the Funds, as same may be amended from time to time, and hereby acknowledge that such trust documents are incorporated herein by reference and are adopted by the Employer.
- **B.** Employer contributions are considered assets of the respective Funds and title to all monies paid into and/or due and owing said Funds shall be vested in and remain exclusively in the Trustees of the respective funds. The Employer shall have no legal or equitable right, title or interest in or to any sum paid by or due from the Employer.

**SECTION 25.** The Employer shall submit a remittance report and the required contributions to the NATIONAL BENEFIT FUNDS by the twentieth (20th) of the month following the month when covered employment was performed. Failure to file said report with the required contributions adopted hereinabove shall constitute a delinquency in violation of the Employer's obligations under this Agreement. The Trustees and/or Directors of the various National Benefit

**40**

Funds may take whatever steps they deem necessary, including legal action, to collect such delinquent payments and provision of the Agreement notwithstanding.

If delinquent, the Employer agrees to pay the interest, liquidated damages, attorney's fees and costs as provided in the respective Trust Agreement.

**SECTION 26.** The Employer shall make available to the National Benefits Funds any and all records of the covered employees which any of such Funds may require in connection with its sound and efficient operation.

**SECTION 27.** The Employer shall be required to make payment at one and one-half (1 1/2) times the regular hourly rate to the respective National Benefit Funds on all overtime hours worked Monday to Saturday and double the regular hourly rate for all hours worked on Sunday and holidays.

**SECTION 28.** If the Trustees of the National Pension Fund change their rules to allow a participating Local to change from the alternative schedule to the default schedule, then at that time either party may request that there be negotiations to discuss whether to change from the Alternative Plan to the Default Plan.

# ARTICLE XIII
## PROMOTION FUNDS

**SECTION 1.**

    **A.** The Employer shall contribute to the Sheet Metal Industry Promotion Funds created by the Trustees of the Sheet Metal Industry Promotion Fund of New York City and the Trustees of the Sheet Metal Industry Promotion Fund of Nassau and Suffolk Counties, the amount set forth in the schedule attached hereto, for all employees covered by this Agreement. Reports shall accompany each remittance on forms as required by the Trustees of the Fund. Contributions by Employers shall be made weekly, mailed on the same day wages are due, and for the same period. All reasonable costs, fees and disbursements incurred in collection of delinquencies shall be paid by delinquent Employers. All delinquent contributions shall bear interest of the prime rate plus twelve percent (12%) with a minimum of fifteen percent (15%) per year. There shall be a five (5) day grace period before the interest shall commence to accrue. The Employer shall receive written notice of the delinquency.

**41**

**B.** The contribution rate per hour may be adjusted at the sole discretion of the Employer Associations.

**SECTION 2.** The Industry Promotion Fund shall be used to promote the welfare of the sheet metal industry within the City of New York and Nassau and Suffolk Counties; and, more specifically, to make known the jurisdiction of the industry and to promote the programs of industry, education, training, administration of Collective Bargaining Agreements, and research and promotion of sheet metal products; to stabilize and improve Employer-Union relations; to promote, support and improve the training and employment opportunities of employees; and to disseminate to general contractors, architects, engineers and owners information about the kind, quality and merits of the work done by the industry; to make public the terms and conditions of this Agreement in order to avoid grievances and jurisdictional disputes; and to provide expanded opportunities for employment of journeyperson sheet metal workers.

**SECTION 3.** The Sheet Metal Industry Promotion Fund of New York City shall be administered by Trustees appointed solely by the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc. The Sheet Metal Industry Promotion Fund of Nassau and Suffolk Counties shall be administered by Trustees appointed solely by SMACNA of Long Island, Inc. Representatives of the respective Industry Promotion Funds shall meet with representatives of the Union to establish liaison at least bimonthly. The Industry Promotion Fund of New York City shall be administered pursuant to the Declaration of Trust dated April 7, 1970, and any amendments thereto. The Industry Promotion Fund of Nassau and Suffolk Counties shall be administered pursuant to the Declaration of Trust dated October 1, 1969, and any amendments thereto.

**SECTION 4.** The Industry Promotion Fund of New York City shall provide up to the sum of fifty thousand dollars and no cents ($50,000.00) per year for the purpose of education and promotion of sheet metal informational material, as well as for securing and disseminating certain industry and project information to all Employers. The Union shall participate in the subject program as to the designation of personnel, allocation of funds and the formulation and administration of same.

**SECTION 5.** There shall be established a program to provide paramedical training for a fixed number of journeypersons each year. This training shall take place outside of the regular work hours and the cost of the training program shall be paid by the Industry Promotion Fund of New York City.

# ARTICLE XIV
## OWNERS AND OWNER-MEMBERS

**SECTION 1.** The Employer shall employ at least one (1) Journeyperson Sheet Metal Worker who is not a member of the firm on all work specified in Article I of this Agreement.

**SECTION 2.** The Employer agrees that not more than one (1) owner, partner, officer, stockholder, or agent involved either directly or indirectly in the ownership or management of a sheet metal shop or business shall work with the tools of the trade or on any productive equipment or on the work specified in Article I of this Agreement, but such work shall be confined to the Employer's shop only.

**SECTION 3.** Owner-members must operate in accordance with provisions of the International Association of Sheet Metal, Air, Rail and Transportation Workers Constitution and Ritual, and the Trust Agreements of the various Funds, such as Vacation, Health and Welfare, Pension, and Annuity.

**SECTION 4.** The Union agrees that the terms and conditions herein will be available only to Sheet Metal Contractors who maintain a properly equipped fabrication shop.    This shall not apply to Architectural, Specialty and Environmental Balancing Contractors.

**SECTION 5.** Each Owner-member shall be required to contribute to all the Funds a minimum of one thousand eight hundred (1,800) hours per year.

## ARTICLE XV
## WORK RULES

**SECTION 1.** Journeyperson sheet metal workers and registered apprentices covered by this Agreement shall provide for themselves all necessary hand tools.

**SECTION 2.** Journeyperson sheet metal workers and registered apprentices covered by this Agreement shall not be permitted or required as a condition of employment to furnish the use of an automobile or other conveyance to transport employees, tools, equipment or materials from shop to job, from job to job, or from job to shop; facilities for such transportation shall be provided by the Employer. This provision shall not restrict the use of an automobile or other

conveyance to transport its owner and personal tools from home to shop or job at starting time or from job to home at quitting time.

**SECTION 3.** When employed in a shop or on a job within the limits of the seven (7) counties of New York, employees shall be governed by the regular working hours specified herein and shall provide for themselves necessary transportation within the said limits from home to shop or job at starting time and from shop or job to home at quitting time, and the Employer shall provide or pay for all necessary additional transportation during working hours.

**SECTION 4.** Employees shall be responsible for the transportation of their hand tools on their own time when being transferred from one job to another after completion of the work day.

**SECTION 5.** If an Employer receives a job or contract for installation and/ or fabrication of sheet metal work, then such job shall be fabricated and/or installed with plans drawn by journeyperson or apprentice sheet metal workers.

**SECTION 6.** Drawings for all standardized items shall be used for fabrication by journeyperson sheet metal workers regardless of who has prepared such drawings.

**SECTION 7.** All drawings may be done in any scale except on drawings sent to the field which must be done in three-eighths inch (3/8") scale.

**SECTION 8.** All duct drawings, background drawings, and revisions to drawings made by journeyperson sheet metal workers shall bear the names and I.A. numbers of the journeypersons making said drawings.

**SECTION 9.** Any drawings, floor layouts, fan and/or pump or terminal units (air and water), fan data or outlet report forms that are required by the Employer for testing and balancing shall be prepared by sheet metal Journeypersons or apprentices in the bargaining unit covered by this Agreement. Any existing plans, layouts or sepias furnished by the owner, architect, or engineer, or prepared by journeypersons or apprentices for other purposes, shall be used for testing and balancing. Any typing or duplicating may be done by office personnel. Any instrument or device and method of testing and balancing may be used if approved by the engineer or approving authority. The work shall be deemed complete when accepted by the engineer or approving authority.

**SECTION 10.** Within one hundred fifty (150) miles of New York City, any job

**44**

that is sketched by Local Union No. 28 must be fabricated by Local Union No. 28.

**SECTION 11.** When a job is located within the seven (7) counties of New York and said job is a joint venture between an Employer located within the seven (7) counties of New York and an Employer located outside the seven (7) counties of New York, the sketching and fabricating of said job must be performed within the seven (7) counties.

**SECTION 12.** The amount of work that a member of the Union may perform shall not be restricted by the Union, nor by the representatives, officers or members of the Union; nor shall the use of machinery, tools, appliances or methods be restricted or interfered with. There shall be unrestricted use of ratchet wrenches if supplied by the Employer. It is understood and agreed that where such tools and equipment are used to perform work previously performed by journeyperson sheet metal workers and registered apprentices, such tools and equipment shall be operated by journeyperson sheet metal workers and registered apprentices.

**SECTION 13.** Duct lifts shall be limited in use as follows:
   **A.** They shall be operated solely by sheet metal journeypersons and apprentices in the bargaining unit covered by this Agreement;
   **B.** Duct lifts shall never be used as a scaffold for supporting employees;
   **C.** All duct lifts/man-lifts shall be operated in accordance with the Manufacturer's Guidelines.
   **D.** Duct lifts shall be limited in use to the erecting of 10-12 gauge metal smoke breechings, double-walled casings, double-walled ducts, all types of units and any other duct work not to exceed the length of twenty (20) linear feet being raised during any one lift;
   **E.** Use of duct lifts will not be abused.

**SECTION 14.** Powder-actuated guns may be used only in accordance with the rules and regulations of the federal Occupational Safety and Health Administration, and only by persons who have first received appropriate training in the use and safety thereof

**SECTION 15.** Any type of hoisting device may be used at the discretion of the Employer. The load per lift shall be limited to the load that can presently be

**45**

lifted on a platform used for lifting dry wall sheets. Nets, containers, etc. must be loaded and unloaded by journeyperson and apprentice sheet metal workers in the bargaining unit covered by this Agreement. Regular past practices of packaging and use of pallets and skids may be continued.

**SECTION 16.** The Employer shall be required to accept an entire job, namely, the sketching, fabrication and installation, except under the following circumstances:

- **A.** When the item it is being asked to fabricate is not normally fabricated by its customer;
- **B.** When the Employer is a manufacturing company in signed agreement with Local Union No. 28.

**SECTION 17.** In accordance with existing or subsequently enacted federal, state or local law, and to ensure the demands of work preservation and job opportunities available to sheet metal workers, the Union shall have the right to withdraw manpower, upon fifteen (15) days' written notice, from an Employer on a job if the following items contained in Division 15 of the specifications are not provided in accordance with this Collective Bargaining Agreement: dampers, VAV's, air outlets, troffers, soundtraps, functional louvers, installation of duct reinforcements and seismic bracing.

**SECTION 18.**

- **A.** Employers must report to the Union all jobs undertaken on the forms provided by the Union, which shall contain the following information:
  - Description of work
  - Job name and location
  - General contractor
  - Mechanical contractor
  - Sheet metal contractor.
- **B.** Mandatory job reports are to be submitted to the Union and the respective Promotion Fund where the work is being performed by every Local Union 28 Draftsmen. The report among other items shall include therein testing and balancing contractors assigned to perform the work.
- **C.** Employers who do testing and balancing must submit Testing and Balancing Job Report Forms. The forms will be supplied to the Employer by the Union. The completed form is to be submitted to the office of the Joint Labor Management Committee and Trust.

**46**

**SECTION 19.** The Employer shall carry insurance or be self-insured to safeguard all employees against loss of tools and clothing in the shop or on the job site due to robbery or fire. The limit of the coverage for each loss shall be four hundred dollars ($400.00). Payment shall be made within two (2) weeks of submission of authenticated list.

**SECTION 20.** The Employer shall provide a suitable heated shanty on all jobs employing four (4) or more journeypersons and apprentices for twenty (20) days or more.

**SECTION 21.** The Employer is to have the company name and address permanently affixed on all trucks.

### SECTION 22. COMPUTER

    **A.** All computer terminals and/or work stations with machinery for the drawing, fabrication, erection, and testing, adjusting and balancing of any work formerly drawn, fabricated, erected and tested, adjusted and balanced by Local Union No. 28 sheet metal journeypersons and apprentices shall be operated by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

    **B.** All drawings (whether produced by hand or on computer) required for fabrication and erection of all work within the jurisdiction of the bargaining unit covered by this Agreement, as stated in Article I, Section 1, shall be done by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

    **C.** All work necessary for the completion of said drawings, including but not limited to architectural, structural, and mechanical backgrounds for duct work drawings, must be drawn (either by hand or on computer) by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

    **D.** No disk, tape or other transfer medium including but not limited to modems ad scanners may be used to transfer all or any part of a drawing to the computer or computers of any Employer unless said disk, tape or other transfer medium has been produced by Local Union No. 28 sheet metal building trades journeypersons and apprentices. Employers may accept disks from others for the purpose of trade coordination only.

    **E.** Architectural and structural backgrounds may be transferred on

computer disks and utilized as backgrounds for duct work drawings.

**F.** There shall be no restrictions on the use of digitizers by sheet metal journeyperson and apprentice draftspersons.

**G.** Plotters and/or printers may be used to produce drawings and labels upon completion of work by sheet metal building trades journeypersons and apprentices. Plotters and/or printers shall be permitted to run without the presence of Union personnel.

**H.** During the duration of a job, a computer disk of duct work may be utilized only by Employers who are part of the bargaining unit.

**I.** All trade coordination (whether done by hand on a composite drawing or on computer) must be done by Local Union No. 28 sheet metal building trades journeypersons and apprentices.

**J.** The first person trained on computerized equipment shall be a journeyperson. Apprentices may be trained on said equipment under Joint Apprenticeship Committee guidelines. When an Employer conducts computer training for its draftspersons not receiving pay, then the Employer shall be obligated to offer said training to all of its drafting employees.

**K.** All computer burned or fabrication labels or bar-scan labels shall bear an identifying mark indicating the name of the shop fabricating the duct work. This shall apply only where a label is utilized, at the Employer's discretion, and is computer generated.

**L.** Architectural and structural backgrounds may be transferred on a computer disk and utilized for background drawings if the drawings are completed on CAD. Any required changes or modifications to the backgrounds will be made by Local Union No. 28 members except those changes provided on disk by the architect.

**M.** Any classification of a Local Union No. 28 worker may clean up the drawings received from architects and engineers. Said employee would remove extraneous information, change the font, and remove any unnecessary text. They are not permitted to do adjustments of the steel, wall locations, or to the reflecting ceiling plan.

**SECTION 23.** All testing, adjusting and balancing report forms and drawings made or marked up by a journeyperson sheet metal worker shall bear the name and I.A. number of the journeyperson sheet metal worker making said reports and marking up said drawings.

**48**

**SECTION 24.** Parties shall jointly establish a system for the submission of Letters of Assignment.

**SECTION 25.** Safe and healthy working conditions shall be observed at all times.

**SECTION 26.** At no time shall a swing or suspended scaffold crew be fewer than two (2) competent sheet metal workers.

**SECTION 27.** It is mutually agreed that all Municipal, State, and federal Safety Standards will be observed at all times.

**SECTION 28.** Each Employer shall affix to the ductwork fabricated in its shop the name of the company, job identification, and, if fabricated for a "B" job, a "B" designation.

**SECTION 29.** Laser devices are not to be considered hand tools.

**SECTION 30.** Provisions of the New York City Paid Sick Leave Law are expressly waived by the parties to this Agreement.

**SECTION 31.** The Employer shall pay for certifications or background checks of Local Union No. 28 Journeypersons and Apprentices, where required, for members to work at a specific job site including, but not limited to, the Metropolitan Transit Authority Track Safety certification and the Port Authority background check.

## ARTICLE XVI
## MARKET RECOVERY ADDENDUM

This addendum applies to all projects that have a sheet metal value of $200,000 or less for work performed in existing buildings. This does not apply to a job that is part of a larger project broken up by the construction manager or mechanical contractor.

**SECTION 1.** The Office of Labor Management shall develop a list of those methods and materials that can be utilized to perform this work so as to allow the Employer to be competitive against non-union.

**49**

**SECTION 2.** Unless the Employer fabricates its own duct work, the duct work must be purchased from a signatory Employer without any restrictions.

**SECTION 3.** Dampers and louvers must continue to be purchased from a Local Union No. 28 Employer.

**SECTION 4.** The wage package cost to the Employer for this work shall be reduced by twenty percent (20%) through a reduction or elimination of certain fringe benefit contributions as well as financial support from the Target Fund or Equality Fund.

**SECTION 5.** This Addendum shall be administered by the Office of Labor Management for purposes of verification and implementation.

**SECTION 6.** This does not apply to any project covered by a Project Labor Agreement or any Union agreement or understanding regarding the project.

**SECTION 7.** For Market Recovery Addendum jobs ($200,000 or less), Light Commercial Workers may unload and distribute all material and equipment throughout the job site, maintain IAQ plastic and/or repair any damage to IAQ plastic in the field on an ongoing basis throughout the course of the project. Said workers can be used as part of the relief given on Target jobs.

## ARTICLE XVII
## MISCELLANEOUS

**SECTION 1.** If any Article or any Section of any Article, or any provision of any Section, or any combination of any provisions of this Agreement be rendered or declared illegal by reason of any existing or subsequently enacted federal, state or local law, or by a decree of a court of competent jurisdiction, such invalidation of such part or portion of this Agreement, and all remaining provisions shall continue to be operating and binding on the parties hereto.

**SECTION 2.** A joint committee consisting of representatives of the Employers and the Union has been established for the following purposes:
  A. To explore market retention, market recovery and market growth in the areas of residential work, light commercial and industrial work, public and utility work, energy management, energy retrofit, indoor air quality, system commissioning, and HVAC service work;

  B. To explore and promote the direct assignment/award of sheet metal

**50**

work from the owner or general contractor to the sheet metal contractor;

    **C.** To discuss the problems of the roofing sheet metal industry with the authority to negotiate a separate addendum for these Employers;

    **D.** To establish a jointly-run safety committee.

    **E.** To develop a market recovery program under the Target Agreement, and to discuss provisions such as Resolution 78 which will allow the Employers to regain work lost to non-union contractors.

**SECTION 3.** When an Employer has a dispute with its customer and either a lien is filed or litigation commenced by said Employer, then the Union may withdraw journeypersons and apprentices from any other Employer seeking to work on that contract until such time as the Union determines that all wages and fringes have been paid by all parties involved.

**SECTION 4.** Any Employer not a member of the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc., or SMACNA of Long Island, Inc. may receive the benefits and assume the obligations of this Agreement by and with the Union by signing an exact copy of this Agreement.

**SECTION 5.** The Union agrees that it will not enter into an Agreement with any Employer containing more favorable conditions than those agreed to in the current Agreement. Should it be shown that more favorable conditions prevail, then the more favorable conditions or wages shall apply to all signatories to this Agreement.

The foregoing provision shall not be applicable to Production, Manufacturing, Target, Airside, Equality, Resolution 78, Specialty and Roofing agreements wherein the Union is a signatory and/or party in interest. It is understood that any of said agreements shall be offered to the Employer for the work covered and described in said agreements. It is also understood that said Production and Manufacturing work shall be performed in separate quarters from any building trades construction work.

A signatory Employer must have a fully operational shop facility located in New York City or Long Island in order to be eligible to enter into a Collective Bargaining Agreement with the Union. This shall not apply to non-union contractors (shops) doing work in New York City and/or Long Island and organized after August 1, 2005.

**SECTION 6.** The Employer, upon written authorization from the employee, shall deduct from wages five cents (\$ .05) per hour and remit same to the Local Union No. 28 Political Action League. The Union has a right to reallocate as it sees fit. Contributions to the Political Action League are not deductible for Federal Income Tax purposes.

**SECTION 7.** The Employer shall provide Statutory or State Disability coverage for its employees. If the rate of such coverage at any time during the term of the Agreement exceeds twice the current rate, then the employees will pay the cost beyond twice the current rate.

**SECTION 8.** The Employer and the Union mutually agree they will treat all employees and applicants for employment without unlawful discrimination as to race, creed, color, national origin, sex, age, disability, marital status, sexual orientation or citizenship status in all employment decisions, including but not limited to recruitment, hiring, compensation, training and apprenticeship, promotion, upgrading, demotion, downgrading, transfer, lay-off and termination, and all other terms and conditions of employment.

## ARTICLE XVIII
## GRIEVANCE PROCEDURE

**SECTION 1.** Any and all complaints, disputes, claims, differences and/or grievances (except that delinquent contributions may also be resolved outside this procedure by bringing an action in federal court or through a motion for administrative expenses/proof of claim in bankruptcy court) arising out of or relating to the interpretation or application of the provisions of this Agreement shall be settled, adjusted and disposed of in the following manner:

- **A.** Between the Employer directly involved and the duly authorized representative of the Union.

- **B.** Between the Business Manager and the Association's official or representative.

- **C.** Grievances not settled in accordance with (A) or (B) above shall be referred to a Joint Adjustment Board consisting of five (5) representatives from the Sheet Metal & Air Conditioning Contractors Association of New York City, Inc., and SMACNA of Long Island, Inc., and five (5) representatives from the Union plus the respective attorney for each, whose decision shall be final and binding. Prior written notice of fourteen (14) days shall be required before a matter is

**52**

referred to the Joint Adjustment Board, Any deadlocked Joint Adjustment Board that is not taken to arbitration within seven (7) working days shall be considered withdrawn.

    **D.** Grievances not resolved under procedure described in (C) above because of deadlock or otherwise shall be referred to arbitration as set forth in Section 2 of this Article XVI.

**SECTION 2.** Arbitration shall be had in accordance with the Labor Tribunal Rules of the American Arbitration Association. All cases shall be heard in chronological order within seven (7) calendar days from the date either party requests arbitration. Any group or series of cases related in substance or time may be submitted for arbitration to one Arbitrator at the same time.

**SECTION 3.** Parties shall share the cost of arbitration equally.

**SECTION 4.** Arbitrator's award shall be final, binding and conclusive upon the parties and employees for all purposes.

**SECTION 5.** The Arbitrator shall have full power and authority to determine all complaints, disputes, claims, differences and grievances in accordance with the terms of the Collective Bargaining Agreement signed by the parties and to award such remedy or relief as is deemed reasonable and proper.

**SECTION 6.** There shall be an expedited hearing before the Arbitrator within three (3) working days of disagreement in connection with the proposed layoff, discharge or termination of a Shop Steward.

**SECTION 7.**
    **A.** Upon the failure on the part of either party to comply with the Arbitrator's award the other party, after three (3) working days, shall be released from the "no strike-no lockout" provision, as the case may be.

    **B.** Upon the failure of a party to comply with the award, the same Arbitrator who heard the original matter must meet within three (3) working days of a request to determine whether or not there has been compliance. If the Arbitrator finds non-compliance, he must make an award providing for liquidated damages in the sum of one thousand dollars ($1,000.00) per day commencing with the third working day following the issuance of the second award.

**53**

**SECTION 8.** It is agreed that funds collected by the Joint Adjustment Board as fines, awards, or other compensation, may be used by the Sheet Metal Workers' Local Union No. 28 Education Fund to fund educational projects upon recommendation to and approval of the Joint Adjustment Board.

**SECTION 9.** It is understood and agreed that in the event an Employer is unsuccessful in securing such work of a nature to be determined to be lower than No. 10 U.S. Gauge, such a matter should not be construed to alter, modify, amend, change or apply to any and all work historically traditionally and customarily performed by journeyperson and apprentice sheet metal workers in the collective bargaining unit in accordance with the Collective Bargaining Agreement.

**SECTION 10.** There shall be no strike or lockout at any time during the term of this Agreement except as provided for in Section 7 A.

## ARTICLE XIX
## TERM

This Agreement and attachments hereto shall become effective as of the first day of August 2014, and remain in full force and effect until the thirty-first day of July, 201**7**, and shall continue in force from year to year thereafter unless written notice of reopening is given no fewer than ninety (90) days prior to the expiration date. In the event such notice of reopening is served, this Agreement shall continue in force and effect until conferences relating thereto have been terminated by either party.

**54**

**A**
# SKETCH OF BUILT UP SYSTEMS



**B**

## SKETCH GOVERNING OBD'S AND SANTROLS
## BELOW HUNG CEILING



# C
## SKETCH GOVERNING OBD'S AND SANTROLS
## ABOVE HUNG CEILING



**58**

| APPRENTICE HOURLY WAGE AND BENEFIT EFFECTIVE JULY 31, 2014 TO JULY 29, 2015 | Journey Person | Pre-Apprentice 6 Mo. Term | First Year 1st & 2nd Term | Second Year 3rd & 4th Term | Third Year 5th Term | Third Year **6th Term | Fourth Year 7th Term | Fourth Year 8th Term | Fifth Year 9th Term |
|---|---|---|---|---|---|---|---|---|---|
|  | 100% | 25% | 35% | 45% | 55% | 60% | 70% | 75% | 80% |
| Wages | $46.96 | $15.02 | $16.44 | $21.13 | $25.83 | $28.18 | $32.87 | $35.22 | $37.57 |
| Vacation Fund | $3.95 | $0.00 | $1.39 | $1.78 | $2.17 | $2.37 | $2.77 | $2.96 | $3.16 |
| National Pension Fund | $13.56 | $0.68 | $4.75 | $6.10 | $7.46 | $8.14 | $9.49 | $10.17 | $10.85 |
| Annuity Fund | $6.37 | $0.00 | $2.23 | $2.87 | $3.50 | $3.82 | $4.46 | $4.78 | $5.10 |
| Health and Welfare Fund | $12.38 | $4.50 | $4.50 | $5.57 | $6.81 | $7.43 | $8.67 | $9.29 | $9.90 |
| Supplemental Unemployment Fund | $0.99 | $0.00 | $0.35 | $0.45 | $0.54 | $0.59 | $0.69 | $0.74 | $0.79 |
| Local Pension Fund | $4.22 | $0.00 | $1.49 | $3.91 | $3.97 | $4.00 | $4.06 | $4.11 | $4.13 |
| SASMI Fund | $2.65 | $0.00 | $0.93 | $1.25 | $1.51 | $1.64 | $1.89 | $2.02 | $2.15 |
| Local Education Fund | $0.88 | $0.88 | $0.88 | $0.88 | $0.88 | $0.88 | $0.88 | $0.88 | $0.88 |
| ITI / N.E.M.I. | $0.17 | $0.17 | $0.17 | $0.17 | $0.17 | $0.17 | $0.17 | $0.17 | $0.17 |
| Joint Labor Management Fund | $1.41 | $0.00 | $0.49 | $0.63 | $0.78 | $0.85 | $0.99 | $1.06 | $1.13 |
| Industry Promotion Fund | $0.55 | $0.00 | $0.55 | $0.55 | $0.55 | $0.55 | $0.55 | $0.55 | $0.55 |
| Scholarship Fund | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 | $0.02 |
| **Total Hourly Rate** | **$94.11** | **$21.27** | **$34.19** | **$45.31** | **$54.19** | **$58.64** | **$67.51** | **$71.97** | **$76.40** |
| **Total Taxable Wages** | **$50.91** | **$15.02** | **$17.83** | **$22.91** | **$28.00** | **$30.55** | **$35.64** | **$38.18** | **$40.73** |
| **Total Fringe** | **$43.20** | **$6.25** | **$16.36** | **$22.40** | **$26.19** | **$28.09** | **$31.87** | **$33.79** | **$35.67** |
| *Assessments* | *$1.74* | *$0.11* | *$0.54* | *$0.77* | *$0.94* | *$1.03* | *$1.21* | *$1.30* | *$1.39* |
| *E.T.E.R. Fund* | *$0.30* | *$0.00* | *$0.30* | *$0.30* | *$0.30* | *$0.30* | *$0.30* | *$0.30* | *$0.30* |
| *\*PAL Fund* | *$0.07* | *$0.00* | *$0.05* | *$0.05* | *$0.05* | *$0.05* | *$0.05* | *$0.05* | *$0.05* |
| ***Total UNION deductions from wages*** | ***$2.11*** | ***$0.11*** | ***$0.89*** | ***$1.12*** | ***$1.29*** | ***$1.38*** | ***$1.56*** | ***$1.65*** | ***$1.74*** |

*\*for Journeyperson only, the Building Fund rate is included.*
*\*\*This percentage will end on January 28, 2015; 5th & 6th terms will be 55% effective January 29, 2015 and forward.*

07/31/2014 – 07/29/2015

| WAGES | | $46.96 |
|---|---|---|

FRINGE BENEFITS

| Vacation fund | 3.95 | |
|---|---|---|
| Welfare Fund | 12.38 | |
| Annuity Fund | 6.37 | |
| SUB Plan | .99 | |
| Labor Management Ct. | 1.41 | |
| Scholarship | .02 | |
| Local Pension Fund | 4.22 | |
| Education Fund | .88 | |
| National Pension Fund | 13.56 | |
| SASMI Fund | 2.65 | |
| ITI | .17 | |
| Industry Promotion Fund | .55 | $47.15 |

$94.11

Note:   the following wage package increases shall apply as follows:

| August 1, 2014 | $2.00 |
|---|---|
| August 1, 2015 | $2.00 |
| August 1, 2016 | $2.75 |

[59]

**WEEKLY APPRENTICE SCHOOL STIPEND**

### TERM

| | |
|---|---|
| 1st | $624.00 |
| 2nd | 624.00 |
| 3rd | 802.00 |
| 4th | 802.00 |
| 5th | 980.00 |
| 6th | 1069.00 |
| 7th | 1247.00 |
| 8th | 1336.00 |
| 9th | 1426.00 |

### PRE APPRENTICE

| | |
|---|---|
| 1st Week | $100.00 |
| 2nd Week | 110.00 |
| 3rd Week | 120.00 |
| 4th Week | 130.00 |

**60**

**SHEET METAL & AIR CONDITIONING CONTRACTORS ASSOCIATION OF NEW YORK CITY, INC.**

**INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS LOCAL UNION NO. 28**

**Negotiating Committee**

Victor Gany, Chairman
Dennis Appel
Ron Finamore
Brad Mattes
Frank Narciso
Mike Reed
Peter Pappas, Jr.
William Rothberg, Executive Director

**Negotiating Committee**

Robert DiOrio, Chairman
Brian Duffy
Butch Keane
Nathaniel Mays
Brian McBrearty
Eric Meslin
Raymond Minieri
Frank Nitto
Robert Soto
Reinaldo Torres
Ralph Tortora

**SMACNA OF LONG ISLAND, INC.**

**Negotiating Committee**

Al LaBella, Chairman
Steven Benkovsky
Randy Buchter
John Hauser
Tom Luerssen
Rick Panciroli

**61**

# EXHIBIT 2

# MEMORANDUM OF UNDERSTANDING

MEMORANDUM OF UNDERSTANDING made this ___6___ day of ___October___, 20 _15_, by and between SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS' LOCAL UNION 28 (hereinafter referred to as the "UNION") and ___NY Chutes, LLC___

located at ___5 Houynau, Rd, Lebanon NJ 08833___
(hereinafter referred to as the "EMPLOYER").

## WITNESSETH

WHEREAS, the UNION and EMPLOYER are desirous of entering into a Collective Bargaining Agreement covering all of the journeyperson and apprentice sheet metal workers employed by the EMPLOYER (hereinafter referred to as the "EMPLOYEES") for the period August 1, 2014 through July 31, 2017, and;

WHEREAS, the UNION and EMPLOYER have negotiated and agree upon terms, conditions and provisions of employment for the EMPLOYEES for the period commencing with the date of the execution of this MEMORANDUM to July 31, 2017.

NOW, THEREFORE, the UNION and EMPLOYER mutually agree as follows:

The terms, conditions and revisions of the Collective Bargaining Agreement Sheet Metal Contracting Division of the Construction Industry by and between Sheet Metal and Air Conditioning Contractors Association of New York City, Inc., SMACNA of Long Island, Inc., and Sheet Metal, Air, Rail and Transportation Workers Local Union 28 effective August 1, 2014 through July 31, 2017, shall constitute the Collective Bargaining Agreement by and between the UNION and the EMPLOYER, covering the EMPLOYEES for the period from the date of the execution of this MEMORANDUM to July 31, 2017.

IN WITNESS WHEREOF, the parties hereto have affixed their signatures the ___6___ day of ___October___ 20 _15_.

___NY Chutes, LLC___                              SHEET METAL, AIR, RAIL AND

___5 Houynau Rd___                                TRANSPORTATION WORKERS

___Lebanon, NJ 08833___                           LOCAL UNION 28

BY: _____                       BY: ___Kevin Connors___
      Signature                                         Signature

___James Roy___                                   ___Kevin Connors___
    Print Name                                        Print Name   President/

TITLE: ___VP___                                   TITLE: ___Business Manager___

45

# EXHIBIT 3

# MEMORANDUM OF AGREEMENT

**AGREEMENT**, made on the date of its mutual execution, by and between International Association Sheet Metal, Air, Rail and Transportation Workers Local Union No. 28 ("Union") and Sheet Metal & Air Conditioning Contractors Association of New York City, Inc. and SMACNA of Long Island, Inc. ("Employer" or "Association").

**WHEREAS**, the Union and the Employer are signatories to a collective bargaining agreement and attachments thereto dated August 1, 2014 (the "CBA"), which CBA was extended by agreement of the Employer and the Union through July 31, 2017; and

**WHEREAS**, the Union and the Employer have been negotiating in good faith for the purpose of reaching agreement on the terms of a successor agreement to the CBA; and

**WHEREAS**, the Employer and the Union have reached an agreement on the terms and conditions of a successor agreement and wish to memorialize same herein, with the understanding that, upon ratification by the bargaining unit, they will sign a new collective bargaining agreement (the "Successor CBA"), which shall incorporate the CBA as amended by this Memorandum of Agreement.

**NOW, THEREFORE**, the Union and the Employer agree as follows:

1.  **TERM (CBA Article XIX)**: The term of the Successor CBA shall be three (3) years, effective as of August 1, 2017 through July 31, 2020. All other provisions of Article XIX shall remain unchanged.

2.   **WAGE INCREASES (CBA Article VII, Section 1(A))**: There shall be a wage package increase of $6.00 as follows: (1) $2.00 increase effective August 1, 2017; (2) $2.00 increase effective August 1, 2018; and (3) $2.00 increase effective August 1, 2019.

3.   **JLM Contributions (CBA Article XII, Section 5: Wage Packet Attachment)**: The Employer and Union shall provide matching $0.20/hour contributions to the Joint Labor Management Committee and Trust to be paid as follows: (1) $0.10/hour matching contributions effective August 1, 2017; (2) Additional $0.10/hour matching contributions effective August 1, 2018.  The Union's matching contributions shall be deducted from wages.

4.   **CBA**: All the terms and conditions of the CBA shall be included in the Successor CBA, except to the extent they are deleted or modified by this Memorandum of Agreement.

# EXHIBIT 4

# NYC SMACNA/SMACNA LI/SMART Local 28
# Collective Bargaining Agreement Extension

This Agreement is made and entered into by and between the Sheet Metal & Air Conditioning Association of New York City, Inc., SMACNA of Long Island, Inc. (collectively, the "Associations") and SMART Local Union No. 28 (Local 28), collectively known as the "Parties".

Whereas, the Parties are subject to a Collective Bargaining Agreement ("CBA") that went into effect on August 1, 2017 and is scheduled to expire on July 31, 2020;

Whereas, the COVID-19 pandemic has effectively shut down New York State, and the Governor of the State of New York has issued multiple Executive Orders, including 202.6, temporarily limiting or suspending almost all facets of commerce and non-essential gatherings of any size;

Whereas, the Parties are unable to determine the specific length of time for which the pandemic will continue to force these restrictions and extenuating circumstances on New York State and our industry;

Now, therefore, the Parties agree as follows:

* To extend the CBA for a period of three (3) months;
* That all provisions of the CBA will remain in place, including the current applicable wage package;
* The parties may, at any time, agree to further extend this agreement;
* The parties may consider, during negotiations, retroactively applying any increase or decrease to the wage package.

This agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all counterparts together shall constitute a single agreement.

ACCEPTED AND AGREED:

INTERNATIONAL ASSOCIATION SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS LOCAL UNION NO. 28

By:

_Eric Meslin_

Eric Meslin

SMACNA OF LONG ISLAND, INC.
By:

_Melissa Barbour_

Melissa Barbour

SHEET METAL & AIR CONDITIONING CONTRACTORS ASSOCIATION OF NEW YORK CITY, INC.

By:

William Rothberg

# EXHIBIT 5

**EIN/PLN: 52-6112463/001**

# Sheet Metal Workers' National Pension Fund Trust Document

AMENDED AND RESTATED AS OF OCTOBER 13, 2021

**Sheet Metal Workers' National Pension Fund**
3180 Fairview Park Drive, Suite 400
Falls Church, Virginia 22042
(703) 739-7000 Toll Free 1-800-231-4622

1

## SHEET METAL WORKERS' NATIONAL PENSION FUND
## TRUST DOCUMENT

# Table of Contents

ARTICLE I.  DEFINITIONS .................................................................................................1

SECTION 1.    TRUST DOCUMENT ................................................................1
SECTION 2.    BENEFITS ..................................................................................1
SECTION 3.    CODE .........................................................................................1
SECTION 4.    COLLECTIVE BARGAINING AGREEMENT ..........................1
SECTION 5.    CONTRIBUTIONS ....................................................................1
SECTION 6.    COVERED EMPLOYMENT ......................................................1
SECTION 7.    EMPLOYEE ...............................................................................2
SECTION 8.    EMPLOYER ...............................................................................2
SECTION 9.    ERISA .......................................................................................2
SECTION 10.   FUND .........................................................................................2
SECTION 11.   INTERNATIONAL UNION OR SMART ....................................2
SECTION 12.   INVESTMENT MANAGER .......................................................2
SECTION 13.   LOCAL .......................................................................................2
SECTION 14.   PLAN ..........................................................................................3
SECTION 15.   PLAN DOCUMENT ...................................................................3
SECTION 16.   PLAN SPONSOR .......................................................................3
SECTION 17.   SMACNA ...................................................................................3
SECTION 18.   TRUSTEES OR BOARD OF TRUSTEES ..................................3
SECTION 19.   UNION ........................................................................................3

ARTICLE II.  GENERAL ....................................................................................................3

SECTION 1.    ESTABLISHMENT OF FUND ...................................................3
SECTION 2.    PURPOSES .................................................................................4

ARTICLE III.  TRUSTEES .................................................................................................4

SECTION 1.    UNION AND EMPLOYER TRUSTEES......................................4
SECTION 2.    ACCEPTANCE OF TRUSTEESHIP...........................................5
SECTION 3.    DURATION OF TRUSTEESHIP.................................................5
SECTION 4.    FORM OF NOTIFICATION .......................................................5
SECTION 5.    TRUSTEE POWERS UPON APPOINTMENT OR RESIGNATION ....6

ARTICLE IV.  POWERS, DUTIES AND OBLIGATIONS OF TRUSTEES .....................6

SECTION 1.    PROPERTY AND ASSISTANCE – ERISA COMPLIANCE ........6
SECTION 2.    CONSTRUCTION OF TRUST AND PLAN DOCUMENTS .........6
SECTION 3.    MANAGEMENT AND CONTROL OF ASSETS .........................6
SECTION 4.    ADDITIONAL DISCRETIONARY POWERS ..............................7
SECTION 5.    REPRESENTATION ....................................................................9
SECTION 6.    COMPENSATION .......................................................................10
SECTION 7.    AUTHORITY TO ENTER INTO MERGER OR SIMILAR AGREEMENTS.............10
SECTION 8.    SUPERSEDING POWER AND LIMITATION OF LIABILITY .....11
SECTION 9.    PERSONAL LIABILITY .............................................................11
SECTION 10.   BOOKS OF ACCOUNT .............................................................11
SECTION 11.   EXECUTION OF DOCUMENTS ...............................................12
SECTION 12.   DEPOSIT AND WITHDRAWAL OF FUNDS .............................12
SECTION 13.   BONDING ..................................................................................12

SECTION 14. FIDUCIARY/PROFESSIONAL LIABILITY INSURANCE ....................................................... 12

**ARTICLE V. CONTRIBUTIONS TO THE FUND** ............................................................................... **13**

SECTION 1. CONTRIBUTIONS DUE ........................................................................................... 13
SECTION 2. REPORTING AND DELINQUENCIES ........................................................................ 14
SECTION 3. ACCESS TO RECORDS, AUDIT OF EMPLOYERS ..................................................... 16
SECTION 4. REFUND OF CONTRIBUTIONS ............................................................................... 16
SECTION 5. POLICIES AND PROCEDURES ................................................................................ 16
SECTION 6. EXIT CONTRIBUTION ........................................................................................... 16
SECTION 7. SURCHARGES ...................................................................................................... 18

**ARTICLE VI. PLAN OF BENEFITS** .................................................................................................. **18**

SECTION 1. BENEFITS ............................................................................................................ 18
SECTION 2. RECIPIENTS OF BENEFITS AND ELIGIBILITY REQUIREMENTS ................................ 18
SECTION 3. WRITTEN PLAN OF BENEFITS .............................................................................. 18
SECTION 4. TAX-QUALIFICATION AND SPECIAL FUNDING REQUIREMENTS ............................ 19
SECTION 5. PAYMENT OF COMPLIANCE- RELATED COSTS AND EXPENSES ............................. 19
SECTION 6. LIMIT OF EMPLOYER'S LIABILITY ....................................................................... 19

**ARTICLE VII. MEETINGS AND DECISIONS OF TRUSTEES** ........................................................ **20**

SECTION 1. OFFICERS OF TRUSTEES ...................................................................................... 20
SECTION 2. TRUSTEE MEETINGS ........................................................................................... 20
SECTION 3. ACTION WITHOUT MEETING ............................................................................... 20
SECTION 4. QUORUM ............................................................................................................ 20
SECTION 5. MAJORITY VOTE OF TRUSTEES ........................................................................... 20
SECTION 6. MINUTES OF MEETINGS ...................................................................................... 21

**ARTICLE VIII. ARBITRATION** ......................................................................................................... **21**

SECTION 1. APPLICATION OF THIS ARTICLE ........................................................................... 21
SECTION 2. EXPENSES OF ARBITRATION ................................................................................ 21

**ARTICLE IX. ADOPTION OF TRUST DOCUMENT** ....................................................................... **21**

**ARTICLE X. AMENDMENT TO TRUST DOCUMENT** .................................................................... **21**

SECTION 1. AMENDMENT BY TRUSTEES ................................................................................ 21
SECTION 2. LIMITATION OF RIGHT TO AMEND ....................................................................... 22

**ARTICLE XI. TERMINATION** ........................................................................................................... **22**

SECTION 1. GENERAL ............................................................................................................ 22
SECTION 2. PROCEDURE ON TERMINATION ............................................................................ 22
SECTION 3. NOTIFICATION OF TERMINATION ......................................................................... 22

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ........................................................................... **22**

SECTION 1. TERMINATION OF EMPLOYER .............................................................................. 22
SECTION 2. VESTED RIGHTS .................................................................................................. 23
SECTION 3. ENCUMBRANCE OF BENEFITS .............................................................................. 23
SECTION 4. SITUS AND GOVERNING LAW .............................................................................. 23
SECTION 5. CONSTRUCTION OF TERMS .................................................................................. 23
SECTION 6. CERTIFICATION OF TRUSTEES' ACTIONS .............................................................. 23
SECTION 7. SEVERABILITY .................................................................................................... 24
SECTION 8. TITLES ............................................................................................................... 24

**SHEET METAL WORKERS' NATIONAL PENSION FUND TRUST DOCUMENT**

THIS TRUST DOCUMENT, which formerly had been known as the AMENDED AND RESTATED AGREEMENT AND DECLARATION OF TRUST and was originally made and entered into as of May 16, 1966, is hereby amended and restated as of October 13, 2021.

WITNESSETH:

WHEREAS, the Trustees desired to amend and restate the Amended and Restated Agreement and Declaration of Trust ("Trust Agreement") in a manner that would not alter the basic principles of the original Trust Agreement;

WHEREAS, the Trust Agreement provided that the Trustees had the power to amend the Trust Agreement in any respect that does not alter the basic principles of the original Trust Agreement;

WHEREAS, the Trustees determined that the amendment, restatement and renaming of the Trust Agreement would not alter the basic principles of the original Trust Agreement;

WHEREAS, the Trustees amended and restated the Trust Agreement and renamed it the "Sheet Metal Workers' National Pension Fund Trust Document" (the "Trust Document");

WHEREAS, the Trust Document provides that the Trustees have the power to amend it at any time, and in any manner; provided, that such amendment does not alter the basic principles of the Trust Document; and

WHEREAS, the Trustees desire to amend and restate the Trust Document in order to, among other things, reflect all amendments adopted through October 13, 2021.

NOW, THEREFORE, in consideration of the premises, and the mutual covenants herein contained, it is mutually understood and agreed to by the Trustees to amend and restate the Trust Document to read as below, as of October 13, 2021:

## Article I.  Definitions

Unless the context or subject matter otherwise requires, the following definitions apply for purposes of this Trust Document:

**Section 1.      Trust Document**

"Trust Document" refers to this document, as well as any amendments or modifications to this document (including any amendment and restatement of this document), which the Trustees duly adopt from time-to-time.  Any such amendments or modifications may be appended to this document, or may be incorporated into a restated version of this document without further Trustee action.  This document originally constituted an amendment and restatement of the Trust Agreement, and it reflects the amendments adopted since that date.

**Section 2.      Benefits**

"Benefits" refer to any pension and ancillary benefits that are provided, or may be provided in the future, to participants and their beneficiaries, pursuant to the Plan Document.

**Section 3.      Code**

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

**Section 4.      Collective Bargaining Agreement**

"Collective Bargaining Agreement" means a collective bargaining agreement between the Union and one or more Employers (together with any amendments or addenda thereto), which requires Contributions to the Fund.  As the context requires, the term "Collective Bargaining Agreement" also refers to any participation or adoption agreement or similar document, which requires Contributions to the Fund.

**Section 5.      Contributions**

"Contributions" refer to the monies required to be paid to the Fund by Employers pursuant to a Collective Bargaining Agreement or any other agreement or document (including but not limited to the Plan Document, this Trust Document, any participation or adoption agreement, and any rehabilitation plan or funding improvement plan), which creates, establishes, modifies or governs an Employer's obligation to contribute monies to the Fund.

**Section 6.      Covered Employment**

"Covered Employment" has the same meaning as in the Plan Document.

1

**Section 7.      Employee**

"Employee" has the same meaning given to the term "Covered Employee" or "Employee" in the Plan Document.  As the context so requires, the term "Employee" shall include a former "Employee."

**Section 8.      Employer**

"Employer" has the same meaning given to the term "Contributing Employer" or "Employer" in the Plan Document.  As the context so requires, the term "Employer" shall include a former "Employer."

**Section 9.    ERISA**

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and includes the regulations promulgated thereunder, as well as, any other applicable law that governs the Fund or its fiduciaries.

**Section 10.    Fund**

"Fund" refers to the trust fund that was first created in 1966 pursuant to the Trust Agreement, and means generally the money or other things of value, which comprise the corpus and additions to the trust fund and which are held for purposes of providing Benefits and defraying the reasonable costs of administering the Plan.  When the context so requires, the term "Fund" also refers to the assets of any entity which is owned by the Fund and which are treated as "plan assets" under ERISA.

**Section 11.    International Union or SMART**

"International Union" or "SMART" refers to the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART"), excepting the Transportation Division of SMART (or any affiliate of the Transportation Division of SMART).

**Section 12.    Investment Manager**

"Investment Manager" has the same meaning given the term in Section 3(38) of ERISA.

**Section 13.    Local**

"Local" refers to a local union chartered by the International Union, which is a party to one or more Collective Bargaining Agreements.

2

**Section 14.      Plan**

"Plan" refers to the Sheet Metal Workers' National Pension Fund, a multiemployer employee pension benefit plan within the meaning of ERISA and includes the Fund, which forms a part of the Plan.

**Section 15.      Plan Document**

"Plan Document" refers to the written plan of Benefits established, maintained, and amended from time to time by the Trustees, as the Plan Sponsor.  The term "Plan Document" includes any other written document forming a part of, or incorporated by reference in, the written plan of Benefits. The Plan Document forms a part of this Trust Document.  The Plan Document also includes any rehabilitation plan and funding improvement plan under ERISA.

**Section 16.      Plan Sponsor**

"Plan Sponsor" refers to the Board of Trustees when it acts in its plan sponsor capacity rather than in its fiduciary capacity.

**Section 17.      SMACNA**

"SMACNA" refers to the Sheet Metal and Air Conditioning Contractors' National Association, a New York, non-profit corporation, and its successors or assigns.

**Section 18.      Trustees or Board of Trustees**

a.    "Employer Trustee" refers to a Trustee appointed to the Board of Trustees by SMACNA.
b.    "Union Trustee" refers to a Trustee appointed to the Board of Trustees by SMART.
c.    "Trustee" refers to an Employer Trustee or a Union Trustee.
d.    "Board of Trustees" or "Trustees" refers collectively to the Employer Trustees and the Union Trustees.

**Section 19.      Union**

"Union" refers to SMART and/or any Local.

## ARTICLE II.  GENERAL

**Section 1.      Establishment of Fund**

The Sheet Metal Workers' National Pension Fund, as created by the original Trust Agreement,

3

shall comprise the Plan's entire assets derived from Employer Contributions made to or for the account of this Fund under Collective Bargaining Agreements, together with any and all investments made and held by the Trustees, or monies received by the Trustees as Contributions or as income from investments made and held by the Trustees or otherwise, and any other money or property, received and/or held by the Trustees for the uses, purposes and trust set forth in this Trust Document.

## Section 2.     Purposes

The Fund is a trust fund that holds Plan assets for the exclusive purposes of paying Benefits to participants and their beneficiaries and defraying the reasonable expenses of administering the Plan.  The Fund is intended to be a tax-qualified, multiemployer defined benefit pension plan, and it is intended to be operated in accordance with the funding rules that apply to multiemployer pension plans under ERISA and the Code.  The payment of Benefits includes the payment of any costs or expenses associated with, or necessary for, the payment of Benefits in accordance with the terms of this Trust Document, the Plan Document and the law, including but not limited to, expenses incurred in Plan design, Plan amendment or to determine the legality, actuarial or financial impact of any changes or possible changes to the plan of Benefits or to develop or maintain any rehabilitation plan or funding improvement plan.  To the extent permitted under ERISA, the Fund, or any organization established, owned, or capitalized by the Fund, may provide to, receive from, or share with, administrative services with any other multiemployer plans and related tax-exempt entities in the sheet metal industry, including but not limited to the Union.

### ARTICLE III.  TRUSTEES

## Section 1.     Union and Employer Trustees

   a.     Functions of the Board of Trustees.

      The Board of Trustees jointly administers and operates the Plan and Fund, and it also is the "Plan Sponsor" as defined in ERISA.  An equal number of Employer Trustees and Union Trustees comprise the Board of Trustees. While the number of Trustees appointed to the Board of Trustees may change from time-to-time, in no event will there be more than four (4) Employer Trustees and four (4) Union Trustees serving on the Board of Trustees.

      (i) Named Fiduciaries: The Trustees are the named fiduciaries of the Plan and they jointly have authority to control and manage the operation and administration of the Plan, except that SMART and SMACNA are the named fiduciaries for purposes of appointing, retaining, removing and replacing individual Trustees.

      (ii) Plan Sponsor: In its Plan Sponsor capacity, the Board of Trustees has the sole authority to make all plan-design decisions, including, but not limited to, establishing, modifying, or amending the Plan Document and determining the

4

eligibility conditions for Benefits and the amount, duration, availability, and types of Benefits provided by the Plan. The Board of Trustees also acts in its capacity as the Plan Sponsor when it carries out the additional funding rules that are imposed upon plan sponsors under ERISA. The Trustees do not act in a fiduciary capacity when carrying out any of their functions as the Plan Sponsor, but rather act in a capacity analogous to a settlor of a trust.

b.   Appointment of Trustees.

(i)   SMART has the sole discretionary authority and responsibility to appoint, retain, remove and replace Union Trustees and is a named fiduciary for those purposes.

(ii)   SMACNA has the sole discretionary authority and responsibility to appoint, retain, remove and replace Employer Trustees (provided that SMACNA confers with the then current Employer Trustees before appointing or removing any new Employer Trustee). SMACNA is a named fiduciary for those purposes.

## Section 2.        Acceptance of Trusteeship

A person who has been appointed as a Trustee accepts his appointment by providing written acknowledgment of his acceptance in a form acceptable to the Board of Trustees or by communicating his acceptance at a duly constituted meeting of the Board of Trustees.

## Section 3.        Duration of Trusteeship

Upon acceptance as a Trustee, a person will continue to serve as a Trustee until his death, incapacity, resignation or removal, as provided in this Trust Document.

## Section 4.        Form of Notification

If any Union Trustee is appointed, removed or replaced by SMART, a written notification by SMART will be sufficient evidence of its action. If any Employer Trustee is appointed, removed or replaced by SMACNA, a written notification from SMACNA will be sufficient evidence of SMACNA's action with respect to the appointment, removal or replacement of any Employer Trustee. Written notice by an appointing authority and any resignation by a Trustee will be delivered in writing to the Fund's office at 3180 Fairview Park Drive, Suite 400, Falls Church, VA 22042 (Attn: Executive Director[1]), and will be effective upon the later of the date specified in the resignation or the Fund's receipt of the resignation.

---

[1] Any reference herein to the term "Executive Director" shall be deemed to include a reference to the term "Fund Administrator," as the context so requires.

5

**Section 5.        Trustee Powers upon Appointment or Resignation**

When a new Trustee accepts an appointment as provided herein, or when the Fund has actual receipt of a Trustee's resignation, the Fund office will notify all of the other Trustees, as well as, any other necessary persons.  Upon a new Trustee's acceptance of his appointment, he will be vested with all the property, rights, powers and duties of a Trustee under this Trust Document and ERISA.  A Trustee who resigns will be divested of such property, rights, powers and duties upon the effective date of his resignation.  Except as ERISA may otherwise provide, no newly appointed Trustee, and no former Trustee, will be responsible for any act or omission before the date he became a Trustee or after the date he ceased to be a Trustee.

<div align="center">

**Article IV.  Powers, Duties and Obligations of Trustees**

</div>

**Section 1.        Property and Assistance – ERISA Compliance**

The Trustees have the discretionary authority and power to use the Fund's assets to purchase, acquire, share or otherwise obtain any services, assistance and personnel, and any premises, office space, materials, supplies, equipment, or other property, which they deem necessary or appropriate for purposes of (i) providing Benefits (including both existing and proposed Benefits); and (ii) defraying the reasonable expense of administering the Plan.  The Trustees may delegate to any agents or employees such duties as they consider appropriate. The Trustees will discharge all powers listed in this Article IV in accordance with, and subject to, the requirements of ERISA.

**Section 2.        Construction of Trust and Plan Documents**

The Board of Trustees, or any duly appointed committee of the Trustees (such as the Appeals Committee), has the sole and absolute power, authority and discretion to construe and decide all final questions relating to the provisions of the Trust Document, the Plan Document, or any other document pursuant to which the Plan is maintained, including, but not limited to: any amendments to the Trust or Plan Document; any participation or adoption agreement (or similar document governing an Employer's Contributions); any rehabilitation or funding improvement plan; and any merger agreement or other similar agreement).  Any such construction or decision by the Trustees or any duly appointed committee of the Trustees (such as the Appeals Committee) is final and binding upon all persons, including, but not limited to, SMART, the Locals, SMACNA, the Employers, the Employees and their families, participants, dependents, beneficiaries and/or legal representative or any person or entity claiming through or on behalf of these persons or entities.

**Section 3.        Management and Control of Assets**

The Trustees have exclusive authority and discretion to manage and control Fund assets in accordance with this Trust Document and applicable law, except to the extent that such authority to manage, acquire, invest or dispose of the assets is delegated to one or more investment managers as follows:

<div align="center">6</div>

The Trustees may appoint one or more investment managers (within the meaning of Section 3 (38) of ERISA) to invest, reinvest or otherwise manage some or all of the Plan's assets, including, but not limited to, the allocation of assets, the handling and voting of proxies, and the disposition of any chose in action. Subject to the terms of the Plan's agreement with the investment manager and all other applicable documents, any such investment manager shall have the same powers as the Trustees have with respect to the Plan assets managed by the investment manager, including, but not limited to, the appointment of sub-managers, advisors, consultants, and counsel (except that the investment manager remains liable for the acts or omissions of any sub-manager, advisor, etc.). Such an investment manager may or may not be designated a "Corporate Trustee" or "Corporate Agent."  The fees of any such investment manager (and its expenses to the extent permitted by law) will be paid out of the Fund.

**Section 4.       Additional Discretionary Powers**

In addition to all other powers as set forth herein or conferred by law, the Trustees, in their fiduciary capacities, have the discretionary authority and power to do any and all of the following:

a.     Establish, maintain and administer the Plan for the benefit of eligible participants and their beneficiaries;

b.     Enter into any and all contracts and agreements for administering the Plan, carrying out the terms of the Plan or Trust Documents, and doing all such things as the Trustees deem necessary or advisable for purposes of defraying the reasonable cost of administering the Plan or providing Benefits to participants and their beneficiaries, including, but not limited to, any actions pertaining to the legality and/or actuarial impact of proposed Benefit changes or modifications being considered by the Plan Sponsor, the maintenance of the tax-qualified status of the Plan; and any reporting and disclosure requirements imposed by law;

c.     Compromise, settle, arbitrate, and release claims or demands in favor of or against the Plan, any Trustee, or any Employee, on such terms and conditions as the Trustees may deem necessary or advisable;

d.     Establish and accumulate a reserve or reserves, adequate, in the opinion of the Trustees, to carry out the purposes of the Plan;

e.     Pay out of the Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws upon or in respect to the Plan or any money, property, or securities forming a part thereof;

f.     Make appropriate allocations of common administrative expenses and disbursements shared or to be shared by the Plan in accordance with ERISA;

7

g.  Receive contributions or payments from any source whatsoever to the extent permitted by law;

h.  Invest and reinvest the Fund's assets in any type of investments permitted by ERISA and to take any and all action with respect to holding, buying, selling, investing or maintaining such investments as the Trustees (or any duly appointed Committee of the Trustees) may deem necessary or appropriate, in their sole discretion;

i.  Invest and reinvest, or authorize any duly appointed Investment Manager(s) to invest, reinvest and manage, any of the Plan's assets in any common or collective trust fund of a bank or any group trust which is exempt from taxation under section 501(a) of the Internal Revenue Code (pursuant to the principles of Rev. Rul. 81-100, 1981-1 C.B. 326, as amended, modified or succeeded by any other applicable ruling or regulation), and the trust instrument creating and governing any such common or collective trust or group trust, is deemed adopted by the Trustees and a part of the Fund, to the extent of the Plan's equitable share thereof;

j.  Appoint, to the extent they deem it appropriate or necessary, a bank or banks or trust company or trust companies whose capital and surplus is not less than $50,000,000 to be designated as (1) "Corporate Trustee," and enter into and execute a trust agreement or agreements with such bank or banks or trust company or trust companies, to provide for the investment and reinvestment of assets, with such other provisions incorporated therein as may be deemed desirable in the Trustees' sole discretion for the proper management of the Fund and, to the extent permitted by law, with respect to the powers which the Trustees may grant to such Corporate Trustee in such agreement; or (2) "Corporate Agent";

k.  Purchase annuities from any insurance company approved by the Trustees;

l.  Agree to allocate among themselves (i.e., to any other Trustee or any committee of Trustees) any of the specific duties, responsibilities, obligations and powers that they have under this Trust Document, the Plan Document or under applicable law; provided that the allocation is specified in writing by appropriate resolution of the Trustees, which resolution will constitute conclusive evidence of the Trustees' agreement to allocate their specific duties, responsibilities, obligations or powers among themselves in accordance with Section 405(b)(1)(B) of ERISA;

m.  Delegate fiduciary responsibilities to persons other than Trustees; provided that the detailed basis of such delegation is specified in writing. The power to designate persons other than Trustees to carry out fiduciary responsibilities shall include, but not be limited to, the power to designate an Executive Director to carry out some or all of the fiduciary responsibilities for administering the Plan. However, the Board of Trustees is the "administrator" and the "plan sponsor" within the meaning

8

of Section 3(16) of ERISA and the "plan administrator" within the meaning of Section 441(g) of the Code.  Notwithstanding anything to the contrary, the power to designate persons other than Trustees to carry out fiduciary responsibilities shall not apply to any responsibility provided under this Trust Document to manage or control Plan assets, other than the power provided hereunder to appoint one or more investment managers in accordance with Section 402(c)(3) of ERISA;

n.    To the extent not delegated to an investment manager, empower one or more Trustees or any other person to act as a proxy reviewer or monitor and to authorize that proxy reviewer to make recommendations regarding proxy statements received and how best to vote such proxies consistent with the applicable law or,  appoint one or more investment managers in accordance with Section 402(c)(3) to vote such proxies or take other appropriate actions relating to the proxies;

o.    Create, establish or capitalize any subsidiary business corporations, limited liability companies, limited partnerships or other similar business organizations as the Trustees deem necessary or appropriate in connection with, or for purposes of administering the Plan (including the sharing of administrative services), limiting the liability of the Plan; or investing assets.  The assets of any such business organization will be deemed assets of the Fund to the extent provided under ERISA, including any applicable U.S. Department of Labor regulations "defining plan assets," but only for purposes of ERISA; and

p.    Do all such things and take any such actions, whether or not expressly authorized in this Trust Document, which the Trustees deem necessary or appropriate to, among other things: (i) protect the property held in the Fund; (ii) accomplish the general objective of enabling participants and their beneficiaries to obtain Benefits in an efficient and economical manner; (iii) comply with any of ERISA's requirements or other applicable law, including but not limited to the additional funding requirements that apply to multiemployer plans; (iv) maintain the Plan's tax-qualified status; (v) determine and evaluate the actuarial cost and effect of any proposed Benefit changes or Plan Document amendments, as well as, the impact such proposed Benefit changes or Plan Document amendments may have on the Plan's tax-qualified status; its funded status; its withdrawal liability; and its ability to comply with the requirements of law; (vi) implement any Benefit changes or Plan Document amendments adopted by the Plan Sponsor; and (vii) provide information requested by the Plan Sponsor pertaining to the Plan's current or projected funded status under ERISA and its current or future tax-qualified status.

**Section 5.        Representation**

When and if a legal proceeding, government investigation, or suit of any kind or nature is instituted against any Trustee or common law employee of the Plan, in any capacity, as a result of his position with the Plan or his service to the Plan, the Trustees may, in their sole discretion and to the extent

permitted by ERISA, authorize the Trustee or employee to hire legal counsel approved by the Plan to represent him; provided that the Trustees have concluded that the Trustee or employee did not violate any fiduciary duty or engage in any malfeasance.  If the hiring of legal counsel is approved by the Trustees in accordance with the preceding sentence, the counsel's fees and expenses, to the extent reasonable, will be paid directly from the Fund, unless and until, the government agency, court, or other applicable adjudicator has found that the Trustee or employee has violated his or her fiduciary duty or engaged in malfeasance, or the Trustees conclude, in their sole discretion, that the continued payment of the counsel's fees and expenses is no longer consistent with the requirements of ERISA.  In that event, the Trustee or employee will be liable to reimburse the Fund for its expenditures.  The Trustees may approve any similar provisions for any service provider which provides services, but the provision must be set forth in a written agreement between the Plan and the service provider, and the provisions will not be binding on the Plan to the extent the Trustees conclude that it is inconsistent with ERISA.

An individual who is an officer, director, or employee of any business organization owned, established or capitalized by the Fund ("affiliated business organization") will be treated as a Trustee or Fund employee for purposes of this section but only if the individual also is a Trustee and serves as an officer, director or employee of the affiliated business organization in his fiduciary capacity, or the individual performs services on behalf of the Plan, which he otherwise would have been performing as an employee of the Plan.

**Section 6.       Compensation**

The Plan does not pay compensation to any Trustee who receives full-time pay from an Employer or Union, except that the Fund will reimburse a Trustee for any direct expenses properly and actually incurred (and not otherwise reimbursed) but only to the extent the reimbursement is consistent with any expense reimbursement policy adopted by the Trustees and with ERISA Sections 408(b)(2) and (c)(2).  The Trustees may authorize the Fund to pay an expense advance to a Trustee (or Plan employee) to cover direct expenses to be properly and actually incurred by such person in the performance of such person's duties with the Plan if (i) the amount of such advance is reasonable with respect to the amount of the direct expense which is likely to be properly and actually incurred in the immediate future (such as during the next month); and (ii) the Trustee (or employee) accounts to the Plan for the expenses properly and actually incurred and covered by the advance; provided, the expense would be reimbursable under any expense reimbursement policy adopted by the Trustees, and the advance is consistent with ERISA Sections 408(b)(2) and 408(c)(2).

**Section 7.       Authority to Enter into Merger or Similar Agreements**

The Trustees are authorized to enter into any agreement on behalf of the Plan providing for the merger or consolidation with, or transfer of assets or liabilities to, any other plan; provided, that each participant of the Plan shall (as if such other plan then terminated) receive a benefit immediately after the merger, consolidation or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer

10

(as if the Plan had then terminated).

The Trustees also are authorized to enter into any agreement on behalf of the Plan providing for the transfer of assets or liabilities to the Plan from any other plan; provided, that such transfer will not adversely affect the Plan's tax qualified status.

**Section 8.       Superseding Power and Limitation of Liability**

The Trustees have the power to do all acts, whether or not expressly authorized herein, which they may deem necessary or appropriate to accomplish the general objectives of: (a) providing Benefits to participants and beneficiaries; or (b) defraying the reasonable expenses of administering the Fund and Plan.  When performing the functions of a fiduciary under ERISA, the Trustees will use the standard of care required by ERISA.

If an investment manager or managers has or have been appointed in accordance with the terms of this Trust Document, no Trustee shall be liable for the acts or omissions of such investment manager or managers or under an obligation to invest or otherwise manage any Plan asset that is subject to the management of such investment manager.

**Section 9.       Personal Liability**

The Trustees, to the extent permitted by law, shall be fully protected in acting upon any instrument, certificate, or paper believed by them to be genuine and to be signed or presented by the proper person or persons, and shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.  Consistent with the powers described in this Article, the Trustees may appoint one or more qualified consultants to serve as technical advisor to the Trustees and attorneys to serve as legal counsel and also such actuaries and accountants as they may from time-to-time find necessary to carry out the requirements of ERISA or provide Benefits.  The Trustees shall be protected to the fullest extent permitted under ERISA with respect to any action taken or suffered by them in good-faith reliance upon the advice of any such consultant, attorney, accountant, or actuary, and all action so taken or suffered shall be conclusive upon each of them and upon all participants, the Union and Employers.

**Section 10.      Books of Account**

The Trustees shall keep true and accurate books of account and records of all their transactions, which shall be audited annually or more often by an independent certified public accountant selected by the Trustees.  The Trustees, or such persons as they may properly designate, shall be responsible for maintaining records sufficient to comply with any ERISA requirement and for the filing of all reports with the Labor Department, Treasury Department, and Pension Benefit Guaranty Corporation, which may be required by applicable law.

**Section 11.      Execution of Documents**

The Trustees may authorize any one Trustee or group of Trustees to execute any notice, agreement, or other written instrument on behalf or for the benefit of, the Plan.  The Trustees also may authorize the Executive Director or the Plan's counsel to execute any notice, agreement, or other written instrument on behalf, or for the benefit of, the Plan.  All persons, partnerships, corporations, or associations may rely upon such authorized signature(s) as conclusive evidence that the notice, agreement, or other written instrument has been duly executed on behalf or for the benefit of, the Plan.

**Section 12.      Deposit and Withdrawal of Funds**

All monies the Fund receives shall be deposited in such bank or banks as the Trustees may designate for that purpose, and all withdrawals of monies from such account or accounts shall be made in accordance with the written authorization of the Trustees or a duly constituted committee of Trustees comprised of at least one Union Trustee and one Employer Trustee.  In addition, the Trustees may, in their sole discretion, designate and authorize an employee of the Fund, such as the Executive Director, to sign checks or execute transfers of money from such separate and specific bank account or bank accounts as the Trustees may designate and establish for that purpose.

**Section 13.      Bonding**

The Trustees may take all such actions and do all such things as they deem necessary or appropriate to ensure that every fiduciary of the Plan and every person who handles funds or other property of the Plan are bonded in accordance with the requirements of Section 412 of ERISA.  The amount of bond shall not be less than the amount required under ERISA Section 412, but may be greater than that amount if the Trustees determine that is advisable.  The Fund shall pay the cost of bonding.

**Section 14.      Fiduciary/Professional Liability Insurance**

The Trustees may authorize the Fund's purchase of insurance for itself or for any of its current or former Trustees, as well as, for any of its current or former fiduciaries or employees, to cover liability or losses occurring by reason of any act or omission of any such person; provided, however, that any such insurance the Fund purchases must permit recourse by the insurer against a fiduciary who has breached his fiduciary obligations to the Plan.  A fiduciary may obtain an endorsement or other insurance to cover liability for the right of recourse if the additional premium for such coverage is not paid from the Fund.  Nothing herein shall in any way limit or affect the ability of any Trustee or other fiduciary to otherwise obtain additional fiduciary liability insurance coverage, to the extent permitted by ERISA.

An individual who is an officer, director, or employee of any business organization owned, established or capitalized by the Fund ("affiliated business organization") will be treated as a

12

fiduciary or employee of the Fund for purposes of the preceding paragraph, if the individual also is a Trustee and serves as an officer, director or employee of the affiliated business organization in his fiduciary capacity, or the individual performs services that he otherwise would be performing as an employee of the Plan.

## Article V.  Contributions to the Fund

### Section 1.        Contributions Due

Subject to such conditions as the Trustees may impose, Contributions must be remitted monthly or in such other intervals as the Trustees prescribe in their sole and absolute discretion. Contributions shall be paid in such amounts as are set forth in the Collective Bargaining Agreement, participation or adoption agreement, or rehabilitation plan or funding improvement plan, as applicable.  In accordance with the Plan Document and Section 401(h) of the Code, Contributions shall be allocated, between the Plan's Code Section 401(h) account for retiree health benefits and the portion of the Fund to be used for all other Benefits.  The Trustees may discontinue retiree health benefits and the allocation to the Plan's Code Section 401(h) account at any time, except that Contributions allocated to the Plan's Code Section 401(h) account may not be used to pay Benefits other than retiree health benefits unless permitted under the Code.  Except as provided herein or as otherwise approved by the Trustees in their sole and absolute discretion, Contributions must be made on the basis of a uniform hourly rate for all Employees within a particular classification of employees for whom Contributions are required to be made and generally must be made for each hour or part of an hour each Employee works.  In addition, Contributions should be made pursuant to the following rules, unless otherwise approved by the Trustees in their sole and absolute discretion:

a.      A Collective Bargaining Agreement (or other agreement) that was in effect before March 1, 2008 may provide, in a form and substance satisfactory to the Plan, that for any person who is employed by an Employer to perform work other than as a building trades journeyman or building trades apprentice, no Contributions will be made for such person during a specified period of employment that does not exceed the first 90 calendar days of his or her employment as a "New Employee" with this Employer, whether or not such days of employment are consecutive.  Such New Employee will not be considered to be a Covered Employee, or consequently, to be working in Covered Employment during such specified period of time.  In addition, such an agreement may provide for contributions at a lesser rate for New Employees than for other Employees during the period beginning immediately after the end of the specified period of time described in the first sentence of this subsection (a) and ending with the 364th calendar day after the New Employee's initial employment date with the Employer; provided that the New Employee was not a participant at any time before his or her current period of employment and provided further that such lesser rate of contributions is at least $0.05 per hour worked.

13

b. Contributions shall be paid on apprentices at a uniform rate which shall be no less than the contribution rate for journeymen, unless the Collective Bargaining Agreement or other agreement provides for graduated contribution rates for apprentices and these graduated contribution rates bear the same relationship to the contribution rates for journeymen as the wage rates for apprentices bear to the wage rates for journeymen specified in the agreement.

c. Except to the extent approved by the Trustees, the Fund will not accept a Collective Bargaining Agreement (or similar agreement) that provides for: (i) a reduction in the level of contributions for Employees; (ii) a suspension of contributions with respect to any period of service; or (iii) any new direct or indirect exclusion of younger or newly hired employees from participation in the Fund.

d. Notwithstanding the foregoing, the minimum participation standards of the Code and ERISA will control over any conflicting provision in any Collective Bargaining Agreement, participation or adoption agreement, or any similar agreement or document governing Contributions to the Fund.

**Section 2.      Reporting and Delinquencies**

Except as otherwise provided by the Trustees in their sole and absolute discretion, the following rules shall apply:

a. Employers shall submit a remittance report in a form acceptable to the Plan, and shall remit the required Contributions no later than the twentieth (20th) of the month following the month in which Covered Employment was performed (except as otherwise approved in writing by the Trustees in their sole and absolute discretion).[2] The Trustees and Plan are empowered to take whatever steps they deem necessary, including legal action, to collect such delinquent Contributions, notwithstanding any provisions of the Collective Bargaining Agreement or other agreement or document.

b. The nonpayment by an Employer of any Contributions when due shall not relieve any other Employer of its Contribution obligations.

c. Employers who fail to meet their Contribution obligations on a timely basis cause the Fund to incur administrative costs. These costs include, but are not limited to, expenses related to employees and service providers who provide delinquency collection services, and expenses for additional accounting and reporting activities. In the event that an Employer is referred to counsel to collect delinquent

---

[2] This exception to the 20th day of the month applies only if it was approved on or after October 13, 2015, or such other date was prescribed by the Plan before October 13, 2015.

Contributions, the Fund incurs additional administrative costs. Because the exact amount of the administrative costs is difficult, if not impossible, to ascertain with respect to each delinquent Employer, the Fund shall assess liquidated damages against delinquent Employers as follows. If an Employer fails to pay the required Contributions and submit accurate supporting remittance reports within 30 days after the due date, that Employer will be liable for liquidated damages equal to the greater of 10% of the delinquent Contributions or $50.00. Those liquidated damages are estimated, to the best of the Trustees' ability, to approximate the cost of the additional administrative expenses and losses caused by an Employer's failure to make timely remittance of Contributions. Delinquent Contributions shall bear interest from the original due date until they are paid at the rate of 0.0233% per day, compounded daily. In the event that suit is filed against a delinquent Employer, liquidated damages shall be the greater of 20% of the delinquent Contributions or interest on the delinquent Contributions at the above stated rate of interest. Those liquidated damages are estimated, to the best of the Trustees' ability, to approximate the cost of the additional administrative expenses and losses incurred when the Fund takes legal action to collect delinquent Contributions, and are consistent with the provisions of ERISA.

d.  If legal counsel is engaged to assist in collection, the delinquent Employer shall also be liable for reasonable attorneys' fees and for all reasonable costs incurred in collection, including, but not limited to, court fees, audit fees, judgment execution, levies, garnishments, etc.

e.  In any action by the Fund to collect delinquent Contributions from Employers, the limitations period for such action shall be governed by the law of the state in which all or the majority of the Employees work, unless such limitations period is less than five years, in which case the limitation period under the law of the Commonwealth of Virginia shall govern.

f.  In addition to the remedies provided herein, the Trustees may seek such other legal and equitable relief as they may deem appropriate.

g.  An Employer's liability for payment of a delinquency and the other amounts required to be paid by a delinquent Employer shall not be subject to the grievance and arbitration procedures contained in any agreement (unless the Trustees elect to utilize those procedures).

h.  If, within a particular month, the Employer had no employees performing Covered Employment, a remittance report shall be filed on the twentieth (20th) day of the following month explaining why no Contributions were paid by the Employer (unless otherwise approved by the Trustees in their sole and absolute discretion). The failure to do so may subject the Employer to liability for all fees and costs resulting therefrom.

15

**Section 3.**        **Access to Records, Audit of Employers**

The Trustees have the authority to conduct an audit of the entire personnel, payroll wage records encompassing all employees and any job or project information of any Employer for the purposes of assuring the accuracy of reports and Contributions, compliance with any applicable law, and compliance with the terms of the Trust Document, the Plan Document, rehabilitation plan or funding improvement plan or any other document governing the Plan.  If an audit or other information reveals that inaccurate reports or insufficient Contributions have been made, the Employer may be required to pay all fees, including audit fees and expenses and also all attorneys' fees and costs incurred in collecting said fees or expenses if legal counsel is engaged or if legal action is necessary to enforce this provision.

**Section 4.**        **Refund of Contributions**

      a.      <u>General</u>.  Except to the extent permitted by ERISA and the Code, Contributions made by Employers are irrevocable, and it shall be impossible under any conditions for any amounts contributed, or any part of the corpus or income of the Fund to revert to, or be used or enjoyed by, any Employer, SMART or the SMACNA or be used for or diverted to purposes other than for the exclusive purposes of providing Benefits and defraying reasonable expenses of administering the Plan.

<u>Other Circumstances Permitting Return of Contributions</u>.  A Contribution by an Employer that was made by a mistake of fact or law shall be returned to the Employer, to the extent provided in policies and procedures adopted by the Trustees and consistent with the applicable provisions of ERISA and the qualification requirements of the Code.

**Section 5.**        **Policies and Procedures**

The Trustees may adopt policies and procedures to carry out the provisions of this Article V.  Such policies and procedures form a part of this Trust Document and shall be binding on the Employers as provided therein the same as if they were contained within the body of this Trust Document.

**Section 6.**        **Exit Contribution**

      a.      <u>Imposition of Exit Contribution in General</u>.  The Trustees impose an "Exit Contribution" (as determined below) on any Employer who: (i) ceased to have an obligation to contribute to the Fund, and (ii) had an event of withdrawal under Title IV of ERISA as a result of the cessation of its obligation to contribute, but was not required to pay withdrawal liability under Title IV of ERISA.  While the actual cost of the Employer's cessation of its obligation to contribute to the Fund cannot be precisely quantified, the Exit Contribution is designed to cover a portion of the costs associated with the loss of contribution income to the Fund, which it uses to fund its accrued liabilities.

16

b.      Employer's Agreement to Pay Exit Contribution.  By agreeing to contribute, continuing to contribute, or continuing to be obligated to contribute, to the Fund, each Employer agrees to pay an Exit Contribution in accordance with this Section 6.  The Employer's obligation to pay an Exit Contribution under this Section 6 is independent of the Employer's collective bargaining agreement and continues to apply after the termination of the collective bargaining agreement (notwithstanding any language to the contrary in the collective bargaining agreement).

c.      Imposition of Exit Contribution During Term of Collective Bargaining Agreement. An Employer described in subsection (a) above shall pay an Exit Contribution during the term of its collective bargaining agreement if it ceases to have an obligation to contribute to the Fund for any reason whatsoever, including, but not limited to: (i) the termination of the Employer's status as a Contributing Employer; (ii) the rejection of the collective bargaining agreement by the Trustees; or (iii) the action of the bargaining parties.

d.      Imposition of Exit Contribution After Expiration of Collective Bargaining Agreement.  An Employer described in subsection (a) above shall pay an Exit Contribution after the expiration of its collective bargaining agreement if it ceased to have an obligation to contribute to the Fund as a result of such expiration, and it did not enter into a successor collective bargaining agreement requiring contributions to the Fund.

e.      Exit Contribution Amount.  The amount of an Employer's Exit Contribution is equal to the amount of the Employer's Contributions due for the 36-month period preceding the month in which the Employer ceased to have an obligation to contribute to the Fund.  The Exit Contribution shall be paid no later than the 20th day of the month following the month in which the Fund assessed the Exit Contribution by sending written demand for the payment of the Employer's Exit Contribution.

f.      Application of this Section 6 to Assessments Made On or After October 15, 2015. The terms of this Article V, Section 6 shall apply only to assessments of Exit Contribution made on or after October 15, 2015.  For any assessment of an Exit Contribution made before October 15, 2015, the terms of Article V, Section 6 of the Trust Document in effect on such date of assessment shall apply.

g.      Nature of Exit Contributions.  The Exit Contribution is a type of Contribution that an Employer is obligated to make under the Trust Document (which is incorporated by reference in the Plan Document).  As such, an Employer's failure to make an Exit Contribution constitutes a delinquency and will be treated in the same manner as any other delinquent Contribution.

h.      Waiver.  Notwithstanding anything to the contrary, the Trustees may waive an Exit

17

Contribution imposed under this Article V, Section 6 if the Trustees decide, in their sole and absolute discretion, that such waiver is appropriate based on the facts and circumstances. Any such decision by the Trustees to waive an Exit Contribution shall have no precedential effect, and should not be construed as an indication that the Trustees will decide to waive an Exit Contribution in the future under similar facts and circumstances.

**Section 7.      Surcharges**

Nature of Surcharges.  Under ERISA, surcharges may be imposed upon Employers in certain circumstances.  Should those circumstances occur, an Employer's failure to pay surcharges shall constitute a delinquency and will be treated in the same manner as other delinquent Contributions.

**Article VI.  Plan of Benefits**

**Section 1.      Benefits**

The Trustees have the sole and absolute power, authority and discretion to determine the Benefits that the Plan provides now, or in the future, and to decide all questions relating to such Benefits, including but not limited to the nature, eligibility, amount, conditions and duration of such Benefits; provided, however, that no Benefits may be provided unless it is a pension, annuity, death benefits or any other type of benefit which would be treated as an ancillary benefit under the applicable provisions of the Code or ERISA (including benefits permitted under Section 401(h) of the Code).  No new Benefits may be provided pursuant to an amendment or modification of the Plan Document if it would adversely affect the tax-qualified status of the Fund and Plan under Section 401(a) or would be inconsistent with the multiemployer funding rules under ERISA and the Code.  All determinations and decisions of the Trustees and/or Committee of the Trustees regarding Benefits, whether made in their fiduciary or plan sponsor capacities, are final and binding upon all persons, including but not limited to any participant or beneficiary, the Union, and any Employer and any and all persons or entities claiming through these persons of entities.

**Section 2.      Recipients of Benefits and Eligibility Requirements**

The Trustees have the sole and absolute power, authority, and discretion to determine, define, specify, or otherwise decide the persons to whom Benefits may be paid  and the eligibility conditions and requirements that must be satisfied in order to participate in the Plan and receive Benefits.

**Section 3.      Written Plan of Benefits**

The detailed basis for payment of Benefits, including but not limited to, the identification and description of the Benefits, the persons to whom Benefits will be paid, and the eligibility requirements and conditions, must be specified in writing by appropriate action of the Trustees, and must be incorporated into the Plan Document or a duly adopted written amendment or

18

modification of the Plan Document.

### Section 4.      Tax-Qualification and Special Funding Requirements

The Fund is intended to qualify under Code Section 401(a) and is intended to be exempt from federal income taxation under Code Section 501(a). The Plan is expected to comply with the tax-qualification requirements of Code Section 401(a), so as to provide, among other things, that the Employers' Contributions are deductible for federal income tax purposes to the extent permitted by law. Additionally, as a multiemployer pension plan, the Plan is subject to special funding rules under ERISA and the Code, as amended. The Plan Sponsor is expected to comply with these funding rules, and it is expected that the Trustees will take appropriate steps to ensure that the Plan operates in compliance with those funding rules. If a new Benefit or a modification to an existing Benefit is under consideration, the Plan's legal counsel and/or its actuarial consultant will advise the Trustees whether the adoption of the new or modified Benefit would be consistent with the qualification requirements of Code Section 401(a) and the funding rules that apply to multiemployer plans under the Code and ERISA. The Trustees may take whatever actions and do all things they deem necessary or appropriate to maintain the Plan's tax-qualified status and comply with the funding requirements of ERISA and the Code.

### Section 5.      Payment of Compliance- Related Costs and Expenses

Any expenditure for purposes of ensuring that the Fund maintains its tax-qualified status under Code Section 401(a), or for purposes ensuring compliance with any of the funding requirements imposed upon the Plan or the Plan Sponsor under ERISA and the Code constitutes a cost for purposes of providing Benefits and may be paid directly by the Fund. The costs of providing Benefits include the payment of any costs or expenses associated with maintaining the Fund's tax-qualified status, complying with the minimum and additional funding requirements of ERISA, and other applicable law. Examples of such necessary costs or expenses include, but are not limited to, costs or expenses incurred as a result of: (i) non-discrimination testing; (ii) evaluation and drafting by the Plan's counsel or actuarial consultant of any proposed Benefits, amendments, or modifications; (iii) actuarial, legal and other expenses incurred in development and modification of any rehabilitation plan or funding improvement plan; (iv) actuarial evaluations or projections; (v) determination letter and private letter ruling applications; and (vi) legal and regulatory filings.

### Section 6.      Limit of Employer's Liability

The financial liability of any Employer shall in no event exceed the obligation to make Contributions either as set forth in its applicable Collective Bargaining Agreement with the Union or as provided in this Trust Document, whichever is greater, or to comply with the provisions of ERISA and the Code, as amended.

## Article VII.  Meetings and Decisions of Trustees

### Section 1.      Officers of Trustees

The Trustees may elect from amongst themselves a Chairman, and such other officers as they deem appropriate, including a Co-Chairman.  The terms of officers shall commence on the date of their election and continue to the date that such Trustee ceases to be a Trustee, resigns his office, or is removed from such office by majority vote of the other Trustees.  At no time shall the office of Chairman and Co-Chairman be held by Trustees designated by the same parties.

### Section 2.      Trustee Meetings

Trustee Meetings may be held in person at such place or places as may be agreed upon by the Chairman and Co-Chairman and may be called by them upon five (5) days' notice to the other Trustees and may be held at any time without such notice if the Trustees consent.  Absent objection made at a meeting, all Trustees participating in a meeting will be deemed to have consented to the meeting call.  Meetings of the Trustees also may be held by telephone, video via internet (or similar medium) at the discretion of the Chairman and Co-Chairman, provided that all Trustees are given appropriate notice of the meeting.

### Section 3.      Action without Meeting

The Trustees may also act without a meeting; provided, however, that in such cases there shall be unanimous written consent by all of the Trustees eligible to vote to the action to be taken.  Any such action shall have the same force and effect as any action taken at a duly constituted meeting of the Trustees.

### Section 4.      Quorum

In all Trustee meetings, two (2) Trustees shall constitute a quorum for the transaction of business providing that there is at least one (1) Employer Trustee and one (1) Union Trustee participating in the meeting.  At all meetings the Employer Trustees and the Union Trustees shall have equal voting strength.  The vote of any non-participating Trustee shall be cast by a participating Trustee appointed by the same party as the non-participating Trustee, and his/her vote will have the same force and effect as if the non-participating Trustee were present.

### Section 5.      Majority Vote of Trustees

Except as provided in Section 3 (actions by unanimous written consent), all actions taken by the Trustees will be by majority vote of the Trustees participating in a duly constituted meeting of the Trustees.  Such majority vote shall govern not only this Article but also any portion of this Trust Document, which refers to action by the Trustees.  In the event any matter presented for decision cannot be decided because of a tie vote, or because of the lack of a quorum at two (2) consecutive meetings, the matter may then be submitted to arbitration as herein provided.

**Section 6.        Minutes of Meetings**

The Trustees will keep minutes summarizing the actions taken by them at each meeting.  The minutes need not be verbatim.  Copies of the minutes will be sent to all Trustees (excluding any Trustee who was recused from consideration of the action).

## Article VIII.  Arbitration

**Section 1.        Application of this Article**

Either the Employer Trustees or the Union Trustees or both may apply to the American Arbitration Association in the area in which the Fund maintains its principal office for the designation of an arbitrator who will decide any disputes among the Trustees or any other matter submitted to arbitration in accordance with this Trust Document.  The arbitrator's decisions will be final and binding; to the extent such decision is in accordance with the requirements of ERISA.  Any arbitrator selected under this Article will be required to enter his decision within a reasonable time.  The scope of any arbitration shall be limited to the provisions of this Trust Document and the provisions of the Plan Document.  The arbitrator shall have no jurisdiction or authority to change or modify the provisions of this Trust Document or the Plan Document, and shall have no jurisdiction to decide any issue arising out of, or the interpretation of, any Collective Bargaining Agreement.  Nor does an arbitrator have any power or authority to modify or change any provisions of a Collective Bargaining Agreement.

**Section 2.        Expenses of Arbitration**

The cost and expenses incidental to any arbitration proceedings, including the fee, if any, of the arbitrator, shall be properly charged against the Fund and the Trustees are authorized to pay such charges.

## Article IX.  Adoption of Trust Document

An Employer adopts and is bound by this Trust Document when it is a party to an instrument (such as a Collective Bargaining Agreement, adoption agreement, participation agreement, rehabilitation plan schedule or funding improvement plan schedule), which obligates the Employer to make Fund Contributions.

## Article X.  Amendment to Trust Document

**Section 1.        Amendment by Trustees**

The Trustees may amend this Trust Document, by written instrument, at any time and in any respect.  The Trustees have the sole discretion to fix the effective date of any amendment.

21

**Section 2.        Limitation of Right to Amend**

No amendment may be adopted which will alter the basic principles of this Trust Document; provided, however, that nothing in this section limits the Trustees authority under Article XII.

### Article XI.  Termination

**Section 1.        General**

The termination of the Plan and the Fund (which constitutes part of the Plan) will be governed by the provisions of Title IV of ERISA and other applicable law. To the extent consistent therewith, the Plan and the Fund (which constitutes part of the Plan), may be terminated, in whole or part, by a written instrument executed by all the Trustees.

**Section 2.        Procedure on Termination**

In the event of termination, the Trustees will take all actions required by ERISA.  Following the payment of any and all obligations of the Fund, any remaining surplus will be distributed in accordance with ERISA and the provisions of the Plan Document; provided, however, that no part of the corpus or income shall be used for, or diverted to, purposes other than for the exclusive benefit of the Employees, their families, beneficiaries, or dependents, or the payment of reasonable administrative expenses or for other payments in accordance with the provisions of the Plan Document and/or ERISA.  Under no circumstances shall any portion of the corpus or income, directly or indirectly, revert or accrue to the benefit of any Contributing Employer, SMACNA, SMART or any Local Union.

**Section 3.        Notification of Termination**

Upon termination in accordance with this Article, the Trustees shall forthwith notify each Local of SMART and each Employer and also all other necessary parties; and the Trustees shall continue as Trustees for the purpose of winding up the affairs of the Fund.

### Article XII.  Miscellaneous Provisions

**Section 1.        Termination of Employer**

The Plan Document describes the circumstances under which the Trustees may terminate an Employer.  If the Trustees terminate an Employer in accordance with the Plan Document, the Employer shall cease to be an "Employer" within the meaning of this Trust Document, except to the extent that any provision applies to a former Employer (e.g., delinquent Contributions, withdrawal liability, Exit Contributions or surcharges).

22

**Section 2.        Vested Rights**

No Employee or any person claiming by or through such Employee, including his family, dependents, beneficiary and/or legal representative, shall have any right, title or interest in or to the Fund or any Fund property or any part thereof except as may be required by ERISA, be specifically determined by the Trustees or specifically provided in the Plan Document.

**Section 3.        Encumbrance of Benefits**

The Trustees intend to make it impossible for participants covered by the Plan to imperil the provisions made for their retirement hereunder.  No participants or beneficiaries have the right to assign, alienate, transfer, sell, hypothecate, mortgage, encumber, pledge or anticipate any payments or portions thereof and any such assignment, alienation, transfer, sale, hypothecation, mortgage, encumbrance, pledge or anticipation shall be void and of no effect whatsoever unless such action shall be in compliance with ERISA and the Code and the regulations promulgated thereunder. To the extent consistent with ERISA, the Trustees may take all such actions they deem necessary or appropriate to carry out the provisions of this section, including but not limited to, the right to terminate or postpone any Benefit payments.  Nothing in this provision shall be construed to limit the right or ability of the Fund to recover any overpayment of benefits, including the recoupment of overpayments from future or prospective benefit payments, in accordance with the Plan Document.

**Section 4.        Situs and Governing Law**

The Commonwealth of Virginia is the situs of the Fund created hereunder.  All questions pertaining to validity, construction and administration of this Trust Document shall be determined in accordance with the laws of the Commonwealth of Virginia, except as required by ERISA or other applicable federal law.

**Section 5.        Construction of Terms**

Wherever any words are used in this Trust Document in the masculine gender, they shall be construed as though they were also in the feminine or  gender-neutral in all situations where they would so apply, and wherever any words are used in this Trust Document in the singular form, they shall be construed as though they were also used in the plural form in all situations where they would so apply, and wherever any words are used in this Trust Document in the plural form they shall be construed as though they were also used in the singular form in all situations where they would so apply.

**Section 6.        Certification of Trustees' Actions**

Any one Trustee, committee of Trustees, or the Executive Director, if duly authorized by the Trustees, may execute any certificate, written instrument or document on behalf of all the Trustees and/or the Fund, and any such execution shall be deemed to be executed by all of the Trustees.  All

persons having dealings with the Fund or with the Trustees may reasonably rely upon such duly executed document.

**Section 7.        Severability**

Should any provision in this Trust Document, the Plan Document, rehabilitation plan, funding improvement plan or in any Collective Bargaining Agreement (or other agreement requiring Contributions) be deemed or held to be unlawful or invalid for any reason, such fact shall not adversely affect the other provisions herein or therein contained unless such illegality or invalidity renders impossible or impractical the functioning of the Fund.  In such a case the appropriate parties shall immediately adopt a new provision to take the place of the illegal or invalid provision.

**Section 8.        Titles**

The title headings of Sections and Articles are for the purpose of convenience only and shall not have any legal significance apart from the text.

**APPENDIX A TO THE TRUST DOCUMENT**
**OF THE SHEET METAL WORKERS' NATIONAL PENSION FUND**
**Rules and Regulations for Employer Withdrawal Liability**

**Section 1.     Preamble**

These Rules and Regulations for Employer Withdrawal Liability of the Sheet Metal Workers' National Pension Fund ("Fund" or "Plan") govern the determination and payment of withdrawal liability ("Withdrawal Liability") pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA").  The Rules and Regulations are part of the Trust Document.  To the extent this Appendix A does not address any matter affecting an Employer's Withdrawal Liability, the relevant ERISA provisions shall apply as if fully set forth in this Appendix A.  The Trustees reserve the right to amend the provisions of this Appendix A from time to time, both with respect to Withdrawals occurring after, and to the extent permitted by law, to Withdrawals occurring on or before the date such amendment is adopted.  Except as otherwise provided below, these Rules and Regulations apply to Employer Withdrawals from the Fund occurring on or after January 1, 2015 in which an arbitrator has not yet been selected as of April 23, 2019.  Withdrawals before this date are governed by the prior applicable Appendix A.

Under regulations of the Pension Benefit Guaranty Corporation ("PBGC"), the Trustees have elected to:

a.     restart initial liabilities after a merger pursuant to 29 C.F.R. §4211.36(b);

b.     change the Allocation Fraction pursuant to 29 C.F.R. §4211.36(d)(2);

c.     exclude only the contributions of significant withdrawn Employers from the denominators of the Allocation Fraction used in the calculation pursuant to 29 C.F.R. §4211.12(b)(1); and

d.     calculate the credit provided by 29 C.F.R. §§4206.3 and 4206.9 by utilizing the restarted initial liabilities after a merger pursuant to 29 C.F.R. §§4211.36(b) and 4211.36(d)(2) instead of utilizing the calculation method specified in 29 C.F.R. §4206.4.

**Section 2.     Definitions-For purposes of this Appendix A:**

a.     "Affected Benefits" means: (1) any "adjustable benefit" that has been reduced under ERISA §305(e)(8) and Internal Revenue Code ("Code") §432(e)(8), and (2) any benefit that has been reduced under ERISA §305(f) and Code §432(f) are disregarded under ERISA §305(g)(1) and Code §432(g)(1) in determining the Plan's Unfunded Vested Benefits for purposes of determining an Employer's Withdrawal Liability.  These reductions are recognized as of the end of the Plan Year in which the reductions took effect.

25

b.     "Allocation Fraction" means a fraction, in which the numerator is the Required Contributions of the withdrawing Employer and the denominator is the Employer Contributions payable with respect to a Plan Year.   For the purposes of allocating the Unamortized Initial Unfunded Vested Benefits for an Initial Plan Year or any Plan Year following such Initial Plan Year, the numerator and denominator of the Allocation Fraction shall be as follows:

The numerator shall be the sum of: (1) the Required Contributions of the withdrawing Employer for the Initial Plan Year, and (2) the Required Contributions, including contributions to any Prior Plan, for each of the four preceding full Plan Years.

The denominator shall be the sum of the (1) Employer Contributions payable to the Plan for the Initial Plan Year and (2) the Employer Contributions, including contributions to any Prior Plan for each of the four preceding full Plan Years, reduced by any Employer Contributions otherwise included in the total made by any Significant Withdrawn Employer that had withdrawn during or prior to the Initial Plan Year.

For the purposes of allocating the Unamortized Change in Unfunded Vested Benefits, Unamortized Balance of the Affected Benefits, and Unamortized Reallocated Unfunded Vested Benefits, the numerator and denominator of the Allocation Fraction shall be as follows:

The numerator shall be the sum of: (1) the Required Contributions for the Plan Year in which such change arose or in which amounts were reallocated, and (2) the Required Contributions, including those made to any Prior Plan for each of the four preceding full Plan Years.

The denominator shall be the sum of: (1) the Employer Contributions made to the Plan for the Plan Year in which such change arose or in which amounts were reallocated, and (2) the Employer Contributions to the Plan and Prior Plans for each of the four preceding full Plan Years, reduced by any Employer Contributions otherwise included in the total payable by any Significant Withdrawn Employer that had withdrawn by the end of the Plan Year in which the change arose or amounts were reallocated.

c.     "Change in Unfunded Vested Benefits" for a Plan Year means the excess of the Unfunded Vested Benefits as of the end of the Plan Year over the sum of: (1) the Unamortized Initial Unfunded Vested Benefits; and (2) the Unamortized Change in Unfunded Vested Benefit for each Plan Year ending before the commencement of the Plan Year for which the change is determined.

26

d.       "Effective Date" means April 23, 2019.

e.       The term "Employer" means an Employer as defined in ERISA §4001(b). Accordingly, all trades and businesses under common control shall constitute a single Employer as provided in ERISA §4001(b) and may include successors and assigns.

f.       "Employer Contributions" means contributions made by all Employers with respect to a Plan Year as reported in the audited financial statements of the Plan for the Plan Year, reduced by amounts that constitute an "automatic employer surcharge" under ERISA §305(e)(7) or Code §432(e)(7).  The amount determined under the preceding sentence shall include the amount of contributions by Employers actually received during the Plan Year, increased by the amount of contributions by Employers accrued during the Plan Year and received during the period ending 8 1/2 months after the end of that Plan Year. Employer Contributions shall exclude any amount attributable to an increase in the contribution rate (or other increase in contribution requirements) that is required or made in order to enable the Plan to meet the requirements of a funding improvement plan or rehabilitation plan, if such increase goes into effect on or after January 1, 2015. Notwithstanding the preceding sentence, Employer Contributions shall include any amount attributable to an increase in contribution requirements: (1) due to increased levels of work, employment, or periods for which compensation is provided, or (2) because of additional contributions used to provide an increase in benefits, including an increase in future benefit accruals permitted by Code §432(d)(1)(B) or (f)(1)(B). The exclusion rule in the third sentence shall cease to apply as of the expiration date of the collective bargaining agreement in effect when the Plan emerges from endangered status.

g.       "Initial Plan Year" means the Plan Year in which the merger of a Prior Plan is effective.  For this purpose, a merger is treated as effective on January 1 of the Plan Year in which it occurs.

h.       "Initial Unfunded Vested Benefits" mean the Unfunded Vested Benefits as of the end of the most recent Initial Plan Year ending before the commencement of the Plan Year in which an Employer Withdraws.  The asset value used to determine the Unfunded Vested Benefits includes the value as of the end of such Initial Plan Year of all outstanding claims for Withdrawal Liability that can reasonably be expected to be collected from Employers that had withdrawn as of the end of such Initial Plan Year.

i.       "Local" or "Local Union" means a local union chartered by SMART (as defined in the Plan Document).  Effective April 1, 2016, the term "Local" or "Local Union" shall also mean, as the context so requires, a District or Regional Council (described in Article 9 of SMART's constitution), the employees of which perform the same

27

duties and functions that previously were performed by employees of the Locals that compose, or are under the jurisdiction of, the District or Regional Council.

j.      "Nonforfeitable Benefit" means: (1) any benefit described in 29 C.F.R. §4001.2, (2) any "adjustable benefit" that has been reduced under  ERISA §305(e)(8) and Code §432(e)(8), (3) any benefit that has been reduced under ERISA §305(f) and Code §432(f), in all cases only if the benefit would otherwise have been includable as a Nonforfeitable Benefit for purposes of determining an Employer's allocable share of Unfunded Vested Benefits.

k.      "Plan Year" means the calendar year.

l.      "Prior Plan" means, with respect to periods before the Initial Plan Year, any plan that has been merged into the Plan.

m.      "Reallocated Unfunded Vested Benefits" for a Plan Year mean amounts:  (1) that the Trustees determine to be uncollectible because of cases or proceedings under Title 11, United States Code, or similar proceedings, (2) that by reason of ERISA §§4209, 4219(c)(1)(B), or 4225 will not be assessed against an Employer to whom a letter demanding payment of Withdrawal Liability has been sent, and (3) that the Trustees determine to be otherwise uncollectible or unassessable.

n.      "Required Contributions" means the total of all contributions that a withdrawing Employer is, or was, required to make to the Plan, or to a Prior Plan, for the Plan Year pursuant to a Collective Bargaining Agreement, another contract, or operation of law, reduced by any amounts that constitute an "automatic employer surcharge" under ERISA §305(e)(7) or Code §432(e)(7). Required Contributions shall exclude any amount attributable to an increase in the contribution rate (or other increase in contribution requirements) that is required or made in order to enable the Plan to meet the requirements of a funding improvement plan or rehabilitation plan, if such increase goes into effect on or after January 1, 2015. Notwithstanding the preceding sentence, Required Contributions shall include any amount attributable to an increase in contribution requirements: (1) due to increased levels of work, employment, or periods for which compensation is provided, or (2) because of additional contributions used to provide an increase in benefits, including an increase in future benefit accruals permitted by Code §432(d)(1)(B) or (f)(1)(B). The exclusion rule in the second sentence shall cease to apply as of the expiration date of the collection bargaining agreement in effect when the Plan emerges from endangered or critical status.

o.      "Significant Withdrawn Employer" means: (1) an Employer to which the Plan sent a notice of Withdrawal Liability; or (2) a withdrawn Employer that in any Plan Year is used to determine the denominator of the fraction of an Employer's Withdrawal Liability, contributed at least $250,000 or, if less, 1% of the total Employer Contributions to the Plan or any Prior Plan for the period.

28

p.    "Trust Document" refers to the document to which this Appendix A is attached and which constitutes the Sheet Metal Workers' National Pension Fund Trust Document, as amended and/or amended and restated from time to time, and also refers to any amendments or modifications to this document that the Trustees duly adopt (any such amendments or modifications may be appended to this document or incorporated into a restated version of this document without further Trustee action).

q.    "Unamortized" when used with the terms Initial Unfunded Vested Benefits, Change in Unfunded Vested Benefits or Reallocated Unfunded Vested Benefits means the amount of the Initial Unfunded Vested Benefits, Change in Unfunded Vested Benefits or Reallocated Unfunded Vested Benefits, as the case may be, reduced by 5% for each Plan Year succeeding the Plan Year with respect to which the determination is initially made and ending prior to the commencement of the Plan Year in which the Employer Withdraws. The Unamortized Balance of the Affected Benefits for a Plan Year is the value of that amount as of the end of the Plan Year in which the reduction took effect ("base year") reduced as if that amount were being fully amortized in level annual installments over 15 years, at the Plan's valuation interest rate, beginning with the first Plan Year after the base year.

r.    The term "Unfunded Vested Benefits," means an amount equal to the value of Nonforfeitable Benefits under the Plan, less the value of the assets of the Plan.

s.    The terms "Withdraws" and "Withdrawal" includes a complete Withdrawal as defined in ERISA §4203 and a partial Withdrawal as defined in ERISA §4205.

**Section 3.    Calculation of Withdrawal Liability before the End of an Initial Plan Year Following a Merger**

The amount of Unfunded Vested Benefits allocable to an Employer who Withdraws from the Plan before the end of the Initial Plan Year shall be determined as if the merger or mergers had not taken place.  Such amount shall be determined using the actuarial assumptions and allocation method of the Prior Plan to which the Employer contributed. With respect to mergers on or after January 1, 1993, the amount of Unfunded Vested Benefits allocated to the Employer for periods before the end of the Initial Plan Year shall be determined as if the date before the effective date of the merger were the end of the last Plan Year prior to the Withdrawal.  It is the Plan's express policy to treat any merger occurring on or after January 1, 1993 as if it had become effective on January 1 of the Plan Year in which it occurs.

**Section 4.    Calculation of Withdrawal Liability after Initial Plan Year Following a Merger**

Pursuant to 29 C.F.R. §§4211.36(b) and 4211.36(d)(2), the amount of Unfunded Vested Benefits

29

allocable to an Employer who Withdraws after the Initial Plan Year shall be the sum of the amounts determined under (a), (b), (c) and (d) below.  If such sum is negative, the Unfunded Vested Benefits allocable to the Employer shall be zero.

a.  The amount determined under this Section 4a shall be the product of:

    (1)  the Unamortized Initial Unfunded Vested Benefits as of the end of the Plan Year preceding the Plan Year in which the Employer Withdraws, multiplied by

    (2)  the Allocation Fraction applicable to the Initial Unfunded Vested Benefits.

b.  The amount determined under this Section 4b shall be the sum of the amounts, determined separately for each Plan Year after the Initial Plan Year that ends before the commencement of the Plan Year in which the Employer Withdraws, where the amount for any such Plan Year is the product of:

    (1)  the Unamortized Change in Unfunded Vested Benefits for such Plan Year, multiplied by
    (2)  the Allocation Fraction for the Plan Year in which such change arose.

c.  The amount determined under this Section 4c shall be the sum of the amounts determined separately for each Plan Year after the most recent Initial Plan Year that ends before the commencement of the Plan Year in which the Employer Withdraws, where the amount for any such Plan Year is the product of:

    (1)  the Unamortized Reallocated Unfunded Vested Benefits for such Plan Year, multiplied by

    (2)  the Allocation Fraction for the Plan Year in which such Unamortized Reallocated Unfunded Vested Benefits arose.

d.  The amount determined under this Section 4d. shall be the sum of the amounts determined separately for each Plan Year that ends before the commencement of the Plan Year in which the Employer Withdraws, where the amount for any such Plan Year is the product of:

    (1)  the Unamortized Balance of the Affected Benefits for such Plan Year, multiplied by

    (2)  the Allocation Fraction for the Plan Year in which such change arose.

**Section 5.**     **Reduction for De Minimis Amounts**

The amount determined under Sections 3 or 4 shall be reduced by the lesser of: (a) 3/4 of 1 percent of the Unfunded Vested Benefits as of the end of the Plan Year immediately preceding the Plan Year in which the Employer Withdraws, or (b) $50,000 -- in either case reduced by the amount, if any, by which the Unfunded Vested Benefits allocable to the Employer under Sections 3 or 4 exceeds $100,000.

**Section 6.**     **Sale of Assets**

    a.    A Withdrawal of an Employer (the "seller") shall not be deemed to occur solely because, as a result of a bona fide, arm's length sale of assets to an unrelated party (the "purchaser"), the seller ceases covered operations or ceases to have an obligation to contribute for such operations, if:

        (1)    the purchaser has an obligation to contribute with respect to the operations for substantially the same number of contribution base units for which the seller had an obligation to contribute;

        (2)    the purchaser provides to the Plan, for the first 5 years following the year of the sale, a bond issued by an acceptable corporate surety company, or an amount held in escrow by a bank or similar financial institution satisfactory to the Trustees, in an amount equal to the greater of:

            (A)    the average annual Employer Contribution that the seller was required to make with respect to the operations under the Plan for the last 3 years preceding the year of the sale, or

            (B)    the annual Employer Contribution that the seller was required to make with respect to the operations under the Plan for the year preceding the year of the sale, which bond or escrow shall be paid to the Plan if the purchaser Withdraws, or fails to make an Employer Contribution when due, at any time during the first 5 years following the year of the sale; and

            (C)    the contract for the sale provides that, if the purchaser Withdraws in a complete Withdrawal or a partial Withdrawal with respect to operations during such first 5 years, the seller is secondarily liable for any Withdrawal Liability it would have had with respect to the operations (but for this Section) if the liability of the purchaser is not paid.

    b.    If the purchaser Withdraws before the end of the fifth year following the year of the sale, and fails to make any Withdrawal Liability payment when due, then the

31

seller shall pay to the Plan an amount equal to the payment that would have been due from the seller but for this Section.

c.   With respect to a seller's distribution of assets:

(1)   If all, or substantially all, of the seller's assets are distributed, or if the seller is liquidated before the end of the fifth year following the year of sale, then the seller shall provide a bond or amount in escrow equal to the present value of the Withdrawal Liability the seller would have had but for this Section.

(2)   If only a portion of the seller's assets are distributed during the first 5 years following the year of the sale, then a bond or escrow shall be required, in an amount equal to the present value of the Withdrawal Liability the seller would have had but for this Section less the market value of any of the seller's assets readily available to satisfy that amount.

(3)   The amount of seller's bond may be adjusted, at the sole discretion of the Trustees, based on the facts and circumstances of the transaction and the nature of the seller's assets, circumstances and operations after the sale.

d.   The liability of the party furnishing a bond or escrow shall be reduced, upon payment of the bond or escrow to the Plan, by the amount thereof.  The Trustees shall have the authority to waive the bond requirement set out herein and in ERISA § 4204 if a request for variance is filed pursuant to 29 CFR § 4204.11 and they are satisfied that it is appropriate to waive such requirement.

e.   The liability of the purchaser under this Appendix A shall be determined as if the purchaser had been required to contribute in the year of the sale and the four preceding years the amount the seller was required to contribute for such operations for such five years.

f.   The term "unrelated party" means a purchaser or seller that does not bear a relationship to the seller or purchaser, as the case may be, that is described in Code § 267(b) or in regulations prescribed by the PBGC.

**Section 7.   Reorganization**

Effective as of April 1, 2016, notwithstanding any other provision in this Appendix A, an Employer's Withdrawal from the Fund shall not be considered to have occurred solely because of a "reorganization" within the meaning of ERISA §4218.  A "reorganization" of a Local Union that is an Employer shall be deemed to have occurred if the Local Union ceases making Employer Contributions to the Fund because a District or Regional Council has executed an adoption agreement (or similar agreement) furnished by the Fund that

provides that the District or Regional Council is assuming some or all of the Employer Contribution obligations of the Local Union to the Fund, and also provides that the District or Regional Council will be secondarily liable for any Withdrawal Liability of the Local Union and includes any other terms and conditions as the Trustees may require.  In the case of a reorganization satisfying the requirements of the preceding sentence, Employer Contributions by the District or Regional Council for Participants who were employed in the jurisdiction of the Local Union shall be treated as Employer Contributions by the Local Union for all purposes under this Appendix A.

**Section 8.**      **Payment of Withdrawal Liability**

a.      The amount of payment shall be calculated as follows:

(1)      Except as provided in paragraphs (2) and (4) below, and in subsections (c) and (d) below, the Employer shall pay its Withdrawal Liability, appropriately adjusted for partial Withdrawal and de minimis reductions as provided in ERISA §§4206 and 4209(a), over the period of years required to amortize the amount in level annual payments determined under paragraph (3) below, calculated as if the first payment were made on the first day of the Plan Year following the Plan Year in which the Withdrawal occurs and as if each subsequent payment were made on the first day of each subsequent Plan Year.  Such amortization period shall be determined based on actuarial assumptions used in the most recent actuarial valuation of the Plan.

(2)      If the amortization period described in paragraph (1) above exceeds 20 years, the liability of the Employer shall be limited to the first 20 annual payments determined under paragraph (3) below.

(3)      Except as provided in paragraph (5) below, the amount of each annual payment shall be the product of:

(A)      the average number of hours of Required Contributions for the three consecutive Plan Years during the 10 consecutive Plan Years, ending before the date of Withdrawal, in which the Employer had an obligation to contribute to the Plan for the greatest number of hours of Required Contributions; and

(B)      the highest contribution rate at which the Employer had an obligation to contribute to the Plan during the 10 Plan Years ending with the Plan Year in which the Withdrawal occurs, except that the highest contribution rate shall exclude: (i) any "automatic employer surcharge" under ERISA §305(e)(7) or Code §432(e)(7) if the obligation for the surcharge accrued on or after December 31, 2014;

33

and (ii) any increase in the contribution rate (or other increase in contribution requirements) that is required or made in order to enable the Plan to meet the requirement of a funding improvement plan or rehabilitation plan, if such increase goes into effect on or after January 1, 2015. Notwithstanding (ii) in the preceding sentence, the highest contribution rate shall include an increase in contribution requirements: (a) due to increased levels of work, employment, or periods for which compensation is provided, or (b) because of additional contributions used to provide an increase in benefits, including an increase in future benefit accruals permitted by Code §436(d)(1)(B) or (f)(1)(B). The exclusion rule in (ii) shall cease to apply as of the expiration date of the collective bargaining agreement in effect when the Plan emerges from endangered status; however, once the Plan emerges from endangered status, increases in the contribution rate disregarded under (ii) shall continue to be disregarded in determining the highest contribution rate for Plan Years during which the Plan was in endangered status.

(4) In the event of the Withdrawal of all or substantially all Employers that contribute to the Plan (within the meaning of ERISA §4219(c)(1)(D)), the de minimis reduction as provided in ERISA §4209(a) and paragraph (2) above shall not apply and total Unfunded Vested Benefits shall be allocated among all Employers in accordance with applicable PBGC regulations.

(5) In the case of a partial Withdrawal, the amount of annual payment shall be adjusted as provided in ERISA §4219(c)(1)(E).

b. Withdrawal Liability shall be payable quarterly, according to the schedule as Trustees direct. Payment of Withdrawal Liability shall commence no later than 60 days after demand is made, notwithstanding any request for review or appeal of the determination of the amount of Withdrawal Liability or of the payment schedule.

c. An Employer may timely prepay its Withdrawal Liability and accrued interest without penalty.

d. Non-payment by an Employer of any amount due with respect to Withdrawal Liability shall not relieve any other Employer of its obligation to make payment of its Withdrawal Liability. In addition to any other remedies to which the parties may be entitled, an Employer shall be obligated to pay interest on the amounts due to the Plan from the date when the payment was due to the date when the payment is received. The interest payable by an Employer, in accordance with the preceding sentence, shall be computed and charged to the Employer at a rate of 0.0205% compounded daily. In the event of default or if the Trustees commence legal actions against an Employer to collect delinquent Withdrawal Liability payment(s),

34

in addition to interest at the above rate, the Employer will be liable to the Fund for attorney's fees incurred by the Fund from the date of the delinquency forward, costs, and the greater of: (1) interest on the delinquent Withdrawal Liability or (2) liquidated damages in the amount of 20% of the delinquent Withdrawal Liability.

e.   In the event of a default, the outstanding amount of the Withdrawal Liability, plus interest on the total outstanding liability from the due date of the missed payment that gave rise to the default, shall immediately become due and payable.  A default occurs if:

(1)   the Employer fails to make, when due, any payment of Withdrawal Liability, if such failure is not cured within 60 days after such Employer receives written notification from the Fund of such failure; or

(2)   the Trustees deem the Plan insecure as a result of any of the following events (each of which the Trustees have determined indicates a substantial likelihood that an Employer will be unable to pay its Withdrawal Liability):

(A)   the Employer's insolvency, or any assignment by the Employer for the benefit of creditors, or the Employer's calling of a meeting of creditors for the purpose of offering a composition or extension to such creditors or the Employer's appointment of a committee of creditors, or liquidating agent, or the Employer's offer of a composition or extension to creditors; or

(B)   the Employer's failure or inability to pay debts as they become due; or

(C)   the commencement of any proceedings by or against the Employer (with or without the Employer's consent) pursuant to any bankruptcy or insolvency laws or any laws relating to the relief of debtors, the readjustment, composition or extension of indebtedness of the Employer, or the liquidation, receivership, dissolution or reorganization of the Employer under such laws; or

(D)   the withdrawal, revocation or suspension by any governmental or judicial entity or by any national securities exchange or association of any charter, license, authorization, or registration required by the Employer in the conduct of its business; or

(E)   any other event or circumstance that in the judgment of the Trustees materially impairs the Employer's creditworthiness or the Employer's ability to pay its Withdrawal Liability when due.

35

**Section 9.**      **Resolution of Disputes**

Any dispute concerning whether a complete or partial Withdrawal has occurred, concerning the amount or payment of any Withdrawal Liability, or any other matter pertaining to ERISA §§ 4201 through 4219 and §4225 will be resolved in the following manner:

      a.      REVIEW BY THE PLAN:  If, within 90 days after an Employer receives a notice and demand for payment of Withdrawal Liability, such Employer files a written statement with the Plan:  (1) requesting a review of any specific matter relating to the determination of such liability or the schedule of payments, (2) identifying any inaccuracy in the determination of the amount of the Unfunded Vested Benefits allocable to the Employer, or (3) furnishing any additional relevant information to the Plan, a review will be conducted by the Fund Office .  The full Board of Trustees, in its capacity as plan sponsor within meaning of ERISA § 4001(a)(10), has allocated to the Fund Office plenary responsibility for review of any matter pertaining to Withdrawal Liability including but not limited to initial and revised assessments, requests for review and any assertion or disposition of claims.  The decision will be communicated in writing to the Employer, including the basis for the decision and the reason(s) for any change in the determination of an Employer's liability or schedule of liability payments.

      b.      ARBITRATION:  Any  arbitration under ERISA shall proceed in accordance with the Multiemployer Pension Plan Arbitration Rules for Withdrawal Liability Disputes of the American Arbitration Association ("AAA Rules"). As required by ERISA §4221(a)(1), within 60 days following the earlier of: (1) receipt of a written decision in accordance with subparagraph (a) above, or (2) 120 days after an Employer has made a timely written request for a review of such Withdrawal Liability matters specified above, either the Employer or the Plan may initiate arbitration as provided herein.

          (1)      Manner of Initiation: The party seeking to initiate arbitration must do so in accordance with the AAA Rules.  Notice to the Plan shall be served as follows:

                    General Counsel
                    Sheet Metal Workers' National Pension Fund
                    3180 Fairview Park Drive, Suite 400
                    Falls Church, VA 22042 22031

          (2)      Venue: All arbitrations, including all arbitration hearings under this Section, shall be conducted at the Plan's, Virginia office, unless the parties mutually agree to another location.

      (3)     Recovery of Arbitration Costs: An arbitrator may award the Plan recovery for its reasonable attorneys' fees and arbitration costs if the Employer has initiated the arbitration in bad faith or engages in dilatory, harassing, or other improper conduct during the course of the arbitration.

      (4)     Transition Rule: In the case of an arbitration that was initiated in accordance with Appendix A in effect prior to the Effective Date of this Appendix A, the initiating party shall have 30 days from the Effective Date to initiate arbitration in accordance with Section 9(b)(1).

   c.    LITIGATION:  Within 30 days after the arbitrator issues its final award in accordance with these procedures, any party to the arbitration proceeding may bring an action in the United States District Court for the Eastern District of Virginia, Alexandria Division, to enforce, modify or vacate the arbitration award, in accordance with ERISA §§4221 and 4301.

## Section 10.    Construction Industry Exemption

ERISA §4203(b) shall apply to those Employers described in ERISA §4203(b)(1).

## Section 11.    Adjustment of Liability for Withdrawal Subsequent to Partial Withdrawal

The amount of credit an Employer receives for payment of a partial Withdrawal Liability arising in an earlier Plan Year shall be determined in accordance with applicable PBGC regulations.  The credit provided by 29 C.F.R. §§4206.3 and 4206.9 shall utilize the restarted initial liabilities after a merger calculated pursuant to 29 C.F.R. §§4211.36(b) and 4211.36(d)(2), instead of utilizing the calculation method specified in 29 C.F.R. §4206.4.

## Section 12.    Adjustment of Liability for certain Sales, Liquidations, or Dissolution of Employer

The amount of Unfunded Vested Benefits allocable to an Employer who Withdraws from the Plan shall be adjusted in accordance with ERISA §4225.

## Section 13.    Authorization to Calculate and Assess Withdrawn Employers

Fund employees or designated providers, under the supervision of a supervisory employee designated by the Trustees (the "Supervisory Employee") are authorized to calculate the Withdrawal Liability of a withdrawn Employer, notify the Employer of the amount and schedule of payments of its Withdrawal Liability, and collect the Withdrawal Liability assessed against the Employer.  The designated providers or Fund employees, under the supervision of the Supervisory Employee, also are authorized to furnish, upon written request, to any Employer an estimate of its Withdrawal Liability, and information on how the estimate was determined, in accordance with ERISA § 101(l). The information provided under this Section 13 will be based on financial

information about the Fund as of the last day of the Plan Year prior to the date of the request. The Fund may impose a reasonable charge to cover copying, mailing, and other costs of furnishing a Withdrawal Liability estimate or other information to an Employer.

**Section 14.     Exemption from Withdrawal Liability for Certain Contributions under "Free Look" Exception**

Consistent with ERISA Section 4210, an Employer that would otherwise incur a complete Withdrawal or a partial Withdrawal will not be deemed to have withdrawn, despite the cessation of its obligation to contribute to the Plan, if the Contribution Committee determines, in its sole and absolute discretion, that all of the following conditions are met:

a.     the Employer first had an obligation to contribute to the Plan on or after January 1, 2015;

b.     the Employer had an obligation to contribute for no more than 48 consecutive calendar months, starting with the first month for which an Employer is obligated to contribute to the Plan;

c.     the Employer was obligated to make Plan contributions for each calendar year through the date of Withdrawal in an amount that was less than 2% of the sum of all employer contributions made to the Plan for each of such years;

d.     the Employer has never before avoided full or partial withdrawal liability from the Plan under this "free look" provision;

e.     any past service credit otherwise grantable to participants (other than current pensioners) for employment with the Employer is cancelled consistent with Code Section 411(a)(3)(E) and the terms of the Plan Document; and

f.     that the ratio of the Fund's assets (determined as of the last day of the calendar year preceding the first calendar year in which the Employer was obligated to contribute to the Plan) to benefit payments made during that calendar year was at least 8-to-1.

The Employer must complete and submit any forms, questionnaires, or other documents, and must provide any additional information, which the Supervisory Employee requests in connection with the determination of whether all of the above conditions are met. If the Employer fails to do so, the Supervisory Employee may conclude, in its sole and absolute discretion, that not all of the above conditions are satisfied. If the Employer fails to respond completely to a request from Supervisory Employee within 90 days, it shall be deemed not to have satisfied the requirements of Section 14 ("Free Look provision"). The determination under the Free Look provision shall be based upon the facts and circumstances known to it at the time its determination is made, and shall be final and binding on all persons (subject to any further review undertaken pursuant to ERISA Section 4219 or to the extent additional facts or circumstances later become known). To qualify

under Section 14, an Employer also must, as soon as practicable, use the Fund's Internet Payment System to report Contributions. An Employer that is exempt from Withdrawal Liability under the Free Look provision also shall be exempt from the Exit Contribution that is provided for under Article V, Section 6 of the Trust Document. Conversely, an Employer that is not exempt from Withdrawal Liability under the Free Look provision shall be liable for an Exit Contribution, in accordance with Article V, Section 6 of the Trust Document, if it Withdraws from the Fund and its Withdrawal Liability is de-minimis.

This Free Look provision shall not affect the liability of any Employer or former Employer for reallocation liability in the event of a mass withdrawal as provided in ERISA Section 4219(c)(1)(D).

# EXHIBIT 6

**Sheet Metal Workers National Pension Fund**

**Procedures for the Collection of Contributions**

### INTRODUCTION

The Board of Trustees (the "Trustees") of the Sheet Metal Workers' National Pension Fund ("Pension Fund") has a fiduciary obligation to collect all money that is due and owing to the Pension Fund. Additionally, the Pension Fund acts as a collections agent for the International Training Institute for the Sheet Metal and Air Conditioning Industry, National Energy Management Institute Committee for the Sheet Metal and Air Conditioning Industry, Sheet Metal Occupational Health Institute Trust, National Stabilization Agreement of Sheet Metal Industry, the Sheet Metal Workers' International Scholarship Fund, and the National Supplemental Savings Plan. These obligations require that the Trustees establish a system for monitoring employers' compliance with their obligations to make contributions to the Benefit Funds and under which the Benefit Funds' administrators and legal counsel will take all legally appropriate and cost-effective steps to collect delinquent contributions, so that they may be applied for the benefit of the Benefit Funds' participants.

In addition, the Employee Retirement Income Security Act of 1974, as amended ("ERISA") defines as a "prohibited transaction" any extension of credit from an employee benefit plan to a contributing employer. A failure to collect contributions when they are due may be treated as such an extension of credit from the plan to the employer. In 1976, the Department of Labor (DOL) issued guidance, in the form of a class exemption from the prohibited transaction rules, which permits reasonable business decisions to be made on unpaid contributions. That guidance is Prohibited Transaction Class Exemption 76-1 ("PTCE 76-1").

The fundamental principles of PTCE 76-1 are the following:

1.      Any compromise of a claim for unpaid contributions, or any arrangement permitting payment later than the normal due date, must be made for the "exclusive purpose of facilitating the collection of such contribution" (and not, for example, to ease the employer's cash-flow problems).

2.      Any such compromise or arrangement and any decision to write off a claim for unpaid contributions as uncollectible must be "reasonable under the circumstances based on the likelihood of collecting such contribution or the approximate expenses that would be incurred" if the plan persisted in trying to collect the contribution by other means.

3.      All such compromises, arrangements, or write-offs must be preceded by "such reasonable, diligent and systematic efforts as are appropriate under the circumstances to collect such contribution or any part thereof."

On December 30, 2003, the DOL issued a prohibited transaction class exemption that applies to settlements of claims against contributing employers for failure to forward participants' deferred wages to 401(k) plans within the required time periods. PTCE 2003-39

(Dec. 30, 2003).  This PTCE requires that any release or reduction of such a claim for contributions, or any extension of credit permitting payment of such delinquent contributions in installments:

      1.     Must be based on the plan attorney's determination that there is a genuine controversy involving the plan;

      2.     Must be authorized on behalf of the plan by a "fiduciary who has no relationship to, or interest in, any of the parties involved in the litigation, other than the plan, that might affect the exercise of such person's best judgment as a fiduciary";

      3.     Must be described in a written agreement or consent decree;

      4.     Must not be part of an arrangement that is designed to benefit a party in interest (*i.e.*, either a contributing employer or the union);

      5.     Must be reasonable in light of the plan's likelihood of full recovery, the costs and risks of litigation, and the value of the claims forgone;

      6.     If it provides for any installment payments or delayed payment, the credit terms must be reasonable in light of the creditworthiness of the employer and the time value of money, and the fiduciary should consider requiring security; and

      7.     The plan must participate in the settlement on terms that are at least as favorable to the plan as the terms that affect any other parties that are not plans.

      The primary policy consideration of the Pension Fund's collection program, other than those that are mandatory under the DOL's guidance, is that the delinquency policy should be designed to avoid being the lender of first resort for an employer that has cash-flow problems.  It is easy for an employer to write itself a loan from the Pension Fund by simply postponing a contribution remittance.  The delinquency policy should make that decision costly, so that if the employer must decide which of its creditors it will pay first, it will have a strong reason to pay the Pension Fund first and postpone payment to its other creditors.

      In compliance with the foregoing principles governing collection, the Board of Trustees has adopted the following rules and procedures regarding the enforcement of employers' reporting and remittance obligations to the Fund.

      A.     Definitions

      For purposes of these Procedures, the following terms are defined as follows:

      1.     **Benefit Funds** - Sheet Metal Workers' National Pension Fund, International Training Institute for the Sheet Metal and Air Conditioning Industry, National Energy Management Institute Committee for the Sheet Metal and

Air Conditioning Industry, Sheet Metal Occupational Health Institute Trust, National Stabilization Agreement of Sheet Metal Industry, the Sheet Metal Workers' International Scholarship Fund, and the National Supplemental Savings Plan.

2.   **CBA** - collective bargaining agreement or other agreement that requires Contributions.

3.   **Contributions** - contributions due from an Employer under the terms of a collective bargaining agreement, the Trust Document, or other agreement, which are due any of the Benefit Funds.

4.   **Contributions Committee** - Committee of the Board of Trustees to which the Trustees confer authority to administer, implement, adopt, modify, amend, carry out, interpret and/or enforce the Procedures and/or the provisions of the Trust Agreement applicable to the collection of Contributions.

5.   **Delinquency Date** - the earlier of the date of delinquency established in a CBA or the 20th day of the month following the month for which Contributions are required to be made, regardless of whether such Contributions are required to be paid monthly or weekly.

6.   **Delinquent Employer** - an Employer that fails to timely remit all Contributions and/or complete and file accurate remittance data on or before the Delinquency Date.

7.   **Employer** - an Employer, which has, or had, an obligation to contribute to any of the Benefit Funds.

8.   **ERISA** - the Employee Retirement Income Security Act of 1974, as amended.

9.   **NSSP** - National Supplemental Savings Plan.

10.   **Pension Fund** - Sheet Metal Workers' National Pension Fund.

11.   **Procedures** - the Sheet Metal Workers' National Pension Fund Procedures for the Collection of Contributions.

12.   **PTCE 76-1** - Department of Labor Prohibited Transaction Class Exemption 76-1.

13.   **Reports** - reports of hours worked by, and earnings and other information on, persons for whom Contributions are required.

14. **SMACNA** - Sheet Metal and Air Conditioning Contractors' National Association.

15. **Trust Documents** - the documents, as may be amended and restated, under which the Pension Fund is established and operates.

16. **Trustees** - unless the context suggest otherwise, the Trustees of the Pension Fund and/or any committee.

17. **Union** - the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") and any Local Union chartered by SMART.

B.    Authority

1.    The Trustees have the legal right to exercise all remedies under ERISA and the Trust Documents.  The Trustees have delegated to the Contributions Committee the authority and power to:

   a. Take any steps and/or perform all acts that are necessary or proper to collect Contributions in a reasonable, systematic and diligent manner, including (without limitation) amending these Procedures, and retaining counsel, auditors and other professionals to assist with collection.

   b. Audit Employer records, assess liquidated damages, attorneys' fees and costs, and take such other action permissible under applicable law to collect Contributions.

   c. Determine whether Contributions have been erroneously paid, and whether a refund of erroneously-paid contributions may be made.  This authority does not diminish the authority of the Board of Trustees to independently make determinations respecting erroneously-paid contributions.

   d. Compromise any claim or enter into a settlement agreement with a Delinquent Employer on the terms the Contributions Committee deem appropriate and consistent with applicable law and regulations.

   e. Establish Settlement Guidelines for Staff and Counsel.   The Trustees may authorize settlements, arrangements, compromises,

4/2018 ed.                                    4

understandings or resolutions of delinquencies that waive or compromise an amount owed, or that contemplate payment of amounts due over a period of time.  Any such settlement that waives or compromises an amount owed, or that contemplates payment of amounts due over a period of time, shall be in writing and comply with applicable law, including PTCE 76-1.

    f.  Depart from these Procedures in any circumstance it deems prudent to do so.

C.    Applicability

    1.    If an Employer's contribution obligation cease, these Procedures apply for the period during which the Employer was obligated to contribute until the Employer's delinquency is finally resolved.

    2.    Nothing in these Procedures creates or confers any substantive or procedural right on any Employer, employee, participant, Local Union or, employee benefit plan or program.  Furthermore, departure or deviation from these Procedures does not confer or create any defense to timely payment of contributions, interest, liquidated damages, attorneys' fees and cost and/or claim for mitigation of damages, with respect to payment of Contributions, interest, liquidated damages, attorneys' fees or costs.

    3.    These Procedures are intended to be consistent with the provisions of the Pension Fund's Trust Documents; however, in the event of a conflict between these Procedures and the Trust Documents, the Trust Documents control.  All matters concerning plan benefits (*e.g.*, benefit credit, benefit eligibility, and benefit amounts) shall be determined under the Pension Fund's plan documents.

**SECTION I**
**TIME TABLE, INITIAL NOTICES and RESOLUTION BEFORE REFERRAL**

A.    The Trustees direct and authorize all reasonable steps necessary or appropriate to promote timely submission of Contributions and Reports and seek prompt payment or submission of delinquent Contributions and Reports.  In most circumstances, the appropriate Local Union and SMACNA representatives shall be copied on any notice or communication to an Employer regarding delinquent Contributions.

B.    If Contributions are not received within ten (10) calendar days after the Delinquency Date, the NPF Billing Department shall send a First Notice to the Employer

notifying the Employer of the apparent delinquency and requesting immediate payment. The Employer is liable for late fees (interest and liquidated damages) beginning five (5) days following the Delinquency Date.[1]  Generally, late fees are 10% of the total delinquency or $50, whichever is greater.  Those Employers that are required to pay Contributions weekly, but fail to timely remit such Contributions, will be assessed interest and liquidated damages as though the Employer is required to remit Contributions monthly.  For example, if an Employer's weekly contributions are due each Friday, the contributions due after the 20th of January will be treated as though they were all due the 20th of February for purposes of assessing interest, liquidated damages and issuing delinquency letters.

C. If the delinquent Contributions are not paid within ten (10) calendar days of the date on First Notice, the NPF Billing Department shall send a Second Notice as soon as practicable.  The Second Notice shall advise that the Employer is liable late fees, attorneys' fees, audit fees, and other collection costs.

D. If the delinquent Contributions are not paid within ten (10) days of the date on the Second Notice, the Compliance Department shall send a Final Notice as soon as practicable.  The Final Notice shall advise the Employer, at a minimum, that:

1.  the Employer is liable for late fees, attorneys' fees, audit fees, and other collection costs, assessed consistent with the Trust Documents;

2.  the Pension Fund may take prompt legal if the Employer does not remit delinquent Contributions, late fees and other collection costs immediately;

3.  the Employer may be subject to withdrawal of labor;

4.  the Trustees may terminate the Employer's participation in the Pension Fund;

5.  any Owner/Member of a Delinquent Employer may cease to accrue benefits, or have his/her benefits adversely affected, under the terms of the applicable plan documents.

E. The NPF Compliance Department may attempt to resolve a delinquency before referral to Counsel (with assistance from other Fund staff as needed).  Resolution efforts may include contacting the Employer's owner(s) and officers, registered agent, and highest-level executives at their office and home addresses.  Generally, the NPF Compliance staff should require, as a condition of settlement, (1) a personal guarantee by the Employer's

---

[1] As described below, the amount of late fees assessed increases substantially if the Benefit Funds file suit against the employer.

owner, and (2) that the Employer remit Contributions and settlement payments via the Internet Payment System.

F.     The Trustees authorize the NPF Executive Director to enter into settlements that comply with the SETTLEMENT GUIDELINES for STAFF AND COUNSEL.

**SECTION II**
**REFERRAL TO COUNSEL TO COLLECT DELINQUENCIES AND ENFORCE AUDIT RIGHTS**

A.     If the Employer has not responded within ten (10) days of the date of the Final Notice, or the Compliance Department is not able to reach a final resolution for payment within the SETTLEMENT GUIDELINES for STAFF AND COUNSEL, the matter shall be referred to the NPF Legal Department as soon as practicable for further review and possible referral to outside counsel.

B.     The NPF Legal Department will send a demand letter advising the Employer of the amounts due and that the matter is being evaluated for legal action. If the Employer's delinquency violates a settlement agreement previously negotiated by outside counsel, the NPF Legal Department may refer the matter back to such outside counsel prior to the NPF Legal Department sending a demand letter.

C.     If the matter is not resolved within a reasonable time after the NPF Legal Department sends a demand letter to the Employer, the NPF Legal Department will evaluate whether to bring legal action against the Employer. NPF staff will continue to send delinquency letters inclusive of new delinquencies, and contact the Local Union, Employer and SMACNA, to the extent feasible.

D.     The NPF Legal Department will determine if a referral to outside legal counsel is appropriate, consistent with this subsection, unless the Trustees otherwise direct.

1.     No case shall be referred to outside counsel unless contributions exceed $3,000, except for rare matters involving habitually delinquent Employers. For so long as delinquent Contributions are less than $3,000, the Compliance Department will periodically seek collection. The Compliance Department shall keep other departments apprised of the delinquency as appropriate and necessary for such other departments to carry out their duties and responsibilities (*e.g.*, Pension Department for Owner-Members).

2.     For delinquent amounts over $3,000, the NPF Legal Department will perform a cost/benefit analysis of referring the matter to outside legal counsel, taking into consideration (without limitation) the costs of potential litigation versus the amount owed, the Employer's history

of delinquencies, and the Fund's ability to collect on a judgment against the Employer.

E.      In all referrals to outside counsel, the Compliance and NPF Legal Departments shall provide all information and documents reasonably necessary to pursue legal action. The Trustees may refer any Delinquent Employer to outside counsel at an earlier or later date than provided for above, as they find appropriate under the facts and circumstances. An Employer's refusal to permit or cooperate with an audit may result in immediate referral even in the absence of a known delinquency.

F.      Upon referral, outside counsel shall conduct a legal and factual review appropriate under the circumstances. In consultation with NPF Legal Department, outside counsel may attempt settlement for a limited time before filing suit.  Upon completion of outside counsel's review and settlement efforts, if any, outside counsel will consult with the NPF Legal Department to analyze the likelihood of obtaining recovery and the litigation costs to the Fund.   Upon instruction from the NPF Legal Department, and unless circumstances dictate otherwise, outside counsel shall file suit against the Employer within three months of referral.   Outside counsel should continue to consult with NPF Legal Department throughout the litigation process, particularly regarding mounting legal costs and obstacles to collecting the amounts owed.

G.      When outside counsel collects delinquencies, or seeks to enforce the right to audit an Employer, whether or not suit is filed, the Employer is generally required to reimburse the Fund for any and all costs, including but not limited to audit costs, attorneys' fees and costs incurred in collections and/or enforcing the right to audit, any attorneys' fees incurred in post-judgment collection efforts (*e.g.*, garnishments, income executions).

H.      A Delinquent Employer (or an Employer facing legal action to enforce the right to audit) shall be expected to reimburse the Fund for all costs incurred in enforcing the Employer's contribution obligations, including the obligation to submit to an audit. Such costs include, but are not limited to audit fees and costs, attorneys' fees, filing fees, fees for service, travel, copying charges, postage, reports, expert fees, and any other costs incurred by the Fund to determine, discover or collect any of the amounts described herein.

I.      If a lawsuit is filed against a Delinquent Employer, the assessment of late fees will increase to:

1.      Interest at the rate of 0.0233% per day, compounded daily assessed from the original due date to the payment receipt date, and

2.      Liquidated damages the greater of 20% of the delinquent contributions or the amount of the accrued interest.

J.     The Benefit Funds may elect a course of action other than legal action including deferring, withdrawing, or settling litigation consistent with the following:

    1.     The requirements of applicable law, including PTCE 76-1;

    2.     The Union's implementation of the SMART Protocol;

    3.     The amount of the delinquent Contributions;

    4.     The length the delinquency has persisted;

    5.     The Employer's ability to pay;

    6.     The likelihood of collecting a judgment once it is obtained;

    7.     The Employer's payment history;

    8.     The likelihood that the costs of a lawsuit will exceed any potential recovery;

    9.     The recommendation of Counsel; and

    10.    Any other factor that may have a material bearing on the collection of the delinquent Contributions.

K.     Once outside counsel files suit, counsel shall prosecute the case to judgment, unless an acceptable settlement or other resolution is reached. Counsel is authorized to enter into settlement negotiations with Delinquent Employers.  The Trustees authorize outside counsel to dismiss any legal action in exchange for the immediate payment of all amounts due and owing.  Any settlement that waives or compromises any amount owed (including interest, liquidated damages, attorneys' fees, audit fees, or other collections costs), or that contemplates payment in installments, must be approved or meet established parameters for preapproval as set forth in the SETTLEMENT GUIDELINES for STAFF AND COUNSEL.

L.     The Fund may publish or otherwise disseminate the names of those Employers against which the Fund has filed suit.

**SECTION III**
**ALLOCATION POLICY**

If an Employer remits only a portion of its delinquent Contributions, the partial payment may be applied as follows:

A.      First, to deferred wages due the NSSP as 401(k) contributions, credited to the participants' accounts *pro rata* based on the full amounts due.

B.      Second, to interest due on such deferred wages owed to the NSSP when collected, credited to the participants' accounts *pro rata* based on the full amounts due.

C.      Third, to the Benefit Funds for contributions, crediting the amounts to the oldest month due, then to that month's late fees, allocated *pro rata* based on the full amounts due.

**SECTION IV**
**TERMINATION OF EMPLOYERS AS CONTRIBUTING EMPLOYERS**

The Pension Fund Plan Document authorizes the Trustees to terminate the participation of Delinquent Employers on account of nonpayment of Contributions, among other reasons.  Before the Trustees terminate an Employer under the Plan Document, the Trustees will provide advance notice, as soon as practicable after the decision has been made to such Termination, to the respective Benefit Fund administrators or chief executives of the other Benefit Funds asking if such funds wish to proceed with termination.  The Benefit Funds shall respond promptly and, if any fund does not respond, it will not be included in the termination.  A Benefit Fund may preauthorize the Pension Fund to terminate on its behalf a chronically delinquent Employer.

**SECTION V**
**MINIMUM STANDARDS EMPLOYER RECORDS REVIEW**

The Fund will review Employer records to monitor Employer compliance with the contribution obligations, deter irregular reporting, and assist in identifying participant benefit credit.  The Trustees have the discretion to determine the number of audits performed each year, but have set a target of auditing every Employer once every five years.  Employers with repeated discrepancies and delinquent contributions may be audited more frequently.  The Trustees may allow exceptions and/or alternatives to these standards in cases where the facts and circumstances make such exceptions and/or alternatives prudent.

A.      Qualification Requirements for Auditors

1.   Audits of Employer records shall be conducted by a qualified Auditor (the "Auditor") with satisfactory experience in compliance testing programs.

2.   Actual fieldwork may be conducted by an audit specialist under the guidance of a qualified accountant from the Auditor.

3.   The Auditor's compliance testing methods should substantially meet these Minimum Standards.

4.   Notwithstanding anything to the contrary, no representations made by an Auditor in the course of its audit, findings, and reporting will be binding upon the Benefit Funds unless the Benefit Funds adopts the findings.

B.   Pre-Audit Procedures

1.   The Auditor will work with NPF staff to select a sampling of Employers that have not been audited in the preceding five years.  Notwithstanding the foregoing, any Employer may be audited with or without cause even if audited within the preceding five years.  The Union, other benefit plans, Contributing Employers or participants may request an audit, however, the request need not be granted.

2.   In most instances, staff will advise the Local Union of Employers selected for audit before the audit.

3.   An audit confirmation letter will be sent to the Employer before the audit.

4.   The Benefit Funds rely on the Local Union for collective bargaining agreement information and other Employer information.  In advance of the audit, the auditor should review all applicable collective bargaining agreements, and obtain clarification for jurisdictional, classification or other related issues from the Local Union as necessary.

C.   Field Work

1.   Initially, the period audited shall be limited to no less than three (3) years.   If the auditor notes any substantive discrepancies, irregularities, patterns or trends indicating noncompliance, the Auditor may extend the audit period.  Unless directed otherwise, auditors shall use professional and reasonable discretion in determining how far to extend the period audited.

2.   The auditor shall request that the Employer have the following records available for inspection:

    a.  Original Time Cards/Sheets
    b.  Payroll registers
    c.  Individual Earnings Records
    d.  941's, State U/C's, W-2's, W-3's and 1099's
    e.  Cash Disbursement Journals
    f.  National Benefit Funds remittance reports/records
    g.  Remittance reports for any other fringe benefit fund to which the Employer contributes
    h.  Personnel records
    i.  Such other records as are necessary to complete the audit

3.  The Auditor shall employ reasonable and customary procedures for testing completeness of records provided.

4.  The Auditor shall review all monthly Reports for the period tested for significant variations between or among months.  The Auditor shall test the accuracy of all payments, adjustments, trends and variances.

5.  The Auditor shall conduct detail testing based on the results of items 1 and 2; selecting calendar quarters from different years if applicable.

6.  The Auditor shall trace hours for a reasonably representative sample of employees from time cards to payroll registers or individual earnings records for each quarter tested.  The Auditor shall compare the gross wages for each employee from the payroll registers or individual earnings records to quarterly tax returns.  The Auditor shall verify that the Employer reported hours worked or compensated, in accordance with the collective bargaining agreement and/or the Benefit Funds' governing documents.  The Auditor shall itemize all discrepancies in wage and fringe benefit contribution rates and amounts reported.  As many Employers are signatory to more than one collective bargaining agreement (*i.e.*, Building Trades, Residential Agreements, Project Agreements, Siding and Decking, Kitchen Equipment Agreements), the Auditor shall verify that hours are reported under the correct collective bargaining agreement for all employees. The Auditor shall note all discrepancies, ambiguities or questions contained in the collective bargaining agreement(s).

7.  The Auditor shall review all monthly reports for the quarters selected and identify all employees who have been added or deleted.  The Auditor shall trace employees to appropriate payroll and personnel records to verify accuracy of addition or deletion.

8. For each quarter tested, the Auditor shall review Employer documentation (*e.g.*, personnel records, reports to other trusts/plans, etc.) to determine the job classifications of all employees who are not reported on the reports to the Benefit Funds. The Auditor shall summarize all questionable employees, listing their job classification or position with the Employer.

9. The Auditor shall note all cash payments to employees and the basis for such cash payments - specifically, any payment that could represent payroll compensation not reported to the Funds, the Union, or to other fringe benefit plans.

10. The Auditor shall verify that Employers report the hours for which Contributions are required for all employees, regardless of whether those employees are part of a bargaining unit.

11. The auditor shall identify all employees working for the Employer outside the Union's geographical jurisdiction, and note how those employees' hours are reported to the Union, the Funds, and any other fringe benefit plan (*e.g.*, to the Union under the two-man rule, to the Union but under another Union's collective bargaining agreement, etc.).

12. The Auditor may expand the scope of the testing when necessary to determine the extent of reporting errors.

13. The Auditor shall attempt to hold an exit conference with the Employer to review the initial audit findings and to solicit the Employer's acknowledgment. The Auditor's function is solely to test compliance. The Auditor is not authorized to comment on or interpret any provision of, or dispute concerning, contribution obligations or otherwise. Nor does the Auditor have authority to make representations or enter into any understandings, settlements or compromises.

D. Reporting and Follow-Up

1. The Auditor shall prepare a preliminary audit report that summarizes the audit findings, underpayments and overpayments on separate schedules. The preliminary report shall note any known issues concerning the collective bargaining agreement(s) or the Funds' governing documents. The preliminary report should itemize all

discrepancies by employee by month and in total.  The preliminary report should contain the employee's name, social security number, hire and termination date, individual fringe contribution rates and the fringe amount computed.  All audits of SASMI locals must include the SASMI fringe rate, fringe computed and gross computed.

2. The Auditor shall send copies of the preliminary audit report to the Employer and pose follow-up questions, however, no representations in the preliminary report shall be binding upon the Funds.

E. Final Report

1. If the Employer takes exception to the preliminary report, the Auditor shall respond with recommendations for the Funds' consideration before finalizing the audit report.

2. Funds' staff will review the final audit report and notify the Employer of the results.  In cases where discrepancies exist, a demand letter will be sent for all amounts due including the cost of the audit and any liquidated damages.  For routine audits where shortages are apparently inadvertent, the cost of the audit and the liquidated damages may be waived upon prompt payment of the shortages.

3. The customary field audit is not expected to uncover each and every reporting irregularity or delinquency; therefore, the absence of an audit finding cannot be taken as definitively establishing the absence of shortages or irregularities.  From time to time, notwithstanding an audit, irregularities, shortages, and omissions may be discovered and pursued by the Fund.

F. Failure to Cooperate with Audit

Employers that refuse to permit an audit in whole or in part may be subject to legal action without further notice, with attorneys' fees, audit charges and other costs assessed to the Employer.

G. Cost Sharing

Other employee benefit plans may already have suitable audit programs in which the Benefit Funds may participate.  The Trustees authorize staff to enter into these programs if there are savings and the programs materially comply with these Minimum Standards described in this Section.  In general, an Auditor should conduct audits on behalf of the Benefit

Funds, and local funds, for a fee less equal or less than the amount the Benefit Funds would pay absent a joint audit.

## SECTION VI
## ERRONEOUS CONTRIBUTIONS, OVERPAYMENT,
## AND REFUND POLICY

Erroneous Contributions or Overpayment mean amount(s) an Employer paid to the Benefit Funds, by a mistake of fact or law (other than a mistake relating to whether the Benefit Funds are exempt from tax under Section 501(a) of the Internal Revenue Code of 1986 (as amended)), in excess of the amount an Employer owes and which might, under appropriate circumstances, be returned to the Employer.

It is the Employer's responsibility to make accurate contributions to the Benefit Funds.  The Benefit Funds are not responsible for errors by the Employer and its personnel or agents in relation to its contribution obligations.

    A.    Allocation to Outstanding Delinquencies

        1.    If an Employer remits a higher Contribution amount than due for its most recent contribution due date, pays a higher or additional settlement payment than required, or pays more in similar situations, the Billing or Compliance Departments will first confirm that the Employer does not have any accumulated delinquencies.  If the Employer has outstanding delinquencies, the overpayment will be applied to the oldest delinquent amount first.

        2.    If the Employer does not have any outstanding delinquencies, the overpayment may be applied to the Employer's next payment due to the Benefit Funds.

        3.    The Compliance Department will notify the Employer of how the overpayment was applied.

    B.    Misdirected Payment:  If the Overpayment is clearly intended for another fund, such as a local health and welfare fund, the Benefit Funds may refund the Overpayment to the Employer or forward a misdirected check to the local fund.  The Compliance or Legal Departments may first attempt to negotiate with the Employer for any outstanding delinquencies owed the Benefit Funds.

    C.    Refund: The Pension Fund may, consistent with ERISA and other applicable law and regulations, refund Erroneous Contributions to an Employer who duly requests a refund.  The Pension Fund may allow a refund of Erroneous Contributions, if at all, only if the Employer establishes a claim for the amount mistakenly paid by filing a written request

within six months after the date it is determined that Erroneous Contributions were made. The Trustees may determine that Erroneous Contributions were made.

      D.     In general, no refund of Erroneous Contributions shall be considered without a written request for such refund having been received within thirty six (36) months after the date that the Erroneous Contributions were paid.  In special circumstances, the Trustees may permit the refund of Erroneous Contributions for longer periods, but not more than six (6) months after the Trustees determine that the contributions constitute Erroneous Contribution.[2]  Those special circumstances include, but are not limited to:

     1.    whether the Erroneous Contributions were made by good faith mistake of fact or law or by computational or other inadvertent mistake;

     2.    whether the Employer or Local Union or the Benefit Funds have notified any employee for whom Erroneous Contributions have been made to the extent practicable;

     3.    whether the Employer has a record of timely payment and owes no shortages, liquidated damages or other delinquency;

     4.    to the extent permitted by Plan, whether any person in pay status is adversely affected by the removal of Erroneous Contributions and the attendant benefit credit; and

     5.    any other circumstances that lead the Trustees to conclude that a refund is in the best interest of the Benefit Funds, its participants and beneficiaries.

      E.     A refund may be conditioned on the execution of releases and other documents and satisfactory factual representations.  An Employer must provide all documents and any other information the Benefit Funds deem necessary with respect to a refund request and may be required to submit to an audit before consideration of a request for refund.  An Employer's failure and/or refusal to timely, promptly, and fully to comply may result in the denial of the request for the refund of Erroneous Contributions.

---

[2]   No determination is made by the Trustees until Fund staff presents information to the Trustees, which the Trustees deem sufficient to enable them to determine whether the contributions constitute Erroneous Contributions.  All such determinations are based on the actual knowledge of the Trustees.  Facts or information known by the Fund's staff shall not be attributed to any Trustee.  The Trustees, or their designee, have the sole power and discretion to make the determination whether such contributions constitute Erroneous Contributions, and, if so, whether they may be refunded to an Employer, and any such determination is final and binding.

F.      Any refund of Erroneous Contributions shall be limited to the amount of such Erroneous Contributions.  An Employer shall not be entitled, and the Fund shall not transfer, any amount of interest or return on investment arguably attributable to Erroneous Contributions, except as required by law.  Further, any amounts refunded must be reduced by any net investment loss to the Benefit Funds for the period that the Benefit Funds retained the Erroneous Contributions.

G.      Nothing in this Section limits the Funds' right to apply Erroneous Contributions to any other amounts an Employer owes, including contributions, withdrawal liability, interest, liquidated damages, audit costs, attorneys' fees, costs and benefit overpayments.  In addition, if the Pension Fund incurred a direct or indirect cost, expense or liability as a result of the Erroneous Contributions, any refund of such Erroneous Contributions may be reduced by the full value of such costs, expense or liability.

As part of an approval of a refund request, an Employer may be permitted to offset Erroneous Contributions against future Contributions.

H.      Any attempt by an Employer to recoup any Erroneous Contributions in a fashion inconsistent with these Procedures may result in the denial of a refund request. Additionally, any unilateral credit taken by the Employer shall be treated as a delinquency. Notwithstanding the foregoing, and subject to the Trustees' direction, the Pension Fund shall continue to perform routine adjustments of Contributions, on a monthly basis, which occur due to minor computation and/or reporting errors or misdirected payments to or for other benefit plans.   These routine adjustments do not require compliance with the foregoing requirements, and the Benefit Funds may continue to perform them as part of the day-to-day remittance processing.

## SECTION VII   REPORTS AND RECORDS

A.      The Trustees shall receive reports from appropriate Fund personnel and counsel on a regular basis, including at Trustee meetings, no less than annually.  The reports shall include such information as the Trustees require for monitoring the effectiveness of collection efforts.  In addition, the Trustees shall review, no less than annually, a report on all cases closed as uncollectible and approve the closing of such cases.

B.      The Benefit Funds or their agents may maintain delinquency-related documents and records electronically or in other media in lieu of paper records, consistent with the requirements of Department of Labor regulations.

***

# EXHIBIT 7

# Sheet Metal Workers' National Pension Fund

August 29, 2022

**VIA ELECTRONIC MAIL**

Renee Sauer
Julianne Fox
NY Chutes LLC
5 Honeyman Road
Lebanon, NJ  08833
nychutes@gmail.com

Re:    Demand for Payment – NY Chutes LLC - ER # 141409

Dear Ms. Sauer and Ms. Fox:

I write on behalf of the Sheet Metal Workers' National Benefit Funds (the "Funds") concerning NY Chutes, LLC's ("NY Chutes") outstanding delinquency to the Funds.[1] NY Chutes has defaulted in its obligations to the Funds pursuant to the terms of its Collective Bargaining Agreement because the company failed to remit all required contributions for the months of July 2016 through December 2020.[2]  Specifically, a payroll audit revealed that the company failed to remit all required contributions for the months of July 2016 through December 2020 in the amount of $74,258.64.    Additionally, pursuant to the Funds' Trust Document, the company owes $1,845.00 in audit costs and $31,691.90 in late fees and interest.

**Please immediately pay $107,795.54 to the Funds**.  Upon receipt of payment, the Funds will apply the payments to the oldest amounts due to the Funds, calculate the additional interest due, and issue written notice of any additional amounts due.

*Please also note that pursuant to Section 1.13 (d)(i)-(ii) of the Sheet Metal Workers' National Pension Plan (the "Plan"),[3] this continued delinquency will result in a cessation of Covered Employment accruals for Owner-Members under the Plan; any Owner-Members will not return to Covered Employment and resume the accrual of Plan benefits until after the delinquency*

---

[1] The Sheet Metal Workers' National Benefit Funds comprise the Sheet Metal Workers' National Pension Fund, the International Training Institute for the Sheet Metal and Air Conditioning Industry, the National Energy Management Institute Committee for the Sheet Metal and Air Conditioning Industry, the Sheet Metal Occupational Health Institute Trust, the National Stabilization Agreement of Sheet Metal Industry, and the Sheet Metal Workers' International Scholarship Fund.

[2] The Funds are investigating whether there are additional amounts owed for periods after December 2020 based on NY Chutes failure to properly report hours to the Funds.

[3] A copy of the Plan document is available at https://www.smwnpf.org/wp-content/uploads/2019/11/Plan-Document-with-Appendices.pdf.

Renee Sauer
Julianne Fox
August 29, 2022
Page 2

*has been resolved and NY Chutes, LLC has resumed making timely contributions to the Plan for twelve months.*

NY Chutes' failure to remit full payment on or before **September 9, 2022** may result in (1) the Funds' recommendation, in accordance with the provisions of the Funds' Procedures for the Collection of Contributions,[4] that SMART direct Local 28 to pull NY Chutes' workforce, and (2) referral of the matter to the Funds' outside legal counsel, with the instruction to file the enclosed draft complaint as soon as practicable.

Please contact Bismark Agyei at (703) 739-7032 or bagyei@smwnbf.org with any questions or concerns.

Sincerely,

Heather Mooneyham
Legal Counsel

Enclosure

cc:    Tearyn Loving, SMWNPF
       Ken Anderson, SMWNPF
       Debbie Elkins, SMWNPF
       Eric Meslin, SMART Local 28 (via email to emeslin@local28union.com)
       Melissa Barbour, SMACNA  (via email to melissa@smacna-li.org)

---

[4] The Procedures for the Collections of Contributions can be accessed at https://www.smwnpf.org/wp-content/uploads/2018/05/Procedures_for_the_Collection_of_Contributions-as-amended-6-11-20.pdf.



April 29, 2022

Mr. Kenneth Anderson
Sheet Metal Workers' National Benefit Funds
3180 Fairview Park Drive
Suite 400
Falls Church, VA  22042

RE: Compliance Audit of NY Chutes LLC for the Sheet Metal Workers' National Benefit Funds
(Employer #141409)

Dear Mr. Anderson:

Enclosed you will find a copy of our compliance audit report detailing discrepancies we noted during our
review of the payroll records of NY Chutes LLC for the period of July 2016 through December 2020.


If there are any questions concerning the audit, please refer them to me.

Sincerely,

Ellen K. Odell

Ellen Odell


Enclosure



April 29, 2022

Board of Trustees of the
Sheet Metal Workers' National Benefit Funds

We have applied certain procedures, as discussed below, to the payroll records of NY Chutes LLC, a contributing employer to the Sheet Metal Workers' National Benefit Funds for the period of July 2016 through December 2020. The purpose of our review was to assist you in determining whether contributions to the Trust Fund are being made in accordance with the Collective Bargaining Agreement in effect and with the Trust Agreement of the Fund. The propriety of the contributions is the responsibility of the employer's management.

Our procedures included a review of the pertinent provisions of the Collective Bargaining Agreements and compared underlying employer payroll records to the Fund's contribution records. The employer records we reviewed included payroll journals, individual earning records, payroll tax returns, contribution reports, job classifications, and general disbursements records as appropriate. The procedures are performed on a test basis and may be expanded if the results so warrant. The scope of this engagement is limited to records made available by the employer and would not necessarily disclose all exceptions in employer contributions to the Fund. Any compensation paid to employees not disclosed to us or made part of the written record was not determinable by us and was not included in our review.

Our procedures related to a review of the employer's payroll records only and did not extend to any financial statements of the contributing employer. The procedures were substantially less in scope than an audit of financial statements of the contributions employer, the objective of which is the expression of an opinion on the contributing employer's financial statements. Accordingly, no such opinion is expressed.

The exceptions to the employer contributions noted are detailed on the accompanying schedules.

Calibre CPA Group, PLLC

7501 WISCONSIN AVENUE | SUITE 1200 WEST | BETHESDA, MD 20814 | 202.331.9880 PHONE | 202.331.9890 FAX
Washington, DC | Chicago, IL | New York, NY | Los Angeles, CA
Calibrecpa.com.



April 29, 2022

Board of Trustees of the
Sheet Metal Workers' National Benefit Funds

### COMPLIANCE AUDIT REPORT

| | |
|---|---|
| Employer Name: | NY Chutes LLC |
| Employer Number: | 141409 |
| Field Work Started: | January 31, 2020 |
| Period Examined: | July 2016 through December 2020 |
| Contact:<br>Title: | Julliane Fox<br>Owner |
| Location of Employer: | 5 Honeyman Road<br>Lebanon, NJ 08833 |
| Location of Audit: | Calibre CPA Group |
| Email Address: | nychutes@gmail.com |
| EIN Tax No. | 47-5122482 |
| Owners/Officers: | Julianne Fox |
| Related companies: | There are no related companies. |



| | |
|---|---|
| Questionnaire completed: | The questionnaire was not completed. |
| Was this a piggyback audit: | Yes, this was a piggyback audit with Local 28. |
| Was a Surety Bond or Equivalency Letter of Credit Provided? | A surety bond or equivalency was not provided. |

Pre-Audit Comments:
A payroll compliance audit was performed on behalf of the Sheet Metal Workers' National Benefit Funds. The contact for this audit was Julianne Fox. Mrs. Fox provided the necessary documentation to complete the audit.

Payroll Reconciliation:
The auditor successfully reconciled payroll to the Form W-3s & 941s for each year of the audit period. Auditor noted, per the 941s, there was no payroll from the 3rd & 4th Qtr. of 2016 as well as no payroll for all of 2017.

Payroll Testing:
Auditor noted the employer did not contribute on any employees during the audit period.

Employee Identification:
Job classifications for all employees were requested. Employees performing covered work were not properly reported. Employer reported some employees to the Local Funds but no contributions were sent to the National Funds.



Hire/Term Testing:
No employees were reported to the National Funds. Auditor picked up employees performing covered work from date of hire.

1099 Testing:
Per Julianne Fox, no Form 1099s were issued during the audit period.

General Ledger Testing:
The employer provided cash disbursements journal for 2018 through 2020. The employer provided checkbook invoices for 2016 and 2017. The auditor reviewed the records and questioned a sample of payees for each year of the audit period. Auditor noted the employer paid individuals not on payroll for covered work. Auditor also noted the employer used PeopleReady in 2020 as temp help. The website for this temp agency shows individuals performing trade work with sheet metal work as a service provided.

NPF vs. Local Comparison:
The auditor noted the employer contributed some hours to the Local Funds but no contributions were sent to the National.

Does your audit include 401k:
This audit did not include any 401K contributions.

Management Notes:
Draft Letter Date:          Draft letter April 21, 2022
Call to Employer:
Manager attempted to reach employer at 973.568.1588 on 4/21/2022 at 1:06PM EST, but was unsuccessful. A VM was left advising the contact that the draft would be sent out today. Please see attached email. The employer disagrees with findings because the employees were non-union working on non union jobs, however the work they performed (per her email) is covered by the CBA. Initial findings remain.

**CALIBRE**
CPA GROUP

April 21, 2022

NY Chutes LLC
5 Honeyman Road
Lebanon, NJ 08833

> RE:  Contributing Employer Compliance Testing of NY Chutes LLC for Sheet Metal
> Workers' National Benefit Funds
> (Employer #141409)

Dear Mrs. Fox:

We have completed our review of the payroll records of NY Chutes LLC. The purpose of our testing was to confirm that contributions were remitted to the above fund(s) utilizing the proper contribution basis and rates for the period July 2016 through December 2020.

Attached is a copy of our compliance audit report, indicating the discrepancies we noted. We ask that you review the compliance audit report and advise us of any adjustments or challenges to our findings with specificity.

**Please contact us within five days of receiving this report April 28, 2022.**

If we do not hear from you by the above date, we will assume you agree with our findings. We are required to submit our report, along with any employer input, to the Fund's Administrative Manager within a reasonable period of time after issuance to the employer. The Fund will review the report and may request additional information.

Given the limits of our testing, the report does not establish that all contributions and remittance data, other than as noted, were properly and fully remitted and reported.

**Please note that additional fees and costs may be due in accordance with the Fund's trust document and collections policy. Because of this do not send payments as a result of this audit until you receive a final bill from the Sheet Metal Workers' National Benefit Funds.**

If there are any questions with regards to this report, please contact me at 202.721.1781 or pparker@calibrecpa.com. We wish to thank you for your assistance in completing this audit.


Sincerely,

*Perry Parker*

Perry Parker

# SHEET METAL WORKERS' NATIONAL BENEFIT FUNDS
## PAYROLL AUDIT SUMMARY

Employer:        NY Chutes LLC

Employer Number:        141409

Audit Period:        July 2016 through December 2020

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | TOTALS |
|------|------|------|------|------|------|--------|
| NPF | $0.00 | $0.00 | $18,091.36 | $35,886.74 | $8,659.02 | $62,637.12 |
| ITI | $0.00 | $0.00 | $130.63 | $259.11 | $62.52 | $452.26 |
| NEMI | $0.00 | $0.00 | $32.66 | $64.78 | $15.63 | $113.07 |
| SMOHIT | $0.00 | $0.00 | $21.78 | $43.19 | $10.42 | $75.39 |
| SASMI | $0.00 | $0.00 | $3,122.41 | $6,314.63 | $1,543.76 | $10,980.80 |
| Underpayments | $0.00 | $0.00 | $21,398.84 | $42,568.45 | $10,291.35 | $74,258.64 |

Explanation of Findings:
A. Failed to report employee in covered classification.
O. Used subcomntractor for covered work.

4/28/2022

| Fund | Rate as of | | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | S |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8/3/2017 | 8/2/2018 | | | | | | | | | |
| NPF | $16.62 | $16.62 | $0.00 | $936.37 | $3,890.24 | $1,595.52 | $1,794.79 | $1,874.74 | $1,318.46 | $1,670.31 | $6 |
| ITI | $0.12 | $0.12 | $0.00 | $6.76 | $28.09 | $11.52 | $12.96 | $13.54 | $9.52 | $12.06 | |
| NEMI | $0.03 | $0.03 | $0.00 | $1.69 | $7.02 | $2.88 | $3.24 | $3.38 | $2.38 | $3.02 | |
| SMOHIT | $0.02 | $0.02 | $0.00 | $1.13 | $4.68 | $1.92 | $2.16 | $2.26 | $1.59 | $2.01 | |
| SASMI | $2.85 | $2.90 | $0.00 | $160.57 | $667.10 | $273.60 | $307.77 | $321.48 | $226.09 | $291.45 | $1 |
| Totals | $19.64 | $19.69 | $0.00 | $1,106.52 | $4,597.13 | $1,885.44 | $2,120.92 | $2,215.40 | $1,558.04 | $1,978.85 | $5 |

| | HOURS | | JAN 160.00 | FEB 160.00 | MAR 219.00 | APR 178.25 | MAY 216.00 | JUNE 170.00 | JULY 176.00 | AUG 200.00 |
|---|---|---|---|---|---|---|---|---|---|---|
| | Rate as of | | | | | | | | | |
| Fund | 8/2/2018 | 8/1/2019 | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG |
| NPF | $16.62 | $16.62 | $2,659.20 | $2,659.20 | $3,639.78 | $2,962.52 | $3,589.92 | $2,825.40 | $2,925.12 | $3,324.00 |
| ITI | $0.12 | $0.12 | $19.20 | $19.20 | $26.28 | $21.39 | $25.92 | $20.40 | $21.12 | $24.00 |
| NEMI | $0.03 | $0.03 | $4.80 | $4.80 | $6.57 | $5.35 | $6.48 | $5.10 | $5.28 | $6.00 |
| SMOHIT | $0.02 | $0.02 | $3.20 | $3.20 | $4.38 | $3.57 | $4.32 | $3.40 | $3.52 | $4.00 |
| SASMI | $2.90 | $2.96 | $464.00 | $464.00 | $635.10 | $516.93 | $626.40 | $493.00 | $510.40 | $592.00 |
| Totals | $19.69 | $19.75 | $3,150.40 | $3,150.40 | $4,312.11 | $3,509.76 | $4,253.04 | $3,347.30 | $3,465.44 | $3,950.00 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ITI | $0.12 | $19.20 | $19.20 | $14.40 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| NEMI | $0.03 | $4.80 | $4.80 | $3.60 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SMOHIT | $0.02 | $3.20 | $3.20 | $2.40 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| SASMI | $2.96 | $473.60 | $473.60 | $355.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Totals | $19.75 | $3,160.00 | $3,160.00 | $2,370.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| O | $ | 57.61 | 200.00 | 11/20/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount f |
| O | $ | 57.61 | 200.00 | 11/27/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount f |
| O | $ | 57.61 | 400.00 | 12/16/2020 | N/A | No | 7.00 | Dividing the J Wage rate by the Amount f |
| O | $ | 57.61 | 300.00 | 12/30/2020 | N/A | No | 6.00 | Dividing the J Wage rate by the Amount f |

**HOURS** 81.00

**Rate as of**

| Fund | 8/1/2019 | 11/1/2020 | TOTAL |
|---|---|---|---|
| NPF | $16.62 | $16.62 | $1,346.22 |
| ITI | $0.12 | $0.12 | $9.72 |
| NEMI | $0.03 | $0.03 | $2.43 |
| SMOHIT | $0.02 | $0.02 | $1.62 |
| SASMI | $2.96 | $3.01 | $241.36 |
| Totals | $19.75 | $19.80 | $1,601.35 |

| From: | NY Chutes LLC |
|---|---|
| To: | Parker, Perry |
| Subject: | Re: [EXT] Re: NY Chutes online entry Local #28 weekly reports & audit |
| Date: | Wednesday, March 30, 2022 3:10:17 PM |
| Attachments: | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |
| | image007.png |
| | image008.png |

Perry:

Yes, Christian Garcia and the temporary helpers had the same job duties as Edwin Rivera on non-union jobs.

Thank you,

Julianne Fox, Director
New York Chutes LLC, a WBE Company
*dba  NY Chutes*
P.O. Box 234
Lebanon, NJ  08833
973-568-1588

On Wed, Mar 30, 2022 at 2:52 PM Parker, Perry <pparker@calibrecpa.com> wrote:

> Thank you for the clarification this was helpful. Did Christian Garcia do the same job duties as Edwin Rivera but only on non-union jobs? Also, for the Jerson, Buono, and Christian group of temps, were they also installing, repairing, and performing routine maintenance at the non-union jobs?



**Perry Parker**                          **| Assistant Manager, Compliance**

**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West

Bethesda, MD 20814

202.721.1781 phone | 202.331.9890 fax

301.752.2412 cell

pparker@calibrecpa.com | www.calibrecpa.com

Connect with us on

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Wednesday, March 30, 2022 2:31 PM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** Re: [EXT] Re: NY Chutes online entry Local #28 weekly reports & audit

Edwin Rivera's job duties include install, repairs and routine maintenance for our non-union customers.  On the Union job, he provided supervision to the Union laborers who were installing a linen chute, because the Union workers had no actual chute installation experience.

The contractors Jerson Tapia, Buona Tfeil, and Christian Donation were temps hired to assist on non-union jobs.  Contractors Cameron Mullin, Carlos Perez and Elijah Vance were temps hired to help move our warehouse.  Carlos Perex is a typ-o--should be Carlos Perez.

Thank you,

Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588

On Wed, Mar 30, 2022 at 11:55 AM Parker, Perry <pparker@calibrecpa.com> wrote:

> Thank you for providing this report. Below are individuals who we need further clarification on the work they performed. Please provide details on the specific job duties each employee performed so we can finish the audit with all needed information.
>
> - Edwin Rivera

- Please provide the daily job duties and work performed by this employee during the audit period. Can you please provide further clarification on the "Union job" hours Edwin was paid for in the 2019 payroll report?

- The below are individuals from the 2018 Cash disbursement report who were not on payroll. Can you please provide the specific job duties and work performed by these individuals.

  - Jerson Tapia
  - Buona Tfeil
  - Christian Donation
  - Cameron Mullin
  - Carlos Perez
  - Elijah Vance
  - Carlos Perex

Thank you,



**Perry Parker | Assistant Manager, Compliance**

**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West

Bethesda, MD 20814

202.721.1781 phone | 202.331.9890 fax

301.752.2412 cell

pparker@calibrecpa.com | www.calibrecpa.com

Connect with us on

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Wednesday, March 30, 2022 11:28 AM
**To:** Lilly Piazza <lilly@cohmlaw.com>
**Cc:** Parker, Perry <pparker@calibrecpa.com>; Sargent, Justin <jsargent@Calibrecpa.com>; Glen Camisa <glen@local28funds.com>; Jack S. Groarke <jsg@cohmlaw.com>; Robert Katuna <rob@local28funds.com>; Teri Brauner <teri@local28funds.com>
**Subject:** [EXT] Re: NY Chutes online entry Local #28 weekly reports & audit

Lilly, etal:

Thank you for clearing this up.  Here is the 2018 CD with payee inserted as requested.

Thank you,

Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588

On Wed, Mar 30, 2022 at 9:21 AM Lilly Piazza <lilly@cohmlaw.com> wrote:

Ms. Fox,

I am responding to your email below on behalf of the auditors at Calibre and our client.

Attached are emails sent by Calibre to NY Chutes requesting a new 2018 cash disbursement report. The report you provided is missing "Payee" names column which was displayed in 2019 and 2020 cash disbursement reports previously provided. Also attached are the 2018 and 2019 provided reports for reference.

Also, Calibre called you on March 3rd in attempt to get further explanation of the work Edwin Rivera performed during the years 2018 through 2020.  As of today, they have not received any emails or calls in response to these requests.  It looks like the messages and phone call were while you were out of Town.   Upon your return you may have missed their emails and voice-mail to you.   As soon as the aforementioned are provided, the submission will be considered complete.

Thank you,


Lilly Piazza, Paralegal

*Colleran O'Hara & Mills LLP*

100 Crossways Park Drive West, Suite 200

Woodbury, New York 11797

P. (516) 248-5757

D. (516) 240-8626

E. lilly@cohmlaw.com

---

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Monday, March 28, 2022 3:31 PM
**To:** teri <teri@local28funds.com>
**Cc:** Glen Camisa <glen@local28funds.com>; Robert Katuna <rob@local28funds.com>
**Subject:** Re: NY Chutes online entry Local #28 weekly reports & audit


Teri, Glen, Robert:


We should be out of the Union and the "zero" weekly reporting requirements by now. We requested withdrawal effective 12/31/2021.


We have given the Calabrese auditors all the source documents that we have for the audit period; most importantly, the tax returns that prove we had no Union activity for the entire audit period.

They have not asked a single question, so can someone please close this, so we can all move on?


Thank you,

Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588


On Wed, Mar 23, 2022 at 12:47 PM teri <teri@local28funds.com> wrote:

Please enter your reports   2/23/22 through 3/23/22

*STATEMENT OF CONFIDENTIALITY* The information contained in this email message and any attachments may be confidential and legally privileged and is intended for the use of the addressee(s) only. If you are not an intended recipient, please: (1) notify me immediately by replying to this message; (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment; and (3) destroy all copies of this message and any attachments.

*STATEMENT OF CONFIDENTIALITY* The information contained in this email message and any attachments may be confidential and legally privileged and is intended for the use of the addressee(s) only. If you are not an intended recipient, please: (1) notify me immediately by replying to this message; (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment; and (3) destroy all copies of this message and any attachments.

*STATEMENT OF CONFIDENTIALITY* The information contained in this email message and any attachments may be confidential and legally privileged and is intended for the use of the addressee(s) only. If you are not an intended recipient, please: (1) notify me immediately by replying to this message; (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment; and (3) destroy all copies of this message and any attachments.

*STATEMENT OF CONFIDENTIALITY* The information contained in this email message and any attachments may be confidential and legally privileged and is intended for the use of the addressee(s) only. If you are not an intended recipient, please: (1) notify me immediately by replying to this message; (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment; and (3) destroy all copies of this message and any attachments.

*STATEMENT OF CONFIDENTIALITY* The information contained in this email message and any attachments may be confidential and legally privileged and is intended for the use of the addressee(s) only. If you are not an intended recipient, please: (1) notify me immediately by replying to this message; (2) do not use, disseminate, distribute or reproduce any part of the message or any attachment; and (3) destroy all copies of this message and any attachments.

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

| | |
|---|---|
| **From:** | NY Chutes LLC |
| **To:** | Sargent, Justin |
| **Cc:** | Parker, Perry |
| **Subject:** | Re: [EXT] Re: Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868 |
| **Date:** | Friday, April 22, 2022 6:49:44 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | image003.png |
| | image004.png |
| | image005.png |
| | image006.png |

We are just going to involve the union on Monday to bring an end to this idiocy.  It has gone for way too long, for nothing.

Thank you,

Julianne Fox, Director
New York Chutes LLC, a WBE Company
*dba  NY Chutes*
P.O. Box 234
Lebanon, NJ  08833
973-568-1588


On Fri, Apr 22, 2022 at 3:20 PM Sargent, Justin <jsargent@calibrecpa.com> wrote:

> Hi Julianne,
>
> We can set up a call for next week.  But as Perry said If is doing covered work Union or not, member or non-member, everything must be reported.
>
> Can you please put your exact rebuttal in writing for us? Because, from your email I'm not seeing why the work shouldn't have been reported. So, I want to make sure we understand exactly your reasoning.
>
> Thanks,
>
>
> **Justin Sargent | Senior Compliance Manager**
>
> **Calibre CPA Group PLLC**
>
> 7501 Wisconsin Avenue, Suite 1200W
>
> Bethesda, MD  20814
>
> 202.721.2440 phone | 740.350.2114 cell
>
> jsargent@calibrecpa.com | www.calibrecpa.com

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Friday, April 22, 2022 3:09 PM
**To:** Parker, Perry <pparker@calibrecpa.com>; Sargent, Justin <jsargent@Calibrecpa.com>
**Subject:** Re: [EXT] Re: Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868

Perry:

It's more complicated than that.  After the <u>one</u> Union job in 2019, our business has been in service and repair for non-union customers.  Our non-union workers are not journeymen, and you have them classified incorrectly.

Please set up a call with the partner for Monday, so we can get the report corrected and we can finally get our bond money back.

Thank you,

Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588

On Fri, Apr 22, 2022 at 1:37 PM Parker, Perry <pparker@calibrecpa.com> wrote:

> To clarify your email below,
>
> You agree as stated in your previous email (attached) that the employees on the draft performed the same job duties. When you say non union work, you are referring to non union job sites not the work performed?
>
> Am I understanding correctly?



**Perry Parker** | **Assistant Manager, Compliance**

**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West

Bethesda, MD 20814

202.721.1781 phone | 202.331.9890 fax

301.752.2412 cell

pparker@calibrecpa.com | www.calibrecpa.com

Connect with us on 

---

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Friday, April 22, 2022 1:23 PM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** Re: [EXT] Re: Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868

Parker,

As we discussed, the inclusion on non union workers doing non union work does not make sense. Businesses are allowed to be union and non union in the same entity and the union work is separate from the non union work.  Non union work does not get pulled into the union.

Please have the partner call us.

Thank you,

Renee Sauer, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588

On Fri, Apr 22, 2022 at 9:14 AM Parker, Perry <pparker@calibrecpa.com> wrote:

That is no problem.



**Perry Parker** | **Assistant Manager, Compliance**

**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West

Bethesda, MD 20814

202.721.1781 phone | 202.331.9890 fax

301.752.2412 cell

pparker@calibrecpa.com | www.calibrecpa.com

Connect with us on

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Friday, April 22, 2022 9:13 AM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** Re: [EXT] Re: Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868

Good morning:

We have another call at 10am.  Can you call at 1pm?

Thank you,

Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588


On Fri, Apr 22, 2022 at 8:41 AM Parker, Perry <pparker@calibrecpa.com> wrote:

Good morning,


Sorry I missed your call, I was out of the office. I am wrapping up some things this morning, I can give you a call at 10 to go over the audit findings.


Thank you,




**Perry Parker**                              **| Assistant Manager, Compliance**

**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West

Bethesda, MD 20814

202.721.1781 phone | 202.331.9890 fax

301.752.2412 cell

pparker@calibrecpa.com | www.calibrecpa.com

Connect with us on


**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Thursday, April 21, 2022 4:52 PM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** [EXT] Re: Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868


Perry:

Please call to explain your reports.  Why are you showing reports with calculations for Local 28 BF on non-union employees and independent contractors?  More importantly,  why do you have NBF calculations for our 2 non-union employees, and independent contractors showing a total underpayment of $46k to the Union's Pension Fund??


Thank you,


Julianne Fox, Director

New York Chutes LLC, a WBE Company

*dba  NY Chutes*

P.O. Box 234

Lebanon, NJ  08833

973-568-1588



On Thu, Apr 21, 2022 at 1:10 PM Parker, Perry <pparker@calibrecpa.com> wrote:

| Citrix Encrypted Email Service |
|---|
| **Perry Parker** has sent you an encrypted message. |
| **Subject:**  Draft audit results of NY Chutes LLC - SMWNBF 141409 & SMW Local 28 Funds 001868<br>**From:**  Perry Parker    pparker@calibrecpa.com<br>**Expires:**  never |
| **View Encrypted Message** |
| Check your email for instructions to activate your account before logging in. |

This message is protected by industry-standard AES 256 bit encryption technology.

**Bismark Agyei**

| | |
|---|---|
| **From:** | Odell, Ellen <eodell@Calibrecpa.com> |
| **Sent:** | Wednesday, May 25, 2022 4:06 PM |
| **To:** | Bismark Agyei; Ken Anderson |
| **Cc:** | Parker, Perry; Sargent, Justin |
| **Subject:** | RE: [EXT] RE: 141409- NY Chutes LLC-ss# |

Thank you for the update!

**Ellen K. Odell | Principal**
Calibre CPA Group PLLC
7501 Wisconsin Avenue, Suite 1200W
Bethesda, MD  20814
**Phone 202.721.1747**
**Cell: 703.963.8626**
**Fax 202.331.9890**
eodell@calibrecpa.com
www.calibrecpa.com
Click here to securely upload files

**From:** Bismark Agyei <BAgyei@smwnbf.org>
**Sent:** Wednesday, May 25, 2022 3:55 PM
**To:** Odell, Ellen <eodell@Calibrecpa.com>; Ken Anderson <KAnderson@smwnbf.org>
**Cc:** Parker, Perry <pparker@calibrecpa.com>; Sargent, Justin <jsargent@Calibrecpa.com>
**Subject:** [EXT] RE: 141409- NY Chutes LLC-ss#

Hi,

Ken is out of the office for the next week and a half. Let's hold off on this until he gets back. I want to confirm with him before giving you an answer.

**From:** Odell, Ellen <eodell@Calibrecpa.com>
**Sent:** Monday, May 23, 2022 11:34 AM
**To:** Bismark Agyei <BAgyei@smwnbf.org>; Ken Anderson <KAnderson@smwnbf.org>
**Cc:** Parker, Perry <pparker@calibrecpa.com>; Sargent, Justin <jsargent@Calibrecpa.com>
**Subject:** FW: 141409- NY Chutes LLC-ss#

Hi Ken and Bismark,
The people on our report without ss#'s were subcontractors found on the general ledger. When we asked about these employees the employer stated that they did work the same as Ed Rivera and Christian Garcia. See email attached that was included with our report. The audit used the same wage rate as what was paid to Christian Garcia and Ed Rivera to determine the hours. As you recall no employees were reported to the NPF. All employees with the exception of Rivera and the temp contractors (no ss#) were reported to the Local Funds.

Do you want us to put the temp subcontractors on the subcontractor spreadsheet?

Thank you!

**Ellen K. Odell | Principal**
Calibre CPA Group PLLC
7501 Wisconsin Avenue, Suite 1200W
Bethesda, MD  20814
**Phone 202.721.1747**

1

**Cell: 703.963.8626**
**Fax 202.331.9890**
eodell@calibrecpa.com
www.calibrecpa.com
Click here to securely upload files

---

**From:** Parker, Perry <pparker@calibrecpa.com>
**Sent:** Monday, May 23, 2022 9:58 AM
**To:** Odell, Ellen <eodell@Calibrecpa.com>
**Subject:** RE: 141409- NY Chutes LLC-ss#

Sounds good!

 **Perry Parker | Assistant Manager, Compliance**
**Calibre CPA Group PLLC**
7501 Wisconsin Avenue, Suite 1200 West
Bethesda, MD 20814
202.721.1781 phone | 202.331.9890 fax
301.752.2412 cell
pparker@calibrecpa.com | www.calibrecpa.com
Connect with us on 

---

**From:** Odell, Ellen <eodell@Calibrecpa.com>
**Sent:** Monday, May 23, 2022 9:51 AM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** RE: 141409- NY Chutes LLC-ss#

Probably, but please let me know how you put up hours. Did you get wages from the gl and use the prevailing wage rate?
How did you know that they were doing covered work.

I want to get back to them with those questions.

Follow up with all outstanding Teamster that have not been scheduled or in process. I have a conference all at 10, I will call you around 11.

**Ellen K. Odell | Principal**
**Calibre CPA Group PLLC**
7501 Wisconsin Avenue, Suite 1200W
Bethesda, MD  20814
**Phone 202.721.1747**
**Cell: 703.963.8626**
**Fax 202.331.9890**
eodell@calibrecpa.com
www.calibrecpa.com
Click here to securely upload files

---

**From:** Parker, Perry <pparker@calibrecpa.com>
**Sent:** Monday, May 23, 2022 9:04 AM
**To:** Odell, Ellen <eodell@Calibrecpa.com>
**Subject:** FW: 141409- NY Chutes LLC-ss#

Ellen,

Good morning! Did the Fund respond if they wanted us to revise the reports? Let me know I can work on that today!

 **Perry Parker | Assistant Manager, Compliance**
**Calibre CPA Group PLLC**

7501 Wisconsin Avenue, Suite 1200 West
Bethesda, MD 20814
202.721.1781 phone | 202.331.9890 fax
301.752.2412 cell
pparker@calibrecpa.com | www.calibrecpa.com
Connect with us on

---

**From:** Odell, Ellen <eodell@Calibrecpa.com>
**Sent:** Friday, May 20, 2022 2:01 PM
**To:** BAgyei@smwnbf.org; Ken anderson (KAnderson@smwnbf.org) <kanderson@smwnbf.org>
**Cc:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** RE: 141409- NY Chutes LLC-ss#

HI All,
I just wanted to let you know that we will get back to you on Monday. Perry has been on vacation and we will get back to you on Monday.

**Ellen K. Odell | Principal**
**Calibre CPA Group PLLC**
7501 Wisconsin Avenue, Suite 1200W
Bethesda, MD 20814
**Phone 202.721.1747**
**Cell: 703.963.8626**
**Fax 202.331.9890**
**eodell@calibrecpa.com**
**www.calibrecpa.com**
Click here to securely upload files

---

**From:** Odell, Ellen
**Sent:** Thursday, May 19, 2022 9:54 AM
**To:** BAgyei@smwnbf.org; Ken anderson (KAnderson@smwnbf.org) <kanderson@smwnbf.org>
**Cc:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** 141409- NY Chutes LLC-ss#

Hi Ken and Bismark,
The people who were not reported were independent contractors, and the employer stated they do not have ss#s. Should we move these employees to the subcontractor spreadsheet?

**Ellen K. Odell | Principal**
**Calibre CPA Group PLLC**
7501 Wisconsin Avenue, Suite 1200W
Bethesda, MD 20814
**Phone 202.721.1747**
**Cell: 703.963.8626**
**Fax 202.331.9890**
**eodell@calibrecpa.com**
**www.calibrecpa.com**
Click here to securely upload files

---

**From:** NY Chutes LLC <nychutes@gmail.com>
**Sent:** Wednesday, April 20, 2022 2:29 PM
**To:** Parker, Perry <pparker@calibrecpa.com>
**Subject:** [EXT] Re: NY Chutes LLC

Perry:

We do not have SS#'s for the temporary help who were paid as independent contractors.

Thank you,

Julianne Fox, Director
New York Chutes LLC, a WBE Company
*dba  NY Chutes*
P.O. Box 234
Lebanon, NJ  08833
973-568-1588

On Tue, Apr 19, 2022 at 2:03 PM Parker, Perry <pparker@calibrecpa.com> wrote:

| Citrix Encrypted Email Service |
| --- |

**Perry Parker** has sent you an encrypted message.

| **Subject:** | NY Chutes LLC | |
| --- | --- | --- |
| **From:** | Perry Parker | pparker@calibrecpa.com |
| **Expires:** | never | |

| View Encrypted Message |
| --- |

Check your email for instructions to activate your account before logging in.

This message is protected by industry-standard AES 256 bit encryption technology.

# **EXHIBIT 8**

**SHEET METAL WORKERS' NATIONAL BENEFIT FUNDS**
**PAYROLL AUDIT SUMMARY**

Employer:          NY Chutes LLC

Employer Number:   141409

Audit Period:      July 2016 through December 2020

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | TOTALS |
|---|---|---|---|---|---|---|
| NPF | $0.00 | $0.00 | $0.00 | $9,265.00 | $1,346.22 | $10,611.22 |
| ITI | $0.00 | $0.00 | $0.00 | $66.90 | $9.72 | $76.62 |
| NEMI | $0.00 | $0.00 | $0.00 | $16.72 | $2.43 | $19.15 |
| SMOHIT | $0.00 | $0.00 | $0.00 | $11.15 | $1.62 | $12.77 |
| SASMI | $0.00 | $0.00 | $0.00 | $1,616.64 | $241.36 | $1,858.00 |
| **Total Underpayments** | **$0.00** | **$0.00** | **$0.00** | **$10,976.41** | **$1,601.35** | **$12,577.76** |

Explanation of Findings:
O. Used subcomntractor for covered work.
Z. Failed to report additional hours from Wilkinson Hi-Rise Job.

Calibre Revised Audit Report

3/3/2023

SHEET METAL WORKERS' NATIONAL BENEFIT FUNDS

| EMPLOYER NUMBER: | 141409 | PAYROLL AUDIT PERIOD: | July 2016 through December 2020 | PRIMARY EXPLANATION OF FINDINGS: |
|---|---|---|---|---|
| LOCAL UNION: | 28 | EMPLOYER NAME: | NY Chutes LLC | Z. Failed to report additional hours from Wilkinson Hi-Rise Job. |
| AREA: | Y00 | EMPLOYER ADDRESS: | 5 Honeyman Road Lebanon, NJ 08833 | |
| INDUSTRY CODE: | 01 | CONTACT & PH#: | Fox Julianne   804-218-6410 | |
| CONTRACT #: | 0282501 | EMAIL: | nychutes@gmail.com | |
| YEAR: | 2019 | | SCHEDULE OF HOURS | |

| SS# | EMPLOYEE NAME | Last 4 of SS# | CLASS | HIRE | ELIGIBLE | TERM | NOTE | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| xxx-xx-xxxx | Uknown | | J | | | | Z | | | 557.46 | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | HOURS | 0.00 | 0.00 | 557.46 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 557.46 |

*Hours calculation attached.

| Fund | Rate as of 8/2/2018 | JAN | FEB | MAR | APR | MAY | JUNE | JULY | AUG | SEP | OCT | NOV | DEC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NPF | $16.62 | $0.00 | $0.00 | $9,265.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $9,265.00 |
| ITI | $0.12 | $0.00 | $0.00 | $66.90 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $66.90 |
| NEMI | $0.03 | $0.00 | $0.00 | $16.72 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $16.72 |
| SMOHIT | $0.02 | $0.00 | $0.00 | $11.15 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $11.15 |
| SASMI | $2.90 | $0.00 | $0.00 | $1,616.64 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1,616.64 |
| Totals | $19.69 | $0.00 | $0.00 | $10,976.41 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10,976.41 |

**Wilkenson Hi-Rise Estimation of Hours**

| | | |
|---|---|---:|
| Invoice Amount | $ | 35,000.00 |
| Journeyman wage rate (8/2/2018) | $ | 54.97 |
| Total Hours | | 636.71 |
| Reported Hours | | 79.25 |
| Outstanding Hours | | 557.46 |

# SHEET METAL WORKERS' NATIONAL BENEFIT FUNDS

| | | |
|---|---|---|
| **EMPLOYER CODE:** 141409 | **PAYROLL AUDIT PERIOD:** January 2019 through December 2020 | **PRIMARY EXPLANATION OF FINDINGS:** |
| **LOCAL UNION:** 28 | **EMPLOYER NAME:** NY Chutes LLC | O. Used subcomntractor for covered work. |
| **AREA:** Y00 | **EMPLOYER ADDRESS:** 5 Honeyman Road Lebanon, NJ 08833 | |
| **INDUSTRY CODE:** 01 | **CONTACT & PH#:** Julianne Fox | |
| **CONTRACT #:** 0282501 | **EMAIL:** nychutes@gmail.com | |

**YEAR:** 2020          **SCHEDULE OF SUBCONTRACTORS PERFORMING COVERED WORK**

| CONTRACTOR NAME | FEIN | NOTE | WAGE RATE | AMOUNT FROM INVOICE/1099/GL | TRANSACTION/ INVOICE DATE | INVOICE # | HOURS ON INVOICE? | HOURS | How were hours determined? |
|---|---|---|---|---|---|---|---|---|---|
| PeopleReady | | O | $ 56.61 | $ 210.00 | 4/3/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 200.00 | 4/24/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 704.00 | 5/15/2020 | N/A | No | 13.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 352.00 | 6/12/2020 | N/A | No | 7.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 200.00 | 6/12/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 704.00 | 8/18/2020 | N/A | No | 13.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 56.61 | $ 200.00 | 9/3/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 57.61 | $ 600.00 | 11/13/2020 | N/A | No | 11.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 57.61 | $ 200.00 | 11/20/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 57.61 | $ 200.00 | 11/27/2020 | N/A | No | 4.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 57.61 | $ 400.00 | 12/16/2020 | N/A | No | 7.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| PeopleReady | | O | $ 57.61 | $ 300.00 | 12/30/2020 | N/A | No | 6.00 | Dividing the J Wage rate by the Amount from Cash disbursement report. |
| | | | | | | | | | |

**HOURS** $81.00

| | Rate as of | | |
|---|---|---|---|
| **Fund** | **8/1/2019** | **11/1/2020** | **TOTAL** |
| NPF | $16.62 | $16.62 | $1,346.22 |
| ITI | $0.12 | $0.12 | $9.72 |
| NEMI | $0.03 | $0.03 | $2.43 |
| SMOHIT | $0.02 | $0.02 | $1.62 |
| SASMI | $2.96 | $3.01 | $241.36 |
| Totals | $19.75 | $19.80 | $1,601.35 |

Calibre Revised Audit Report

3/3/2023